## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WATCH TOWER BIBLE AND TRACT SOCIETY OF PENNSYLVANIA<br>200 Watchtower Drive, Patterson, NY 12563,<br><br>Plaintiff,<br><br>v.<br><br>THE RUSSIAN FEDERATION<br>Ministry of Foreign Affairs<br>Smolenskaya-Sennaya Ploshchad, 32/34<br>Moscow, Russia 119200;<br><br>MINISTRY OF HEALTH OF<br>THE RUSSIAN FEDERATION<br>Ministry of Foreign Affairs<br>Smolenskaya-Sennaya Ploshchad, 32/34<br>Moscow, Russia 119200; and<br><br>FEDERAL STATE BUDGETARY INSTITUTION "V.A. ALMAZOV NATIONAL MEDICAL RESEARCH CENTRE" OF THE MINISTRY OF HEALTH OF THE RUSSIAN FEDERATION<br>Ulitsa Akkuratova, 2<br>St. Petersburg, Russia 197341,<br><br>Defendants. | CIVIL ACTION NO. **24-cv-2523**<br><br>**COMPLAINT** |

Watch Tower Bible and Tract Society of Pennsylvania ("Watch Tower" or "Plaintiff") hereby brings this action against the Russian Federation, the Ministry of Health of the Russian Federation ("Ministry of Health"), and the Federal State Budgetary Institution "V.A. Almazov National Medical Research Centre" of the Ministry of Health of the Russian Federation ("Almazov"), which are collectively referred to as "Russia" or "Defendants." As discussed further herein, Almazov is the alter ego and/or an agency or instrumentality of the Ministry of Health and the Russian Federation. Plaintiff, with knowledge as to itself and as to the facts within its possession, and otherwise on information and belief, hereby alleges:

# I. PRELIMINARY STATEMENT

1.     This action arises out of, and seeks a remedy for, (1) Russia's unlawful expropriation of Watch Tower's property, as well as (2) the direct harms Russia has caused Watch Tower to suffer in the United States through its commercial activities since that expropriation.  The facts giving rise to this case, however, are part of a broader, documented, and widely condemned campaign of discrimination and persecution of Jehovah's Witnesses by the Russian Federation.  Currently there are 137 Jehovah's Witnesses (men and women, ages 27-73) incarcerated in Russia for terms spanning two months to eight years due to their religious activity.[1]

2.     "Jehovah's Witnesses have been present in Russia since 1891.  They were banned after the Bolshevik Revolution in 1917 and criminally prosecuted for practising their faith in the USSR."  *Taganrog LRO and Others v. Russia*, Eur. Ct. H.R., App. No. 32401/10 and 19 others, ¶ 5 (June 7, 2022), https://hudoc.echr.coe.int/fre?i=001-217535 (hereinafter "*Taganrog*").

3.     Following the fall of the Soviet Union, and after nearly a century of persecution, Jehovah's Witnesses in Russia were able to openly practice their faith.  Subsequently, Watch Tower (a charitable organization) established a public presence in Russia by, among other things, obtaining title to real property in St. Petersburg, Russia, for the purpose of facilitating the peaceful and lawful religious activities of Jehovah's Witnesses.

4.     Tragically, the ability of Jehovah's Witnesses to freely and openly worship in Russia was cut short.  Since at least 2007, the Russian Federation has undertaken a coordinated,

---

[1] *See, e.g.,* U.S. Comm'n on Int'l Religious Freedom, *2024 Annual Report*, at 42, https://www.uscirf.gov/sites/default/files/2024-05/2024%20Annual%20Report.pdf; *see* Press Statement, U.S. Dep't of State, Religious Freedom Concerns in Russia (Feb. 25, 2021), https://www.state.gov/religious-freedom-concerns-in-russia/; *see Imprisoned for Their Faith— Russia*, JW.ORG, https://www.jw.org/en/news/region/russia/jehovahs-witnesses-in-prison/ (last visited Aug. 30, 2024).

deliberate, and sustained campaign of disinformation, discrimination, and persecution of Watch Tower and Jehovah's Witnesses.  This attack campaign culminated in Russia's illegal seizure of Watch Tower's property and its ongoing occupation by the Ministry of Health and Almazov.[2]

5.    As discussed herein, given Russia's brazen and illegal conduct, and the direct effects of that illegal activity in the United States, this Court has both subject matter and personal jurisdiction over the Russian Federation, the Ministry of Health, and Almazov pursuant to the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1330, 1602 *et seq.* ("FSIA").  To remedy the harms suffered, Watch Tower respectfully requests that it be awarded compensatory damages from Defendants and that punitive damages be awarded against Almazov for its outrageous, intentional, and unlawful conduct.

## II.  THE PARTIES

6.    Plaintiff Watch Tower Bible and Tract Society of Pennsylvania is a nonprofit corporation that is incorporated in the Commonwealth of Pennsylvania and recognized under § 501(c)(3) of the Internal Revenue Code, is authorized to conduct activities in the State of New York, and has its principal office in the Town of Warwick, New York.  Watch Tower is a charitable organization that exists to support the worldwide religious activity of Jehovah's Witnesses, who peacefully practice their faith in more than 230 countries.

7.    Defendant Russian Federation is a "foreign state" within the meaning of 28 U.S.C. § 1603(a) and is responsible for the theft of Plaintiff's property in Russia.  The U.S. Department

---

[2] *See* Ann A. Simmons, *Russia Seizes Property From Jehovah's Witnesses After Banning Group*, WALL ST. J. (Mar. 6, 2019, 10:26 AM), https://www.wsj.com/articles/russia-seizes-property-from-jehovahs-witnesses-after-banning-group-11551885978; *see Russia Confiscates Former Branch Property*, JW.ORG (June 15, 2018), https://www.jw.org/en/news/region/russia/confiscates-former-branch-property/.

of State has designated the Russian Federation a "Country of Particular Concern" under the International Religious Freedom Act of 1998, 22 U.S.C. §§ 6401 *et seq.*, due to its systematic persecution of religious minority communities, including Jehovah's Witnesses.[3]

8.      Defendant Ministry of Health of the Russian Federation is a political subdivision and/or integral part of the Russian Federation and is thus a "foreign state" under 28 U.S.C. § 1603(a) and is responsible for the ongoing trespass and use of Plaintiff's property in Russia. Although, broadly speaking, the Ministry of Health is the Federation's executive body responsible for drafting and implementing health policy, it also engages in various commercial activities, including property management, educational services, and coordination of medical and scientific research.[4]  The Ministry of Health is headed by the Minister of Health of the Russian Federation, who is a senior official within the Russian Government.  Thus, the Ministry of Health is ultimately directed, influenced, and controlled by the Russian Federation.

9.      Defendant Federal State Budgetary Institution "V.A. Almazov National Medical Research Centre" of the Ministry of Health of the Russian Federation (Cyrillic: Федеральное Государственное Бюджетное Учреждение "Национальный Медицинский Исследовательский Центр Имени В.А. Алмазова" Министерства Здравоохранения Российской Федерации) (also known as "Federal State Budgetary Institution 'Almazov National Medical Research Centre' of the Ministry of Health of the Russian Federation," "Almazov National Medical Research Centre," and/or "Almazov") is a state-owned, state-funded, and state-run medical research facility that is, has been, and continues to be under the control of the Russian

---

[3] *See* Press Statement, U.S. Dep't of State, Religious Freedom Designations (Jan. 4, 2024), https://www.state.gov/religious-freedom-designations/.
[4] *See Ministry of Health of the Russian Federation*, THE RUSSIAN GOVERNMENT, http://government.ru/en/department/23/events/ (last visited Aug. 30, 2024).

Federation and/or Ministry of Health or their predecessors and is responsible for the ongoing trespass and use of Plaintiff's property in Russia. Almazov's principal place of business is located in Russia at 197341 St. Petersburg, Ulitsa Akkuratova, 2 (Cyrillic: 197341, Санкт-Петербург, ул. Аккуратова, д. 2). Almazov is an alter ego and/or agent of the Russian Federation because, among other things and as further discussed below, the Russian Federation founded and established Almazov as a "federal state budgetary institution" and, as such, Almazov is dominated by the Russian Federation and the Ministry of Health, which issue policies, orders, and/or directives to Almazov (including those involving commercial activities) that Almazov abides by and that cause it to act on the Russian Federation's behalf.[5] Almazov is also an "agency or instrumentality" of Russia as defined in 28 U.S.C. § 1603(b) because Almazov (1) is a separate legal entity; (2) is an organ or political subdivision of Russia; and (3) it is not a citizen of any state of the United States nor was it created under the laws of a third country. Accordingly, Almazov is a "foreign state," as defined in 28 U.S.C. § 1603(a), because it is an "agency or instrumentality" and/or the alter ego of the Russian Federation.

### III. JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over the claims asserted herein under 28 U.S.C. § 1330(a), which provides that "[t]he district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state" within the meaning of 28 U.S.C. § 1603(a), so long as an exception to foreign sovereign immunity is established under one of the provisions contained in 28 U.S.C. §§ 1605-1607. One exception to

---

[5] *See, e.g., History of the Almazov National Medical Research Centre*, ALMAZOV NATIONAL MEDICAL RESEARCH CENTRE, http://www.almazovcentre.ru/?page_id=121&lang=en (last visited Aug. 30, 2024); *see Contacts*, ALMAZOV NATIONAL MEDICAL RESEARCH CENTRE (hereinafter "ALMAZOV"), http://www.almazovcentre.ru/?page_id=673&lang=en (last visited Aug. 30, 2024).

Defendants' sovereign immunity exists under 28 U.S.C. § 1605(a)(2), because the claims in this action are "based upon . . . an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." Another exception to Defendants' sovereign immunity exists under 28 U.S.C. § 1605(a)(3), because Plaintiff's claims also arise out of Defendants' taking of Plaintiff's property in violation of international law. Consequently, as described herein, Defendants are not immune from suit under § 1605(a)(2) and/or § 1605(a)(3), and this Court has subject matter jurisdiction.

11.     This Court has personal jurisdiction over the Russian Federation, the Ministry of Health, and Almazov under 28 U.S.C. § 1330(b) and 28 U.S.C. § 1605(a), and Rule 4(k)(2) of the Federal Rules of Civil Procedure.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(f)(4) because this suit is brought against a foreign state and/or its political subdivisions.

### IV.  FACTUAL ALLEGATIONS

13.     Plaintiff realleges and incorporates herein by reference the preceding paragraphs as if fully set forth herein at length.

### A.  Plaintiff Watch Tower and Jehovah's Witnesses

14.     Plaintiff Watch Tower, a nonprofit corporation established in 1884, exists to support the peaceful worship of the religious community of Jehovah's Witnesses worldwide.

15.     Over 80 years ago, the U.S. Supreme Court noted that "Watch Tower Bible and Tract Society, an organization incorporated for the purpose of preaching the Gospel of God's Kingdom" is "an organization for Jehovah's Witnesses, an evangelical group, founded upon and drawing inspiration from the tenets of Christianity" who "spread their teachings . . . by house to

house visits." *Largent v. State of Texas*, 318 U.S. 418, 420 (1943) ("The Witnesses look upon their work as Christian and charitable").

16.     Among other things, directly and indirectly, Watch Tower supports Jehovah's Witnesses worldwide who, as part of their worship, help people in need, provide disaster relief, and construct and maintain places of worship (known as "Kingdom Halls" and "Assembly Halls") and other facilities used to further Jehovah's Witnesses' Bible educational work.  This worldwide work is funded entirely by voluntary donations.[6]

17.     Watch Tower also directly assists Jehovah's Witnesses in their Bible education activities by publishing Bibles, producing and publishing Bible-based religious literature, and—significantly for the purposes of this suit—by owning properties and facilities that serve as places for worship and for the administration of the local activities of Jehovah's Witnesses as they peacefully practice and observe their faith.

18.     As discussed herein, following the fall of the Soviet Union, Watch Tower established a public presence in Russia and owned real property, such as the religious administrative center near St. Petersburg that was later illegally seized by Defendants.

19.     Although the Russian Federation is engaged in broader attacks on Jehovah's Witnesses which non-partisan organizations condemn as "violat[ing] the pluralism of thought and belief that is foundational to a democratic society,"[7] it is Defendants' discriminatory and illegal

---

[6] *See, e.g., About Jehovah's Witnesses*, JW.ORG, https://www.jw.org/en/jehovahs-witnesses (last visited Aug. 30, 2024); *What is the Watch Tower Bible and Tract Society?*, JW.ORG, https://www.jw.org/en/jehovahs-witnesses/faq/watchtower-society/ (last visited Aug. 30, 2024); *How is the Work of Jehovah's Witnesses Financed?*, JW.ORG, https://www.jw.org/en/jehovahs-witnesses/faq/donations-worldwide-work-finances-money/ (last visited Aug. 30, 2024).
[7] Human Rights Watch, *Russia: Court Bans Jehovah's Witnesses* (April 20, 2017, 12:37 PM), www.hrw.org/news/2017/04/20/russia-court-bans-jehovahs-witnesses.

expropriation of Watch Tower's property and the events and consequences surrounding and following that theft which constitute the basis of this Complaint.

### B.  The Administrative Centre of Jehovah's Witnesses in Russia

20.     Although Jehovah's Witnesses have been present in Russia since 1891, after nearly a century of religious persecution, they were finally able to openly worship and freely and publicly associate with other adherents of their religious community when the Soviet legislature enacted the Freedom of Conscience and Religious Associations Act in 1990.[8]

21.     Following these developments, Soviet authorities registered the "Administrative Centre of the Religious Organisations of Jehovah's Witnesses in the Soviet Union," which became the national religious entity for Jehovah's Witnesses.

22.     On April 29, 1999, the Russian Federation, pursuant to its newly enacted Federal Law on the Freedom of Conscience and Religious Associations, re-registered this religious entity as the "Administrative Centre of Jehovah's Witnesses in Russia" ("Administrative Centre").

23.     During this time, local congregations of Jehovah's Witnesses in Russia registered as Local Religious Organizations ("LROs") in furtherance of their religious activity.

24.     By 2017, approximately 400 LROs enjoyed legal status and facilitated the worship of over 175,000 individual Jehovah's Witnesses throughout Russia.  As discussed below, the Russian Federation ordered that the Administrative Centre and the LROs in Russia be liquidated and that all of the properties owned by the Administrative Centre, the LROs, and Watch Tower be expropriated without compensation.

---

[8] *See Soviets Adopt Law on Religious Freedom*, N.Y. TIMES (Sept. 27, 1990) at A3; https://www.nytimes.com/1990/09/27/world/soviets-back-law-on-religious-freedom.html.

### C. **The Bethel Facility in Russia**

25.     In the early 1990's, with Watch Tower's assistance, the Administrative Centre purchased and renovated a complex of buildings in St. Petersburg, Russia. This "Bethel Facility"—known to Jehovah's Witnesses as "Bethel" (from the Hebrew word meaning "House of God")—is located at the following address:  197739 St. Petersburg, pos. Solnechnoye, ul. Srednyaya, d. 6 (Cyrillic: 197739, Санкт-Петербург, поселок Солнечное, Средняя улица, дом 6). *See* Exhibit A.[9]

26.     Until 2017, when the Russian Federation stole the Bethel Facility, this property served as a place of worship and the national headquarters for Jehovah's Witnesses in Russia. At all relevant times, the Bethel Facility was used by Jehovah's Witnesses to support the practice of their faith. It was staffed by approximately 300 full-time ministers of Jehovah's Witnesses, all members of a religious order, who lived and worked at that facility as part of their religious calling.

27.     Throughout the 1990s, the Administrative Centre owned and maintained the Bethel Facility. Eventually, though, the Administrative Centre became interested in transferring ownership of the Bethel Facility to Watch Tower, whose global mission is to support the worship of Jehovah's Witnesses worldwide.

28.     In connection with this property transfer, Watch Tower registered as a foreign legal entity with the Russian Federation's State Revenue Inspectorate in June 2000. *See* Exhibit B. As a registered foreign legal entity, Watch Tower was required to pay land and property taxes in Russia, unlike the Administrative Centre, a Russian religious entity, that was tax exempt.

---

[9] The exhibits referenced in the Complaint are attached as Exhibits A to S to the Declaration of Paul D. Polidoro (Exhibit 1 hereto) and are hereby incorporated by reference to the Complaint.

29.     On March 1, 2000, the Administrative Centre executed a Gift Contract that transferred to Watch Tower ownership and title of the real property, including ten buildings, then comprising the Bethel Facility.  *See* Exhibit C.

30.     On March 29, 2000, the Russian Federation recognized this lawful transfer of property ownership to Watch Tower when the transfer was duly registered with the St. Petersburg City Bureau of Registration of Rights to Real Property, as reflected in the Russian Federation's Unified State Register of Rights to Real Property and Related Transactions.  *See* Exhibit D.

31.     Thereafter, Watch Tower and the Administrative Centre executed contracts dated May 24, 2000, and November 20, 2000, wherein Watch Tower authorized the Administrative Centre, in its capacity as a religious organization, to continue using, operating, and maintaining the Bethel Facility now owned by Watch Tower.  *See* Exhibit E and Exhibit F.

32.     On November 14, 2000, and December 27, 2000, the Russian Federation recognized the contracts for uncompensated use between Watch Tower and the Administrative Centre to be lawful and fully compliant with Russian law when these executed contracts were duly registered with the St. Petersburg City Bureau of Registration of Rights to Real Property.  *See* Exhibit E at 4 and Exhibit F at 3.

33.     After these contracts were fully executed and registered with the Russian government, Watch Tower owned the Bethel Facility and the Administrative Centre used the Facility, all without incident and with the Russian Federation's knowledge and approval.  For years, Russia levied taxes on Watch Tower, Watch Tower paid these property taxes, and Russian government officials accepted Watch Tower's tax payments as the legitimate and lawful owner of the Bethel Facility.

34.     Because the arrangement between Watch Tower and the Administrative Centre benefited them both and allowed Watch Tower to expand its chartered objectives of supporting Jehovah's Witnesses worldwide, they agreed to a second transfer of property.

35.     On September 17, 2010, the Administrative Centre executed a second Gift Contract that transferred to Watch Tower ownership and title of additional buildings and plots of land, all of which were subsequently subsumed within Watch Tower's Bethel Facility.  *See* Exhibit G. Again, the Russian Federation recognized this lawful transfer of property ownership to Watch Tower when this transfer was duly registered with the St. Petersburg City Bureau of Registration of Rights to Real Property on October 23, 2010.  *Id.* at 4-5.

36.     On July 28, 2011, Watch Tower and the Administrative Centre executed a contract permitting the Administrative Centre to continue using the additional buildings and land that had been transferred to Watch Tower and added to the Bethel Facility.  Like the prior agreements, this agreement was conditioned on the Administrative Centre maintaining the Bethel Facility and making improvements to the land and buildings now owned by Watch Tower.  *See* Exhibit H.

37.     On October 5, 2011, the Russian Federation recognized the use contract between Watch Tower and the Administrative Centre to be lawful and fully compliant with Russian law when this signed contract was duly registered with the St. Petersburg City Bureau of Registration of Rights to Real Property.  *See* Exhibit H at 5-6.

38.     At all times relevant to this action, Watch Tower was the legal and registered owner of the Bethel Facility, a complex of buildings and land that was assigned a "cadastral number" (a unique identification number assigned to property) by the Russian Federation.  As the owner of the Bethel Facility, Watch Tower was responsible for paying, and did pay, to the Russian Federation all land and property taxes imposed on the Bethel Facility from 2000 to 2017 (when

Russia stole the Bethel Facility from Watch Tower).  Based on available financial records, Watch Tower has paid more than 172 million Russian rubles (approximately 3 million U.S. dollars at the exchange rate in 2017) in land and property taxes for the Bethel Facility to the Russian Federation.

39.    If the Administrative Centre held ownership and had been the legal titleholder to the Bethel Facility, Watch Tower would not have been responsible for these taxes under Russian law.  For some 17 years the Russian Federation repeatedly recognized and reaffirmed that Watch Tower was the lawful owner and title holder of the Bethel Facility each time it taxed Watch Tower on the basis of Watch Tower's ownership of the Bethel Facility, each time it inspected the Bethel Facility, and each time it required Watch Tower, as the property owner, to provide representatives to interface with Russian government officials.  At no time between 2000 and 2017 did the Russian Federation dispute the validity of the contracts between Watch Tower and the Administrative Centre.

### D.   Russia's Targeted Campaign of Persecution Against Jehovah's Witnesses

40.    Regrettably, religious freedom and expression in Russia were short lived, as the Russian Federation began a targeted campaign of persecution against the entire community of Jehovah's Witnesses.

41.    The Russian Federation amended its Suppression of Extremism Act, Federal Law No. 114-FZ, 25 July 2002 ("The Extremism Act") to permit the criminal prosecution of Jehovah's Witnesses and peaceful religious organizations like Watch Tower and the Administrative Centre.

42.    The Extremism Act, among other things, empowers the Russian Federation to liquidate "extremist" organizations and seize their property without compensation.

43.     The Russian Federation has used the Extremism Act to not only persecute and prosecute individual Jehovah's Witnesses and members of other religious minorities, but also to illegally seize property belonging to Jehovah's Witnesses individually and collectively.

44.     In January 2007, Deputy Prosecutor General Viktor Yakovlevich Grin, acting as an agent on behalf of the Russian Federation, issued a circular to regional prosecutors asserting without basis that Jehovah's Witnesses presented a public threat, namely that:

> Various branches of foreign religious and charitable organisations operate in Russia, whose activities do not formally violate the provisions of Russian law but quite often contribute to the escalation of tensions in society. Representatives of foreign religious associations (Jehovah's Witnesses, Unification Church, Church of Scientology, etc.), followers of various Oriental beliefs, and followers of Satanism form branches that frequently carry out activities harmful to the moral, mental, and physical health of their members. *Taganrog*, ¶ 8.

45.     In this circular, Deputy Prosecutor General Grin directed Russian prosecutors, who act as agents of the Russian Federation, "[t]o check whether territorial bodies of the [telecoms regulator Roskomnadzor] . . . properly execute their legal duty to uncover extremist material in the media belonging to religious associations (Church of Scientology, Jehovah's Witnesses, and other religious organisations that have their own printing facilities)." *Taganrog*, ¶ 8.

46.     Thereafter, the Russian Federation began terrorizing local congregations of Jehovah's Witnesses throughout Russia, as well as individuals and families. The Russian state police raided dozens of homes of Jehovah's Witnesses and Kingdom Halls, during which they discovered so-called "extremist" materials, such as Bibles and religious pamphlets. At times, law enforcement officers planted these materials prior to initiating a raid. As *The Moscow Times* reported: "The men who stormed into the hall were armed with handguns and clad in masks and bullet proof vests, as if prepared for a shootout. Inside, several dozen worshipers, many of whom

were children or elderly, were in the midst of a Bible reading.  The raid, led by the police and Federal Security Services (FSB) officers . . . targeted the Jehovah's Witnesses[.]"[10]

47.    The Russian Federation continued to escalate its campaign of disinformation, discrimination, and persecution against Jehovah's Witnesses, the Administrative Centre, and Watch Tower, with an eye toward taking Watch Tower's property.

48.    On January 27, 2014, Deputy Chief S.P. Akishin of the Federal Security Services (FSB), acting as an agent of the Russian Federation, informed other Russian officials that the Office of the Prosecutor General was preparing to liquidate the Administrative Centre, stating: "Currently, the Russian Prosecutor General's Office, in cooperation with other Russian law-enforcement agencies, is preparing to submit a claim to the [Russian Federation] Supreme Court to declare the organisation 'Administrative Centre of Jehovah's Witnesses in Russia' extremist, to liquidate it, and to ban its activity in this country."  *See* Exhibit I.

49.    Following the issuance of this January 27, 2014, letter, the Russian Federation took a number of actions, each of which violated international law, including, but not limited to:

     a.    On November 12, 2014, the Supreme Court of Russia upheld the Federation's liquidation of the LRO of Jehovah's Witnesses in Samara and the confiscation of its property as an alleged "extremist organisation."  *See Taganrog*, ¶¶ 62-64.

---

[10] Evan Gershkovich, *Russia's Crackdown on Jehovah's Witnesses Begins with a Foreigner*, THE MOSCOW TIMES (April 27, 2018), https://www.themoscowtimes.com/2018/04/27/russia-crackdown-jehovah-witnesses-begins-with-a-foreigner-a61288; *see Brother Yuriy Zalipayev Faces Two Years in Prison in Russia*, JW.ORG (Sept. 23, 2020), https://www.jw.org/en/news/region/russia/Brother-Yuriy-Zalipayev-Faces-Two-Years-in-Prison-in-Russia/; *see* Patrick Reevell, *Russia's mysterious campaign against Jehovah's Witnesses*, abcnews.com (July 18, 2021, 10:48 AM), https://abcnews.go.com/International/russias-mysterious-campaign-jehovahs-witnesses/story?id=78629389.

b.   On December 2, 2014, the Russian Federation banned and blocked the purportedly "extremist" official website of Jehovah's Witnesses (jw.org) in Russia.  Thereafter, on July 21, 2015, the Russian Federation's Ministry of Justice added the website jw.org to Russia's Federal List of Extremist Materials.  *See Taganrog*, ¶¶ 80-85.

c.   On April 20, 2017, the Supreme Court of Russia ordered the liquidation of the Administrative Centre as an "extremist organisation" and of all LROs of Jehovah's Witnesses and the confiscation of all properties used by Jehovah's Witnesses in their religious activities.  *See Taganrog*, ¶ 90.  This widely condemned "Liquidation Decision" effectively banned the activities of Jehovah's Witnesses in Russia.[11]

d.   On August 17, 2017, the Russian Federation, by and through the Vyborg City Court, declared the *New World Translation of the Holy Scriptures* in the Russian language, a Bible published by Jehovah's Witnesses, to be an "extremist" publication.  To date, this Bible remains banned in Russia.

e.   Since the April 2017 ban, hundreds of Jehovah's Witnesses have been criminally prosecuted for extremism and sentenced to pretrial detention or imprisonment.

50.    These developments confirm that the Russian Federation, including its various political subdivisions, agencies, and instrumentalities, has had and continues to have a clear, systematic plan to suppress the peaceful worship of Jehovah's Witnesses.

---

[11] *See, e.g.,* Press Statement, U.S. Comm'n on Int'l Religious Freedom, *RUSSIA: Jehovah's Witnesses Banned After Supreme Court Rejects Appeal* (July 17, 2017), https://www.uscirf.gov/news-room/releases-statements/russia-jehovahs-witnesses-banned-after-supreme-court-rejects-appeals ("The Supreme Court's decision sadly reflects the government's continued equating of peaceful religious freedom practice to extremism.  The Witnesses are not an extremist group, and should be able to practice their faith openly and freely and without government repression.").

### E.  **Russia Expropriates Watch Tower's Property**

51.    Russia's campaign of persecuting Jehovah's Witnesses reached a zenith when it refused to allow Watch Tower to participate in court proceedings liquidating the Administrative Centre and confiscating Watch Tower's property.  Russia's actions included:

    a.    On March 15, 2017, the Russian Ministry of Justice filed a claim in the Supreme Court of Russia to liquidate the Administrative Centre and confiscate its property and assets.

    b.    On April 5, 2017, the Supreme Court of Russia rejected Watch Tower's application to be added as a third party to the liquidation proceedings.  Although Watch Tower's application highlighted its legal interest as the owner of the Bethel Facility, the Court ruled that the liquidation proceedings did not affect the American corporation's rights or interests.

    c.    On April 20, 2017, the Supreme Court of Russia issued its Liquidation Decision, dissolving the Administrative Centre, confiscating the Bethel Facility and other places of worship, and effectively banning Jehovah's Witnesses in Russia.

    d.    On June 1, 2017, the Supreme Court of Russia rejected Watch Tower's leave to appeal the Liquidation Decision and the seizure of the Bethel Facility, again ruling that its decision did not affect the American corporation's legal rights and interests.

    e.    On August 31, 2017, the Supreme Court of Russia rejected Watch Tower's subsequent request for leave to appeal, again ruling that its decision did not affect the American Corporation's legal rights and interests.

52.    Since the Bethel Facility still remained in the name of its owner (Watch Tower), the Russian Federation then initiated proceedings—without notice to Watch Tower—seeking to

void the two Gift Contracts by which Watch Tower obtained ownership of and title to the Bethel Facility. The Russian Federation's Prosecutor's Office in the Kurortnyy District (where the Bethel Facility is located) filed this action in the Sestroretskiy District Court, requesting that the Bethel Facility be immediately turned over to the Russian Federation based on the Liquidation Decision.

53.     On September 11, 2017, the Russian Federation's Sestroretskiy District Court noted the property belonged to Watch Tower, but placed an arrest on the Bethel Facility. *See* Exhibit J.

54.     In a decision rendered as a fait accompli, on December 7, 2017, the Russian Federation's Sestroretskiy District Court annulled the Gift Contracts. *See* Exhibit K. According to the District Court, the Gift Contracts were fictitious and, therefore, the transfer of the Bethel Facility from the Administrative Centre to Watch Tower should be nullified. Consequently, as the Russian Federation had already liquidated the Administrative Centre, the Russian government seized title and possession of the American corporation's property.

55.     As an immediate result, Watch Tower lost the rights and benefits attending ownership of the Bethel Facility, including the right and benefit to possess, alienate, sell, rent, lease, and otherwise enjoy the use of its property for its own benefit without interference. Watch Tower also lost its legal right to send representatives from the United States to the Bethel Facility. Additionally, Watch Tower expended and continues to expend resources in the United States in an attempt to reverse the Russian Federation's December 7, 2017, Annulment Order.

56.     In an attempt to exhaust its remedies in Russia, Watch Tower appealed the Russian Federation's expropriation-by-sham-proceeding, but the appeal was summarily rejected by the Federation's Saint Petersburg City Court on May 3, 2018.

57.     On October 30, 2018, Watch Tower filed a special appeal with the Supreme Court of Russia challenging the lower court's ruling upholding the Russian Federation's confiscation of the Bethel Facility based on the Liquidation Decision against the Administrative Centre.

58.     While this appeal was pending, the Russian Federation, by and through its Deputy Minister of Justice, admitted to the European Court of Human Rights that, according to the Rosreestr property records, the "real estate objects [the Bethel Facility], situated in St. Petersburg, pos. Solnechnoye at 6 Srednaya [sic] Street" "are owned by the Watch Tower Bible and Tract Society of Pennsylvania[.]"  *See* Exhibit L ¶¶ 8, 15 (letter dated December 7, 2018).

59.     Nonetheless, on December 13, 2018, the Supreme Court of Russia denied Watch Tower's appeal and upheld the Russian Federation's right to confiscate the Bethel Facility based on the Liquidation Decision against the Administrative Centre.  *See* Exhibit M.

60.     It was around or prior to this time that the Russian Federation apparently became interested in converting the Bethel Facility into a medical scientific research center under the control of the Russian Federation and its Ministry of Health.  It was also around this time that Defendant Almazov began to participate in the illegal trespass of Watch Tower's property.

61.     On February 19, 2019, the Russian Federation transferred Watch Tower's property to Defendant "Federal State Budgetary Institution 'V.A. Almazov National Medical Research Centre' of the Ministry of Health of the Russian Federation" and granted Almazov the right to enjoy "[p]ermanent (indefinite) use" of the Bethel Facility.  *See* Exhibit N.  Almazov has and continues to openly occupy and use the Bethel Facility.

62.     The Ministry of Health of the Russian Federation—Almazov National Medical Research Centre's *Results 2019* report discloses that "[n]ot long ago Almazov National Center was given the opportunity to implement innovative educational [and biomedical and scientific] projects

after the land and complex of buildings transfer in Solnechny [sic] village in the Kurortny [sic] district of St. Petersburg" made to Almazov.  *See* Exhibit O.  This report also includes photos of Almazov personnel at the Bethel Facility.

63.     On June 28, 2023, the Minister of Health of the Russian Federation visited and toured the Bethel Facility, now used by Defendants for biomedical research, scientific endeavors, and medical education and training.  The news article published on Almazov's website includes photos of the Minister of Health, the Director General of Almazov, and other officials standing in the main reception lobby of the Bethel Facility and touring the Bethel Facility.  *See* Exhibit P.

64.     To this day, Almazov—along with the Russian Federation and the Ministry of Health—continue to deny Watch Tower access to the property that Defendants know rightfully belongs to Watch Tower.  Almazov has voluntarily collaborated with, and/or was directed by, the Russian Federation and the Ministry of Health to take control of Watch Tower's property.

65.     In 2017, Watch Tower obtained two independent valuations for the Bethel Facility. These establish the value of the property at over 30 million U.S. dollars.  *See* Exhibit Q (Engel & Völkers) (USD 30,972,000) and Exhibit R (Knight Frank) (approximately USD 32,011,027).

### F.  European Court of Human Rights Ruling

66.     Having failed to obtain relief for the unlawful taking in Russia and in an attempt to exhaust their legal remedies, Watch Tower and the Administrative Centre filed applications for relief before the European Court of Human Rights ("ECHR").  *See Administrative Centre of Jehovah's Witnesses v. Russia*, App. No. 10188/17; *Watch Tower v. Russia*, App. No. 31683/19.

67.     Given the factual and other overlaps in these two applications, in the interest of efficiency, Watch Tower agreed that, if the ECHR wished to do so, its application could be held in abeyance pending disposition of the Administrative Centre's application.  Nevertheless, Watch

Tower's ECHR application clearly and unequivocally maintained: "The Administrative Centre, however, was not the owner of the Bethel facility when it was confiscated. It was owned by the applicant Watch Tower Bible and Tract Society of Pennsylvania (WTPA), which permitted the Administrative Centre to use that property. That lawful arrangement was well-known by the State. WTPA duly registered its property ownership, regularly paid all taxes on the property, and responded to all State inquiries concerning the property." *Watch Tower v. Russia*, App. No. 31683/19, ¶ 58.2 (July 17, 2019).

68.    On June 7, 2022, the ECHR ruled in favor of the Administrative Centre and several Jehovah's Witnesses individually and collectively in *Taganrog LRO and Others v. Russia*, and recognized that the 2017 Liquidation Decision was a violation of international law, finding that:

> [T]he forced dissolution of all religious organisations of Jehovah's Witnesses in Russia was not merely the result of a neutral application of legal provisions but disclosed indications of a policy of intolerance by the Russian authorities towards the religious practices of Jehovah's Witnesses designed to cause Jehovah's Witnesses to abandon their faith and to prevent others from joining it. The use of an excessively broad wording of the extremism legislation to disband the communities of Jehovah's Witnesses across Russia, the breaking-up of their religious meetings, the confiscation of the religious publications, searches in their homes and places of worship, surveillance by the security services, and other forms of interference with their religious practices reinforce this conclusion. . . . By seeking to suppress the religious activities of Jehovah's Witnesses as they did, the Russian authorities failed to act in good faith and breached the State's duty of neutrality and impartiality vis-à-vis the religion of Jehovah's Witnesses. *Id.,* ¶ 254.

69.    In regards to the unlawful taking of the Bethel Facility, the ECHR ordered Russia either to return the confiscated property within three months of the final judgment or to pay compensation to the Administrative Centre for the Bethel Facility in the sum of EUR 38,243,874 (approximately USD 42,709,037 at the current exchange rate). *See Taganrog*, Appendix II.

70.     Reprehensibly, though unsurprisingly, the Russian Federation has refused to return the Bethel Facility and refused to pay the amounts that the ECHR ruled were due on account of the Russian Federation's confiscation of the Bethel Facility.  *See* Exhibit S.  Moreover, on the same day that the ECHR rendered its decision in *Taganrog*, the Russian Federation passed legislation to remove itself from the jurisdiction and authority of the ECHR.

71.     Recognizing the futility of obtaining relief in any other forum, Watch Tower now brings this lawsuit to vindicate its property rights in the Bethel Facility and to obtain compensation for Defendants' wrongful conduct.

### V.  FURTHER JURISDICTIONAL ALLEGATIONS UNDER THE FSIA

72.     Plaintiff realleges and incorporates herein by reference the preceding paragraphs as if fully set forth herein at length.

### A.  Almazov is the alter ego and/or an "agency or instrumentality" of the Russian Federation and the Ministry of Health

73.     This Court has subject-matter and personal jurisdiction over Almazov under 28 U.S.C. § 1330(b) on the basis that Almazov is the alter ego and/or an "agency or instrumentality" of the Russian Federation and the Ministry of Health, 28 U.S.C. § 1603(a)-(b), and an exception to foreign sovereign immunity applies as set forth herein.

74.     Almazov is an "agency or instrumentality" of Russia under 28 U.S.C. § 1603(b) because Almazov (1) is a separate legal entity from the Russian Federation (which is demonstrated by the Federation's transfer of legal title of the Bethel Facility to Almazov), (2) is an organ or political subdivision of the Russian Federation, and (3) it is not a citizen of any state of the United States nor was it created under the laws of a third country.

75.     Almazov is the alter ego and/or agent of the Russian Federation and the Ministry of Health, as Almazov is fully dominated by the Russian Federation—it is wholly owned and

managed by the Federation, its profits go to the Federation, it is required to pursue government policies, and it is used for commercial purposes. Furthermore, treating the Russian Federation and Almazov as separate would result in fraud and injustice.

76.    Almazov identifies itself as a "federal state budgetary institution," a designation given to state-owned, state-funded, and state-controlled entities, agencies, and organizations established by the Russian Federation.[12]

77.    As delineated in Article 9.2 of the Russian Federal Law No. 7-FZ of January 12, 1996 (hereinafter "Article 9.2"), the activities of federal state budgetary institutions are supervised by the Russian government and, as such, budgetary institutions do not have the right to refuse to perform their government-assigned tasks or duties. Moreover, per Article 9.2, a budgetary institution's property is owned by the Russian Federation. Thus, although land or property given to a budgetary institution to carry out its statutory task is provided on the basis of the right of "permanent (indefinite) use," a budgetary institution does not have the right to sell or dispose of the property without the consent of the Russian government.

78.    As reported by Almazov, the Russian Federation is "the founder" of Almazov and exercises its authority and power over Almazov by and through the Ministry of Health.[13]

79.    The Russian Minister of Health directly appoints Almazov's Director General.

80.    The Russian Federation and Ministry of Health's management and control of Almazov is also evidenced by the numerous government officials and representatives on

---

[12] *See Contacts*, ALMAZOV, http://www.almazovcentre.ru/?page_id=673&lang=en (last visited Aug. 30, 2024).

[13] *See* Документы, регламентирующие деятельность Центра Алмазова (*Documents regulating the activities of the Almazov Centre)*, ALMAZOV, http://www.almazovcentre.ru/?page_id=671 (last visited Aug. 30, 2024).

Almazov's Board of Trustees.[14]  For example, the Speaker of the Federation Council of the Federal Assembly of the Russian Federation (akin to the U.S. Speaker of the House) is the Chairman of Almazov's Board of Trustees.[15]  Almazov is also regularly visited by Russian government officials.  When Russian President Vladimir Putin visited Almazov and met with health-care workers, he mentioned his involvement with Almazov: "I hope that you too were shown around the centre where we are today.  Despite the fact that I was directly involved in its establishment and development, it still impresses me a lot.  This is exactly what medicine today needs[.]"[16]

81.    The Russian Federation and Ministry of Health's management and control of Almazov is also evidenced by the government policies, resolutions, and orders issued to Almazov. Since Article 9.2 specifies that budgetary institutions do not have the right to refuse to perform their government-assigned tasks or directives, Almazov is obligated to follow these government orders.  For example, over the years, the Russian Federation and Ministry of Health have issued numerous orders directing the restructuring of Almazov, the merging of Almazov with other institutions, and even the renaming of Almazov, and Almazov has complied.[17]  The Russian Federation and Ministry of Health have and continue to issue orders directing Almazov to

---

[14] *See* Попечительский совет Центра (*Board of Trustees of the Centre*), ALMAZOV, http://www.almazovcentre.ru/?page_id=34161 (last visited Aug. 30, 2024).

[15] *See* Попечительский совет Центра (*Board of Trustees of the Centre*), ALMAZOV, http://www.almazovcentre.ru/?page_id=34161 (last visited Aug. 30, 2024); *see Meeting with Federation Council Speaker Valentina Matviyenko,* PRESIDENT OF RUSSIA, http://en.kremlin.ru/events/president/news/74705 (last visited Aug. 30, 2024).

[16] *See Meeting with Healthcare Sector Workers at Almazov*, PRESIDENT OF RUSSIA, http://en.kremlin.ru/events/president/news/57080 (last visited Aug. 30, 2024).

[17] *See, e.g., History*, ALMAZOV, http://www.almazovcentre.ru/?page_id=121&lang=en (last visited Aug. 30, 2024); *see* Федеральное государственное бюджетное учреждение «Национальный медицинский исследовательский центр имени В.А. Алмазова» *(Almazov National Medical Research Centre)*, MINISTRY OF HEALTH, https://minzdrav.gov.ru/ministry/podvedy/federalnoe-gosudarstvennoe-byudzhetnoe-uchrezhdenie-severo-zapadnyy-federalnyy-meditsinskiy-issledovatelskiy-tsentr (last visited Aug. 30, 2024).

implement special initiatives and programs involving biotechnology, artificial intelligence, medical education, among others, which Almazov has promptly carried out.

82.    The Russian Federation and the Ministry of Health also exercise economic control over Almazov.  As detailed in Article 9.2, budgetary institutions, such as Almazov, are financially supported by the Russian Federation and receive funds from the Federal Treasury.  For example, the Russian Federation's Resolution of July 16, 2018, No. 832, signed by then Russian Federation Prime Minister Dmitry Medvedev, provided a budget allocation of 6.822 billion rubles from the federal budget for the construction of a new scientific and education complex for Almazov.[18]

83.    Furthermore, on information and belief, Almazov's Charter specifies that:

a.    the Russian Federation is Almazov's founder and its authority over Almazov is exercised by the Ministry of Health;

b.    the Ministry of Health is the chief administrator of budgetary funds for Almazov from the Federal Treasury;

c.    Almazov's property is federal property;

d.    Almazov's government-imposed objectives and activities include "income-generating activities" related to the development of scientific and scientific-technical activities, educational activities, and the development of medical products;

e.    Almazov is authorized and tasked with carrying out "income-generating activities" under agreements and contracts with legal entities and individuals on a

---

[18] *See* О бюджетных ассигнованиях на создание научно-образовательного комплекса на базе Национального медицинского исследовательского центра имени В.А.Алмазова (*Budget allocations for the creation of a scientific and educational complex [for] Almazov*), GOVERNMENT OF RUSSIA (July 21, 2018), http://government.ru/docs/33338/ (last visited Aug. 30, 2024).

reimbursable basis involving scientific and technical activities, as well as experimental and educational developments, including the development of intellectual property, the manufacture of pharmaceutical drugs, the development and sale of medical devices, pharmaceutical and radiopharmaceutical activities, clinical studies, the coordination of medical conferences, the publication and distribution of printed materials regarding scientific activities, the procurement and storage of donor blood, veterinary activity, software and information resources creation, organ donor transportation, artificial intelligence, among other subjects.

f.  The Russian Federation retains intellectual property rights over and benefits financially from Almazov's income-generating and commercial endeavors.

84.  On information and belief, Almazov's Charter specifies that Almazov is a separate "legal entity" with the right to "bear obligations, be a plaintiff and defendant in court in accordance with the legislation of the Russian Federation" and "to conclude contracts with legal entities and individuals in order to carry out income-generating activities" and "to carry out foreign economic and international activities . . . in accordance with the procedure established by the Ministry [of Health]" for the benefit of the Russian Federation.

85.  Since Almazov is so extensively controlled by the Russian Federation and Almazov's property, including the confiscated Bethel Facility, remains federal property owned by the Russian Federation, adherence to separate identities would work fraud or injustice. Thus, the equities support finding Almazov to be the alter ego and/or an "agency or instrumentality" of the Russian Federation and the Ministry of Health.

### B.  Defendants are not immune under 28 U.S.C. § 1605(a)(2)

86.     This Court has subject matter and personal jurisdiction over Defendants in this action, because an exception to sovereign immunity exists under the FSIA's commercial activity exception, 28 U.S.C. § 1605(a)(2).

87.     Under § 1605(a)(2), a foreign state shall not be immune from suit for an action "based upon . . . an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States."

88.     This action is based upon multiple acts in Russia by the Russian Federation, the Ministry of Health, and Almazov.  As discussed herein, these acts were taken in connection with Russia's commercial activity, namely, the unlawful commercial use of the confiscated Bethel Facility in Russia.  Defendants' ongoing commercial use of this confiscated property and subsequent commercial activity enabled Defendants to alter the flow of money within, out of, and/or into the United States thereby causing "a direct effect in the United States."

### C.  Defendants are not immune under 28 U.S.C. § 1605(a)(3)

89.     This Court has subject matter and personal jurisdiction over Defendants in this action, because an exception to sovereign immunity is also established under the FSIA's takings exception, 28 U.S.C. § 1605(a)(3).

90.     Under § 1605(a)(3), a foreign state shall not be immune from suit in any civil case "in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state[.]"

91.     Furthermore, under § 1605(a)(3), a foreign state (including an agency or instrumentality thereof) is not immune from civil suit in any case "in which rights in property taken

in violation of international law are in issue and that property or any property exchanged for such property is . . . owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States."

92.    Rights in property are in issue within the meaning of both these exceptions to immunity. The property rights in issue in this case include, but are not limited to, Watch Tower's property rights to own, hold title, use, access, and otherwise enjoy the Bethel Facility—rights that were unlawfully taken and continue to be violated by the Russian Federation, the Ministry of Health, and Almazov.

93.    Under international law, a state may take property only with just compensation, meaning that the compensation must be prompt, adequate, and effective.

94.    Defendants have not provided any compensation whatsoever to Watch Tower for the seizure and wrongful use of the Bethel Facility, for the annulment of the Gift Contracts between the Administrative Centre and Watch Tower, or for Defendants' ongoing trespass upon and use of the Bethel Facility. Furthermore, Defendants have refused to pay the ECHR judgment. Defendants' property takings thus violate international law.

95.    The expropriation of the Bethel Facility constituted a violation of international customary and treaty law, as evidenced by various legal instruments, including, but not limited to:

     a.    Article 17 of the Universal Declaration of Human Rights, G.A. Res. 217 A (III), U.N. Doc. A/RES/3/217 A (III) (Dec. 10, 1948) ("Everyone has the right to own property alone as well as in association with others. No one shall be arbitrarily deprived of his property.");

     b.    Article 1 of Protocol No. 1 to the European Convention on Human Rights, Paris, 20.III.1952 (ratified by the Russian Federation on May 5, 1998, and in effect until

the Federation ceased to be a Party to the Treaty on Sept. 16, 2022) ("Every natural or legal person is entitled to the peaceful enjoyment of his possessions. No one shall be deprived of his possessions except in the public interest and subject to the conditions provided for by law and by the general principles of international law.").

96.    Moreover, the expropriation further violates international law because the Bethel Facility was taken arbitrarily, for discriminatory reasons, and without due process, as discussed herein and as demonstrated by the fact that Watch Tower's property was unlawfully targeted and expropriated due to the Russian authorities' intolerance of the religious beliefs and practices of Jehovah's Witnesses. As the ECHR held:

> [T]he Court finds that the forced dissolution of all religious organisations of Jehovah's Witnesses in Russia was not merely the result of a neutral application of legal provisions but disclosed indications of a policy of intolerance by the Russian authorities towards the religious practices of Jehovah's Witnesses designed to cause Jehovah's Witnesses to abandon their faith and to prevent others from joining it. *Taganrog,* ¶ 254.

97.    The Russian Federation's nullification of the Gift Contracts between the Administrative Centre and Watch Tower formed part of a program of religious persecution and discrimination against Jehovah's Witnesses that violates international law, such that the Russian Federation's annulment of the transactions and confiscation of the Bethel Facility was itself a taking in violation of international law. For instance:

a.    An international tribunal, namely the ECHR, has already ruled that the Russian Federation's taking without compensation of the Bethel Facility violated international law. *See Taganrog,* ¶¶ 274-285 ("There has therefore been a violation of Article 1 of Protocol No. 1 [to the European Convention of European Rights] in respect of all types of possessions.")

b.  Because the unwinding of the property transfer contracts was part of a sustained campaign of religious persecution against Watch Tower and Jehovah's Witnesses, the taking is a crime committed in violation of international law.

c.  Article 18 of the International Covenant on Civil and Political Rights (adopted December 16, 1966, entered into force March 23, 1976) 999 UNTS 171 ("ICCPR") ratified by both the Russian Federation and the United States, guarantees "[e]veryone shall have the right to freedom of thought, conscience and religion. This right shall include freedom to have or to adopt a religion or belief of his choice, and freedom, either individually or in community with others and in public or private, to manifest his religion or belief in worship, observance, practice and teaching."  The Russian Federation's actions, therefore, violated Watch Tower's Article 18 rights under the ICCPR.

d.  The U.N. General Assembly's Declaration on the Elimination of All Forms of Intolerance and of Discrimination Based on Religion or Belief (adopted November 25, 1981) A/RE/36/55 ("United Nations Declaration") provides that "[n]o one shall be subject to discrimination by any State, institution, group of persons, or person on the grounds of religion or belief," and specifies that the right to freedom of thought, conscience, and religion includes the freedom "[t]o worship or assemble in connection with a religion or belief, and to establish and maintain places for these purposes," "[t]o establish and maintain appropriate charitable or humanitarian institutions," and "[t]o teach a religion or belief in places suitable for these purposes."  Articles 2(1), 6(a), (b), (e).  Defendants' actions thus violated articles 2(1), 6(a), 6(b), and 6(e) of the United Nations Declaration.

e. Russia's discriminatory taking of property without compensation amounts to a violation of international law. As the ECHR recognized: "By seeking to suppress the religious activities of Jehovah's Witnesses as they did, the Russian authorities failed to act in good faith and breached the State's duty of neutrality and impartiality vis-à-vis the religion of Jehovah's Witnesses." *Taganrog*, ¶ 254.

98. The Bethel Facility, which the Russian Federation stole from Watch Tower in violation of international law, is now being used by the Russian Federation to generate income that in turn, as part of its general revenues, is being exchanged for property now present in the United States in connection with commercial activity carried on in the United States by the Russian Federation. The property exchanged for the property that the Russian Federation stole from Watch Tower is present in the United States in connection with commercial activities carried on in the United States by the Russian Federation and the Ministry of Health includes, but is not limited to:

a. Almazov's commercial activities described herein, because Almazov is the alter ego, agent, and/or instrumentality of the Russian Federation and Ministry of Health.

b. The Russian Federation has consular offices in New York, Texas, and Washington, D.C., which promote business and commercial interests in the United States.

c. Russia's use of United States capital and debt markets to obtain financing, which resulted in the Russian Federation owing approximately USD 40 billion.[19]

---

[19] *See* Eshe Nelson et al., *Dollars or Rubles? Russian Debt Payments Are Due, and Uncertain*, N.Y. TIMES (Mar. 15, 2022), https://www.nytimes.com/2022/03/15/business/russia-debt-bonds-default.html (last visited Aug. 30, 2024).

    d.   According to the congressional findings accompanying Public Law 118-50 enacted in 2024, there are "between $4,000,000,000 and $5,000,000,000" in Russian sovereign assets "reportedly subject to the jurisdiction of the United States."[20]

99.    The Russian Federation stole the Bethel Facility from Watch Tower, and Almazov uses and operates the confiscated Bethel Facility as directed by the Russian Federation and the Ministry of Health.  Because Almazov, the Russian Federation, and the Ministry of Health are alter-egos of one another, the Russian Federation, the Ministry of Health, and Almazov own, possess, and/or operate the property stolen from Watch Tower.

100.    Defendant Almazov is and at all relevant times has been engaged in commercial activity in the United States within the meaning of 28 U.S.C. § 1603(d).

101.    Almazov is heavily involved in the global pharmaceutical and biotechnology industries.[21]  Almazov also operates a biobank on its premises and manages BioBank Russia.[22]

102.    Almazov identifies itself as "a leading innovative research and teaching hospital in Russia and globally" and reports having "international collaborations" with "key partners" in the United States with whom Almazov signs memoranda of understanding and research agreements, engages in joint research projects, publicizes medical tourism and medical services market opportunities, participates in educational programs, promotes its school of medicine and recruits

---

[20] Rebuilding Economic Prosperity and Opportunity for Ukrainians Act, Public L. No. 118-50, Div. F, April 24, 2024, 138 Stat. 942 § 101(a)(8).

[21] In addition to Almazov's commercial activity in the United States, Almazov is also involved in similar activities in China (Ascentage), England (GSK), France (AB Science), Germany (Bayer), Lebanon (Pharma Group), Japan (Astellas and Takeda), Sweden (Sobi), and Switzerland (Novartis).

[22] See BIOBANK RUSSIA, https://biobank.almazovcentre.ru/# (last visited Aug. 30, 2024); *Almazov Centre to Create a Startup Studio*, ALMAZOV, http://www.almazovcentre.ru/?p=97467&lang=en (last visited Aug. 30, 2024).

prospective students, recruits prospective investors, and collaborates on clinical trials and new medical therapies, among other projects.[23]  Almazov's self-reported collaborations in the United States include, but are not limited to:

a. International Business Machines Corporation (IBM) headquartered in New York. As reported by Almazov, its "international collaboration" with IBM includes "Joint Study Agreement No. W1872788 dated 08.2018 between Almazov Centre and [IBM's] Thomas J. Watson Research Center" in Yorktown Heights, New York, which is "the global headquarters of IBM research, the largest industrial research organization in the world."[24]

b. Greehey Children's Cancer Research Institute at the University of Texas Health Science Center in San Antonio, Texas, with whom Almazov has collaborated in "carrying out cooperative scientific work in the field of molecular and physiology DNA damage markers study in cells of hemoblastosis patients."[25]

c. University of Texas MD Anderson Cancer Center in Texas, with whom Almazov signed a memorandum of understanding to continue to "facilitate future

---

[23] *Int'l Collaborations*, ALMAZOV, http://www.almazovcentre.ru/?page_id=1766&lang=en (last visited Aug. 30, 2024); *Int'l Advisory Board*, WORLD-CLASS RESEARCH CENTRE FOR PERSONALIZED MEDICINE, https://ncmu.almazovcentre.ru/en/about/sovety-i-komissii/nablyudatelnyy-sovet/ (last visited Aug. 30, 2024).

[24] *IBM Research-Yorktown Heights*, IBM, https://research.ibm.com/labs/yorktown-heights (last visited Aug. 30, 2024); *Arrhythmology Research Department*, ALMAZOV, http://www.almazovcentre.ru/?page_id=2022&lang=en (last visited Aug. 30, 2024).

[25] *Int'l Collaboration 2012*, ALMAZOV, http://www.almazovcentre.ru/?page_id=6259&lang=en (last visited Aug. 30, 2024); *Int'l Collaboration 2011*, ALMAZOV, http://www.almazovcentre.ru/?page_id=6504&lang=en (last visited Aug. 30, 2024).

cooperation in training programmes, joint research projects and improving oncological care in the Russian Federation and the USA."[26]

d. University of Arkansas, with whom Almazov signed a memorandum of understanding and "participated in the Consortium on Thyroid and Pregnancy, analysis of scientific data, [and] co-authored articles."[27]

e. University of Iowa, with whom Almazov has signed cooperation agreements and collaborated on research projects.[28]

f. Yale University in Connecticut, with whom Almazov reports collaborating "in the field of specialist training in cardiovascular surgery and interventional surgery[.]"[29]

g. The Broad Institute of MIT and Harvard, a research organization headquartered in Massachusetts, with whom Almazov has signed a memorandum of understanding, has "collaborated in education and science in order to study the epidemiology of risk factors and [cardiovascular disease]" and in "joint research projects to study

---

[26] *Conference Modern Treatment Strategies and Horizons in Hematology and Oncology*, ALMAZOV, http://www.almazovcentre.ru/?p=36145&lang=en (last visited Aug. 30, 2024); *Department of Fundamental Oncology with Genetics Engineering and Cell Therapy Group*, ALMAZOV, http://www.almazovcentre.ru/?page_id=64929&lang=en (last visited Aug. 30, 2024); *Professor Zaritskey Discussion Club*, ALMAZOV, http://www.almazovcentre.ru/?p=80142&lang-en&lang=en (last visited Aug. 30, 2024).

[27] *Int'l Collaboration*, ALMAZOV, http://www.almazovcentre.ru/?page_id=1766&lang=en (last visited Aug. 30, 2024); *Laboratory of Endocrine Diseases in Pregnancy*, ALMAZOV, http://www.almazovcentre.ru/?page_id=6472&lang=en (last visited Aug. 30, 2024).

[28] *Int'l Collaboration 2011*, ALMAZOV, http://www.almazovcentre.ru/?page_id=6504&lang=en (last visited Aug. 30, 2024); *Int'l Collaboration 2012*, ALMAZOV, http://www.almazovcentre.ru/?page_id=6259&lang=en (last visited Aug. 30, 2024); *Research Dep't of Microcirculation and Myocardial Metabolism*, ALMAZOV, http://www.almazovcentre.ru/?page_id=5020&lang=en (last visited Aug. 30, 2024).

[29] *Int'l Collaboration 2012*, ALMAZOV, http://www.almazovcentre.ru/?page_id=6259&lang=en (last visited Aug. 30, 2024); *Affiliations*, THE ALMAZOV FOUNDATION OF NORTH AMERICA, https://www.almazovfoundna.org/mission (last visited Aug. 30, 2024).

the genetics and epigenetic mechanisms of healthy aging," and has collaborated on medical journal articles with Broad Institute researchers on multiple occasions.[30]

103.    Several of Almazov's doctors and researchers are reportedly paid clinical investigators in clinical trials for pharmaceutical and biotechnology companies in the United States, including AbbVie, Inc., Boston Scientific Corporation, and Pfizer Inc.

104.    In addition to Almazov's self-reported commercial activities, Defendant Almazov is and at all relevant times has been engaged in the following additional commercial activities in the United States:

a. Almazov has collaborated with the U.S. government, including, but not limited to:

i. National Cancer Institute, the federal government's principal agency for cancer research and training;

ii. National Institute of Diabetes and Digestive and Kidney Diseases, a part of the U.S. Department of Health and Human Services;

iii. National Institutes of Health, a part of the U.S. Department of Health and Human Services, the nation's medical research agency and one of the largest public funders of biomedical research in the world.

b. Almazov has collaborated with multiple commercial entities in the United States, including, but not limited to:

i. Abbott Laboratories, a health care technologies company headquartered in Illinois;

ii. AbbVie Inc., a biopharmaceutical company headquartered in Illinois;

---

[30] *Int'l Collaboration*, ALMAZOV, http://www.almazovcentre.ru/?page_id=1766&lang=en (last visited Aug. 30, 2024); *NCDs Epidemiology Research Laboratory*, ALMAZOV, http://www.almazovcentre.ru/?page_id=8375&lang=en (last visited Aug. 30, 2024).

    iii.  Amgen Inc., a biotechnology company headquartered in California;

    iv.  Asher Biotherapeutics, Inc., a company headquartered in California;

    v.  Biosense Webster, Inc. (part of Johnson & Johnson MedTech), a medical technology company headquartered in California;

    vi.  Boston Scientific Corporation, a medical technology company headquartered in Massachusetts;

    vii.  Bristol Myers Squibb, a biopharmaceutical company headquartered in New Jersey;

    viii.  Genentech, Inc., a biotechnology company headquartered in California;

    ix.  Janssen Pharmaceuticals, a pharmaceutical company wholly owned by Johnson & Johnson, headquartered in New Jersey;

    x.  Medtronic, Inc., a healthcare technology company, headquartered in Minnesota;

    xi.  Merck Sharp & Dohme LLC, a subsidiary of Merck & Co., Inc., a pharmaceutical company headquartered in New Jersey;

    xii.  Oncovir Inc., a biotechnology company headquartered in Washington, D.C.;

    xiii.  Pfizer Inc., a pharmaceutical company headquartered in New York.

c.  Almazov has collaborated with educational institutions in the United States, including, but not limited to:

    i.  Baylor College of Medicine in Texas;

    ii.  Columbia University in New York;

    iii.  The Ohio State University College of Medicine in Ohio;

    iv.   Tufts University School of Medicine in Massachusetts;

    v.   University of Alabama at Birmingham in Alabama;

    vi.   University of California Davis School of Medicine in California;

    vii.   University of Missouri-Kansas City in Missouri;

    viii.   University of Pennsylvania in Pennsylvania;

    ix.   University of Virginia School of Medicine in Virginia;

    x.   Washington University School of Medicine in St. Louis in Missouri.

d.  Almazov has collaborated with hospitals and healthcare providers across the United States, including, but not limited to:

    i.   Massachusetts General Hospital in Massachusetts;

    ii.   Nationwide Children's Hospital in Ohio;

    iii.   The Ohio State University Wexner Medical Center in Ohio;

    iv.   Vanderbilt University Medical Center in Tennessee;

    v.   Yale New Haven Hospital in Connecticut.

e.  Almazov has collaborated with publishers of medical and scientific journals and textbooks across the United States, including, but not limited to:

    i.   American Chemical Society, headquartered in Washington, D.C.;

    ii.   American College of Cardiology, headquartered in Washington, D.C.;

    iii.   American Society of Hematology, headquartered in Washington, D.C.;

    iv.   Cold Spring Harbor Laboratory Press, headquartered in New York;

    v.   Nova Science Publishers, Inc., headquartered in New York.

f.  Almazov has collaborated with foundations across the United States, including, but not limited to the Almazov Foundation of North America, Inc. in Connecticut.

## VI.  CAUSES OF ACTION

## COUNT ONE:  EXPROPRIATION IN VIOLATION OF INTERNATIONAL LAW

105.    Plaintiff repeats and realleges paragraphs 1 through 104 as if fully set forth herein.

106.    Plaintiff owned and had the right to quiet possession of the real property comprising the Bethel Facility.

107.    Under international law, a state is responsible for injury resulting from a taking by the state of the property of a national of another state that: (1) is not for a public purpose, (2) is discriminatory, or (3) is not accompanied with just compensation.

108.    As alleged above, at the time of Russia's taking of the Bethel Facility, Watch Tower was (and is) an American Corporation.

109.    As the ECHR has recognized, Russia's taking of the Bethel Facility was not for a public purpose, it was discriminatory, and it was not accompanied by just compensation.

110.    Therefore, Russia's taking of the Bethel Facility constituted an unlawful expropriation by a state against a non-citizen without just compensation, thus violating international law.

111.    Accordingly, Defendants are liable to Plaintiff for the expropriation of the Bethel Facility.

## COUNT TWO:  TRESPASS

112.    Plaintiff repeats and realleges paragraphs 1 through 111 as if fully set forth herein.

113.    Plaintiff owned and had the right to quiet possession of the real property comprising the Bethel Facility.

114.    Defendants have illegally entered and/or intruded upon the Plaintiff's property without permission and/or justification, and have continued that unauthorized use, invasion, occupation, disruption, possession, and entry since at least 2019.

115.    Defendants' actions were intentional, arbitrary, and in violation of international law.

116.    Defendants' unlawful actions have caused and continue to cause severe injury and damages to Plaintiff, including the ongoing deprivation of the exclusive possession and/or use of the Bethel Facility and damages reasonably flowing therefrom, which amounts shall be quantified at trial.

117.    Defendants should be required to pay compensatory and other damages.

118.    Given the outrageous conduct set forth herein, Almazov should be required to pay punitive damages.

## <u>COUNT THREE</u>:  UNJUST ENRICHMENT

119.    Plaintiff repeats and realleges paragraphs 1 through 118 as if fully set forth herein.

120.    Through the conduct set forth herein, Defendants gained real property from Plaintiff without providing compensation to Plaintiff for said real property.

121.    It would be unjust, inequitable, and against good conscience for Defendants to retain the benefit conferred without paying Plaintiff the value of the property and its use.

122.    Plaintiff asserts in the alternative to its other claims that it has no adequate remedy at law for this injury.

123.    As a result of the foregoing, in the alternative to its other claims, Plaintiff asserts that it is entitled to a substantial award of damages on the ground of unjust enrichment, in an amount to be proved at trial.

124.    Given the outrageous conduct set forth herein, Almazov should be required to pay punitive damages.

## COUNT FOUR:  CIVIL CONSPIRACY

125.    Plaintiff repeats and realleges paragraphs 1 through 124 as if fully set forth herein.

126.    In the alternative, to the extent Defendants are deemed separate entities (and for the reasons discussed herein, it is alleged that Defendants are alter egos and/or agents of one another), the Russian Federation and the Ministry of Health, on the one hand, and Almazov, on the other, conspired to and did steal Watch Tower's property.

127.    Watch Tower has suffered and continues to suffer an ongoing injury as a result of Defendants' conspiracy to illegally deprive Watch Tower of its right to property, and to aid and abet each other's illegal conduct, which has led to Defendants' unjust enrichment.

128.    As a result of the foregoing, in the alternative to its other claims, Plaintiff asserts that it is entitled to a substantial award of damages, in an amount to be proved at trial.

## COUNT FIVE:  AIDING AND ABETTING

129.    Plaintiff repeats and realleges paragraphs 1 through 128 as if fully set forth herein.

130.    In the alternative, to the extent Defendants are deemed separate entities (and for the reasons discussed herein, it is alleged that Defendants are alter egos and/or agents of one another), each Defendant independently engaged in tortious or otherwise illegal conduct, consisting of (among other things) trespass upon Plaintiff's property, taking of property in violation of international law, unjust enrichment, and conspiracy.

131.    Each Defendant knowingly and substantially assisted and encouraged the other Defendants in their unlawful activities toward Watch Tower.

132.    Each Defendant had actual knowledge and/or was generally aware of the wrongful conduct of the other Defendants, and was generally aware of the role that the other Defendants and it were playing in their unlawful conduct toward Watch Tower.

133.    As a result of the foregoing, in the alternative to its other claims, Plaintiff asserts that it is entitled to a substantial award of damages, in an amount to be proved at trial.

## VII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

1.     Grant judgment against Defendants, and award Plaintiff such damages, including

compensatory damages, as may be proved at trial, as well as costs.

2.     Award Plaintiff an award of punitive damages against Defendant Almazov pursuant

to 28 U.S.C. § 1606.

3.     Enter an order requiring Defendants to pay Plaintiff pre- and post-judgment

interest.

4.     Grant Plaintiff such other and further relief as the Court deems just and proper.


Dated:       September 3, 2024              Respectfully submitted,

By:  _____

Paul D. Polidoro (D.C. Bar No. NY0575)
    ppolidor@jw.org
Philip Brumley (D.C. Bar No. NY0578)
    pbrumley@jw.org
Keturah A. Dunne (D.C. Bar No. 495658)
    kdunne@jw.org
Mario F. Moreno (D.C. Bar No. NY0580)
    mmoreno@jw.org
Yasmin Restrepo (D.C. Bar No. NY0586)
    yrestrepo@jw.org
WATCH TOWER BIBLE AND TRACT SOCIETY OF
PENNSYLVANIA—LEGAL DEPARTMENT
200 Watchtower Drive
Patterson, NY 12563
Telephone:  (845) 306-0711

*Attorneys for Plaintiff Watch Tower Bible and
Tract Society of Pennsylvania*