**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| WATCH TOWER BIBLE AND TRACT SOCIETY OF PENNSYLVANIA, | |
| Plaintiff, | |
| v. | Case No. 1:24-cv-02523-RC |
| THE RUSSIAN FEDERATION, *et al*., | **<u>Oral Argument Requested</u>** |
| Defendants. | |

**MEMORANDUM OF POINTS AND AUTHORITIES
<u>IN SUPPORT OF THE RUSSIAN FEDERATION'S MOTION TO DISMISS</u>**

CURTIS, MALLET-PREVOST,
  COLT & MOSLE LLP
  Kevin A. Meehan (D.C. Bar No. 1613059)
  Juan O. Perla (D.C. Bar No 1660389)
  1717 Pennsylvania Avenue, N.W.
  Washington, D.C. 20006
  Tel.: (202) 452-7373
  Fax: (202) 452-7333
  kmeehan@curtis.com
  jperla@curtis.com

*Attorneys for Defendants Russian
Federation, Ministry of Health of the Russian
Federation, and Federal State Budgetary
Institution V.A. Almazov National Medical
Research Centre*

Dated: Washington, D.C.
       February 7, 2025

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ......................................................................................... 1

RELEVANT BACKGROUND ........................................................................................... 3

    A.   Factual Allegations ................................................................................. 3

    B.   Procedural History .................................................................................. 7

ARGUMENT ..................................................................................................................... 8

I.    The Federation Was Not Properly Served under the FSIA ...................................... 9

II.   No Exception to Sovereign Immunity Applies under the FSIA ........................... 13

    A.   The FSIA's Expropriation Exception Does Not Apply ............................... 14

        1.   The Domestic Takings Rule Precludes Any Finding that the Bethel Facility Was Taken in Violation of International Law ...................................... 14

        2.   The Complaint Does Not Plead the Requisite Jurisdictional Nexus with the United States ............................................................................. 16

    B.   The Commercial Activity Exception Does Not Apply ............................... 18

III.   Watch Tower Cannot State a Claim Because the Act of State Doctrine Applies ................ 20

CONCLUSION ................................................................................................................. 26

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Agudas Chasidei Chabad of U.S. v. Russian Federation*,
    528 F.3d 934 (D.C. Cir. 2008)......................................................................... 25

*Arch Trading Corp. v. Republic of Ecuador*,
    839 F.3d 193 (2d Cir. 2016) ........................................................................... 19

*Argentine Republic v. Amerada Hess Shipping Corp.*,
    488 U.S. 428 (1989)......................................................................................... 8

*Azadeh v. Gov't of the Islamic Republic of Iran*,
    318 F. Supp. 3d 90 (D.D.C. 2018)................................................................. 11

*Azima v. Rak Inv. Auth.*,
    305 F. Supp. 3d 149 (D.D.C. 2018)............................................................... 13

*Banco Nacional de Cuba v. Farr*,
    383 F.2d 166 (2d Cir. 1967) ........................................................................... 24

* *Banco Nacional de Cuba v. Sabbatino*,
    376 U.S. 398 (1964)......................................................................................... 21

*Barnet v. Ministry of Culture & Sports of the Hellenic Republic*,
    961 F.3d 193 (2d Cir. 2020) ........................................................................... 18

* *Barot v. Embassy of the Republic of Zambia*,
    785 F.3d 26 (D.C. Cir. 2015) ......................................................................... 11

*Beg v. Islamic Republic of Pakistan*,
    353 F.3d 1323 (11th Cir. 2003) ..................................................................... 19

*Ben-Rafael v. Islamic Republic of Iran*,
    540 F. Supp. 2d 39 (D.D.C. 2008)................................................................. 10

*Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*,
    581 U.S. 170 (2017)......................................................................................... 13

*Braka v. Bancomer, S.A.*,
    589 F. Supp. 1465 (S.D.N.Y. 1984) ............................................................. 21

*Butler v. Sukhoi Co.*,
    579 F.3d 1307 (11th Cir. 2009) ..................................................................... 13

*Chabad v. Russian Federation,*
110 F.4th 242 (D.C. Cir. 2024) ........................................................ 26

*Chuidian v. Philippine National Bank,*
912 F.2d 1095 (9th Cir. 1990) ........................................................ 19

* *Compania de Gas de Nuevo Laredo, S.A. v. Entex, Inc.,*
686 F.2d 322 (5th Cir. 1982) ........................................................ 24

*de Csepel v. Republic of Hungary,*
27 F.4th 736 (D.C. Cir. 2022) ........................................................ 13

*De Csepel v. Republic of Hungary,*
714 F.3d 591 (D.C. Cir. 2013) ........................................................ 13

* *De Csepel v. Republic of Hungary,*
859 F.3d 1094 (D.C. Cir. 2017) ........................................................ 16, 26

*De Sanchez v. Banco Central de Nicaragua,*
770 F.2d 1385 (5th Cir. 1985) ........................................................ 19

*Dole Food Co. v. Patrickson,*
538 U.S. 468 (2003) ........................................................ 23

*Empresa Cubana Exportadora de Azucar y Sus Derivados v. Lamborn & Co.,*
652 F.2d 231 (2d Cir. 1981) ........................................................ 25

* *Federal Republic of Germany v. Philipp,*
592 U.S. 169 (2021) ........................................................ 2, 14, 15, 22

*First Nat'l City Bank v. Banco Para El Comercio Exterior De Cuba,*
462 U.S. 611 (1983) ........................................................ 19, 20

*Fischer v. United States,*
603 U.S. 480 (2024) ........................................................ 23

*French v. Banco Nacional de Cuba,*
23 N.Y.2d 46 (N.Y. 1968) ........................................................ 22, 23

*Garb v. Republic of Poland,*
440 F.3d 579 (2d Cir. 2006) ........................................................ 18, 19

* *Garvey v. Admin. Rev. Bd.,*
56 F.4th 110 (D.C. Cir. 2022) ........................................................ 23

*Gater Assets Ltd. v. Moldovagaz*,
   2 F.4th 42 (2d Cir. 2021) ................................................................................ 8, 20

*Gilson v. Republic of Ireland*,
   682 F.2d 1022 (D.C. Cir. 1982) .............................................................................. 8

*Glen v. Club Mediterranee S.A.*,
   365 F. Supp. 2d 1263 (S.D. Fla. 2005) .................................................................. 25

\* *GSS Grp. Ltd. v. Nat'l Port Auth. of Liberia & Republic of Liberia*,
   822 F.3d 598 (D.C. Cir. 2016) .............................................................................. 20

*Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela*,
   743 F. App'x 442 (D.C. Cir. 2018) ........................................................................ 13

\* *Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela*,
   784 F.3d 804 (D.C. Cir. 2015) .............................................................................. 20

*Helmerich & Payne Int'l Drilling Co. v. Petroleos de Venezuela, S.A.*,
   No. 11-cv-1735 (CRC), 2024 U.S. Dist. LEXIS 169895
   (D.D.C. Sep. 20, 2024) ........................................................................... 22, 25, 26

*Kiobel v. Royal Dutch Petro. Co.*,
   569 U.S. 108 (2013) ............................................................................................. 23

*Morrison v. Nat'l Australia Bank Ltd.*,
   561 U.S. 247 (2010) ............................................................................................. 23

*Nemariam v. Federal Democratic Republic of Ethiopia*,
   491 F.3d 470 (D.C. Cir. 2007) .............................................................................. 14

*Nocula v. UGS Corp.*,
   520 F.3d 719 (7th Cir. 2008) ................................................................................ 21

\* *OBB Personenverkehr AG v. Sachs*,
   577 U.S. 27 (2015) ............................................................................................ 2, 18

*Omni Capital Int'l v. Rudolf Wolff & Co.*,
   484 U.S. 97 (1987) ................................................................................................. 9

*Peterson v. Royal Kingdom of Saudi Arabia*,
   416 F.3d 83 (D.C. Cir. 2005) .................................................................................. 8

*Phoenix Consulting, Inc. v. Republic of Angola*,
   216 F.3d 36 (D.C. Cir. 2000) ............................................................................. 8, 13

*Price v. Socialist People's Libyan Arab Jamahiriya,*
    294 F.3d 82 (D.C. Cir. 2002) ............................................................. 8, 13

*Ramirez de Arellano v. Weinberger,*
    745 F.2d 1500 (D.C. Cir. 1984) (en banc) ........................................... 25

*Republic of Austria v. Altmann,*
    541 U.S. 677 (2004) ............................................................................ 21

\* *Republic of Sudan v. Harrison,*
    587 U.S. 1 (2019) .......................................................................... passim

*RJR Nabisco, Inc. v. European Cmty.,*
    579 U.S. 325 (2016) ............................................................................ 23

*Schubarth v. Federal Republic of Germany,*
    891 F.3d 392 (D.C. Cir. 2018) ...................................................... 14, 16

*Simon v. Republic of Hungary,*
    812 F.3d 127 (D.C. Cir. 2016) ............................................................ 17

*Smith-Haynie v. District of Columbia,*
    155 F.3d 575 (D.C. Cir. 1998) ............................................................ 21

*Tidewater Inv. SRL v. Bolivarian Republic of Venezuela,*
    No. 17-1457 (TJK), 2018 U.S. Dist. LEXIS 211469
    (D.D.C. Dec. 17, 2018) ....................................................................... 11

*Transaero, Inc. v. La Fuerza Aerea Boliviana,*
    30 F.3d 148 (D.C. Cir. 1994) ........................................................... 9, 11

\* *TransAmerica Leasing, Inc. v. La Republica de Venezuela,*
    200 F.3d 843 (D.C. Cir. 2000) ............................................................ 20

\* *UAB Skyroad Leasing v. OJSC Tajik Air,*
    No. 21-7015, 2022 U.S. App. LEXIS 16977 (D.C. Cir. June 17, 2022) .................................. 20

*Underhill v. Hernandez,*
    168 U.S. 250 (1897) ............................................................................ 21

*Von Saher v. Norton Simon Museum of Art,*
    897 F.3d 1141 (9th Cir. 2018) ............................................................ 21

*W.S. Kirkpatrick & Co. v. Env't Tectonics Corp.,*
    493 U.S. 400 (1990) ............................................................................ 21

* *Water Splash, Inc. v. Menon*,
    581 U.S. 271 (2017) .................................................................................... 10

*World Wide Minerals, Ltd. v. Republic of Kazakhstan*,
    296 F.3d 1154 (D.C. Cir. 2002) .................................................................. 21

*Yang Rong v. Liaoning Province Gov't*,
    362 F. Supp. 2d 83 (D.D.C. 2005) .............................................................. 25

* *Yang Rong v. Liaoning Province Gov't*,
    452 F.3d 883 (D.C. Cir. 2006) ........................................................ 2, 18, 19

**Statutes & Rules**

22 U.S.C. § 2370(e)(2) ...................................................................................... 22

28 U.S.C. § 1330(a) ............................................................................................. 8

28 U.S.C. § 1330(b) ............................................................................................. 8

28 U.S.C. § 1603(b)(1) ...................................................................................... 19

28 U.S.C. § 1605(a)(2) .................................................................................... 2, 18

28 U.S.C. § 1605(a)(3) ................................................................................. passim

28 U.S.C. § 1608(a) ......................................................................... 8, 9, 10, 11

28 U.S.C. § 1608(a)(1) ...................................................................................... 10

28 U.S.C. § 1608(a)(2) ...................................................................................... 10

28 U.S.C. § 1608(a)(3) .......................................................................... 10, 11, 12

28 U.S.C. § 1608(c) ............................................................................................ 12

Fed. R. Civ. P. 12(b)(1) ....................................................................................... 1

Fed. R. Civ. P. 12(b)(2) ....................................................................................... 1

Fed. R. Civ. P. 12(b)(4) ....................................................................................... 1

Fed. R. Civ. P. 12(b)(5) ....................................................................................... 1

Fed. R. Civ. P. 12(b)(6) .................................................................................. 1, 20

**Treaties**

Convention for the Protection of Human Rights and Fundamental Freedoms,
Nov. 4, 1950, 213 U.N.T.S. 221 ............................................................................. 6

Convention on the Service Abroad of Judicial and Extrajudicial Documents in
Civil or Commercial Matters, Nov. 15, 1965, 20 U.S.T. 361 ............................... 2, 10

**Other Authorities**

110 Cong. Rec. 19559 (1964) ...................................................................................... 24

*Black's Law Dictionary* (12th ed. 2024) .................................................................... 22

Council of Europe, *Chart of signatures and ratifications of Treaty 005*, Treaty Office ............... 6

Hague Conference on Private International Law,
*Declaration/reservation/notification by the Russian Federation* ............................ 10

Order Granting Certiorari,
*CC/Devas (Mauritius) Limited, et al. v. Antrix Corp. Ltd., et al.*,
Nos. 23-1201, 24-17 (Oct. 4, 2024), 2024 U.S. LEXIS 3063 .................................. 8

Restatement (Third) of Foreign Relations Law of the United States § 444 (1987) ..................... 25

S. Rep. No. 88-1188 (1964) ........................................................................................ 24

*Taganrog LRO and Others v. Russia*,
App. Nos. 32401/10 and 19 others, Eur. Ct. H.R. (2022) ................................. 6, 7, 15

U.S. District Court for the District of Columbia,
*Attorney Manual for Service of Process on a Foreign Defendant* (2021) ............... 11

Defendants the Russian Federation and the Ministry of Health of the Russian Federation (together, the "Federation") submit this memorandum of points and authorities in support of its motion to dismiss the complaint filed by Plaintiff Watch Tower Bible and Tract Society of Pennsylvania ("Watch Tower") for insufficient process and service of process under the Foreign Sovereign Immunities Act ("FSIA") pursuant to Federal Rules of Civil Procedure ("Federal Rules") 12(b)(4)-(5), for lack of subject matter and personal jurisdiction under the FSIA and for lack of personal jurisdiction under the Due Process Clause of the U.S. Constitution pursuant to Federal Rules 12(b)(1)-(2), and for failure to state a claim due to application of the act of state doctrine pursuant to Federal Rule 12(b)(6).

## PRELIMINARY STATEMENT

This case arises out of the alleged expropriation of real property of a Russian entity located in Russia.  Jurisdiction is predicated on the FSIA, but service has not been effected in accordance with the mandatory service provisions of the FSIA, and jurisdiction in any event is not available under the FSIA because that statute sets forth a general rule of foreign sovereign immunity from suit in U.S. courts and no exception to immunity applies in this case.

With respect to service of process, the FSIA contains specific service requirements that must be strictly adhered to in order to establish personal jurisdiction over a foreign state, and Watch Tower failed to comply with those requirements.  *Republic of Sudan v. Harrison*, 587 U.S. 1, 4–5 (2019).  Watch Tower purported to serve the Federation via courier and Russian post.  But Supreme Court precedent and decisions of courts in this district make clear that the delivery of process documents by any form of mail is ineffective service on any defendant in Russia because the Russian government objected to service by postal channels under Article 10 of the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or

Commercial Matters, Nov. 15, 1965, 20 U.S.T. 361 (the "Hague Convention"). Even if service by mail were legally permissible (and it is not), the record shows that Watch Tower did not strictly adhere to the FSIA's requirements. Accordingly, Watch Tower's attempt to serve the Federation through Russian post failed, which itself is a basis for dismissal of the complaint.

With respect to sovereign immunity, Watch Tower invokes the expropriation and commercial activity exceptions under the FSIA, but neither exception applies.

The expropriation exception does not apply because Watch Tower has not pleaded a taking "in violation of international law." 28 U.S.C. § 1605(a)(3). Under the "domestic takings rule," international law is not implicated when a state takes property belonging to its own nationals. *Federal Republic of Germany v. Philipp*, 592 U.S. 169, 176–77 (2021). In this case, based on the allegations stated and the documents referenced in the complaint, the allegedly confiscated properties belonged to a Russian entity. In addition, a foreign state may only be subject to jurisdiction under this exception if the allegedly expropriated "property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state," which is not the case here. 28 U.S.C. § 1605(a)(3).

Watch Tower's claims also fall outside the commercial activity exception to immunity, as none of the claims is "based upon" commercial activity. 28 U.S.C. § 1605(a)(2). The Supreme Court has held that a claim is "based upon" the "gravamen" of the complaint, *i.e.*, the allegedly wrongful conduct that injured the plaintiff. *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 35 (2015). The gravamen of all of Watch Tower's claims is the alleged taking of property by the Federation, which is a quintessentially sovereign, not commercial, act. *See Yang Rong v. Liaoning Province Gov't*, 452 F.3d 883, 889–90 (D.C. Cir. 2006).

Lastly, since the property at issue is located in Russia, the act of state doctrine also foreclosies Watch Tower's claims. The doctrine precludes U.S. courts from inquiring into the validity of a foreign state's sovereign acts within its own territory. Here, Watch Tower is challenging the validity of Russia's sovereign acts, including the alleged expropriation and Russian court decisions ruling that the property in question belonged to a Russian national. Thus, the complaint does not state a claim upon which relief may be granted.

## RELEVANT BACKGROUND

### A.    Factual Allegations

This action arises out of the Federation's alleged expropriation of real property, referred to as the "Bethel Facility," in Russia. According to the complaint, the Bethel Facility was initially acquired in the 1990s by the Administrative Centre of Jehovah's Witnesses in Russia (the "Administrative Centre"), a Russian legal entity. Compl. ¶¶ 25–26. On March 1, 2000, the Administrative Centre executed a "Gift Contract" purporting to transfer title and ownership of the Bethel Facility to Watch Tower, a Pennsylvania corporation. *Id.* ¶ 29. Thereafter, Watch Tower and the Administrative Centre executed a series of contracts giving the Administrative Centre the right to continue using and operating the Bethel Facility for free. *Id.* ¶ 31.

Over the years, the Administrative Centre continued to acquire property associated with the Bethel Facility in Russia. On September 17, 2010, the Administrative Centre executed a second "Gift Contract" purporting to transfer title and ownership of this additional property to Watch Tower. *Id.* ¶ 35. On July 28, 2011, Watch Tower and the Administrative Centre executed a contract giving the Administrative Centre the right to continue using and operating this additional property for free. *Id.* ¶ 36.

On January 27, 2014, Russian authorities announced that they intended to initiate legal proceedings to liquidate the Administrative Centre under applicable laws. *Id.* ¶ 49. On March

15, 2017, the Ministry of Justice initiated liquidation proceedings in the Supreme Court of Russia.  *Id.* ¶ 51(a).  Watch Tower sought to intervene in the proceedings "as a third party," but the Supreme Court rejected the application on the ground that the proceedings "did not affect [Watch Tower's] rights and interests."  *Id.* ¶ 51(b).  There is no allegation that the Administrative Centre was not allowed to participate or was otherwise not fully heard in the liquidation proceedings.  On April 20, 2017, the Supreme Court of Russia entered an order directing the dissolution of the Administrative Centre (the "Liquidation Decision").  *Id.* ¶¶ 49(c), 51(c).  Watch Tower's attempts to appeal that decision were denied on the ground that the liquidation "did not affect [Watch Tower's] legal rights and interests."  *Id.* ¶ 51(d)–(e).

Following the Liquidation Decision, the Federation proceeded to identify and seize the Administrative Centre's property in Russia.  *Id*. ¶¶ 52–53.  The Federation filed a separate action in the Sestroretskiy District Court, requesting that the Bethel Facility be turned over to the Federation on the ground that the Gift Contracts that purportedly transferred the Bethel Facility from the Administrative Centre to Watch Tower were void.  *Id*. ¶ 52.  The Russian district court placed an arrest on the property pending a decision on the merits.  *Id*. ¶ 53.

On December 7, 2017, the Russian district court issued the decision that is referenced in and appended to the complaint, annulling the Gift Contracts on the ground that they were "fictitious."  *Id.* ¶ 54; Exhibit K, ECF No. 1-12 at 6, 15–27.  The court explained that, under Russian law, a "fictitious transaction" is a "transaction concluded only for appearances, without the intention to create corresponding legal consequences."  Exhibit K, ECF No. 1-12 at 6.  It found that, after execution of the Gift Contracts, nothing about the Administrative Centre's activities changed: "the Religious Organisation [*i.e.*, the Administrative Centre] continued to possess and use the property on the same terms" at no cost, and the Administrative Centre

"carried the burden of maintenance of the property," "essentially continuing to exercise authority as an owner." *Id.* at 7.

The Russian district court further found that Watch Tower was "not registered on the territory of the Russian Federation" and that "the parties did not have the possibility to actually execute said transactions for alienation of real property." *Id.* at 8. The fact that the purported transfer of title had been registered with the City of St. Petersburg did not prove otherwise, because registration of transferred property "does not prevent classification of such a transaction as void" under Russian law. *Id.* It also did not matter that Watch Tower had notified the Russian tax agency of its purported ownership of the transferred properties or paid taxes on the properties, because those actions did "not demonstrate that the disputed real property was really transferred." *Id.* Thus, after having examined the "totality [of] the evidence submitted by the parties," the Russian district court concluded that the Gift Contracts were void as "fictitious." *Id.* Watch Tower was represented in the proceedings, and its objections were heard. *Id.* at 3.

Watch Tower appealed the Russian district court's decision to the Supreme Court of Russia, which rendered its decision on December 13, 2018. Compl. ¶¶ 56–57, 59; *see* Exhibit M, ECF No. 1-14. The Supreme Court of Russia explained that, under Russian law, the "grounds for reversing or amending judicial rulings . . . are significant violations of the norms of substantive or procedural law that impacted the outcome of the case . . . ." Exhibit M, ECF No. 1-14 at 2. After reviewing the lower court's reasoning, the Supreme Court concluded that Watch Tower's arguments, "directed at reassessing the evidence gathered in the case, cannot be seen as grounds for reversing the contested judicial rulings . . . because they do not demonstrate that there were significant violations of norms of substantive or procedural law." *Id.* at 3. The

Supreme Court thus denied Watch Tower's appeal and upheld the Federation's right to seize the Administrative Centre's property based on the Liquidation Decision.  Compl. ¶ 59.

According to the complaint, on February 19, 2019, the Federation transferred the Bethel Facility to the Federal State Budgetary Institution V.A. Almazov National Medical Research Centre of the Ministry of Health of the Russian Federation (the "Almazov Centre"), which continues to occupy and use the property to this day.  *Id.* ¶ 61.  The Almazov Centre is a state-owned medical research facility.  *Id.* ¶ 9.  It was created as a separate "legal entity" under Russian law.  *Id.* ¶ 84.

After the liquidation, the Administrative Centre and Watch Tower filed applications against the Federation in the European Court of Human Rights for alleged violations of the Convention for the Protection of Human Rights and Fundamental Freedoms, Nov. 4, 1950, 213 U.N.T.S. 221 (the "European Convention on Human Rights").[1]  Watch Tower's application was held in abeyance while the Administrative Centre's application proceeded.  *Id*. ¶¶ 66–67.

On June 7, 2022, the European Court rendered its judgment.  *Id*. ¶ 68; *see Taganrog LRO and Others v. Russia*, App. Nos. 32401/10 and 19 others, Eur. Ct. H.R. (2022) ("*Taganrog*"). According to the European Court's judgment, relied upon by Watch Tower throughout the complaint (¶¶ 2, 44–45, 49, 68–70, 96–97), the Federation violated provisions of the European Convention on Human Rights by, among other things, taking certain properties belonging to the Administrative Centre and affiliated local religious organizations ("LROs") in Russia.

---

[1] As noted in the complaint, after withdrawing from the Council of Europe and the European Convention on Human Rights in early 2022, the "Federation passed legislation to remove itself from the jurisdiction and authority of the [European Court of Human Rights]."  Compl. ¶ 70; *see also* Exhibit S, ECF No. 1-20 at 2; Council of Europe, *Chart of signatures and ratifications of Treaty 005*, Treaty Office, https://www.coe.int/en/web/conventions/full-list?module=signatures-by-treaty&treatynum=005.

*Taganrog*, ¶¶ 274, 285.  The European Court noted that, with regard to properties purportedly "transferred to foreign organisations prior to the liquidation decision," the Administrative Centre contended that "the LROs had remained the owners of the properties up to the date on which the liquidation decision became effective," relying on the Russian court "decisions annulling the transfers."  *Id.* at ¶ 276.

The European Court further noted that the Russian courts "considered that the transfer deeds had been null and void under Russian law and that the Administrative Centre or the LROs had been the legal owners of the property on the date of the liquidation decision . . . ."  *Id.* at ¶ 279.  The European Court thus treated the "immovable property" at issue as being "owned by the Administrative Centre and the LROs," and ordered the Federation to return the properties "to the applicants," namely, the Administrative Centre and LROs, or pay them the specified compensation.  *Id.* at ¶¶ 278, 306(12)-(13); *see also id.* at ¶ 27 (identifying "the applicants" as including the LROs and the Administrative Centre, without mentioning Watch Tower).

### B.    Procedural History

On September 3, 2024, Watch Tower commenced an action in this Court against the Federation and the Almazov Centre.  Watch Tower asserts claims for expropriation under international law and common law causes of action for trespass, unjust enrichment, civil conspiracy, and aiding and abetting—all of which stem from the alleged taking of the Bethel Facility in Russia.  Compl. ¶¶ 110-11, 113-16, 120-21, 126-27, 130.  Watch Tower invokes this Court's jurisdiction under the FSIA based on the expropriation and commercial activity exceptions to sovereign immunity.  *Id.* ¶¶ 86, 89.

Watch Tower filed an affidavit purporting to have served the Federation in Russia by courier and Russian post on December 9, 2024, "pursuant to 28 U.S.C. § 1608(a)(3)."  ECF No. 26 at 1; ECF No. 27 at 1.

The Federation now moves to dismiss the complaint for ineffective service of process and lack of personal and subject matter jurisdiction, as well as for failure to state a claim.

## ARGUMENT

The FSIA provides "the sole basis for obtaining jurisdiction over a foreign state," such as the Federation, in any civil action.  *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989).  The FSIA's jurisdictional grant "is not a particularly generous one." *Peterson v. Royal Kingdom of Saudi Arabia*, 416 F.3d 83, 86 (D.C. Cir. 2005).  Unless one of the FSIA's exceptions to sovereign immunity applies, this Court lacks personal and subject matter jurisdiction over the Federation.  28 U.S.C. § 1330(a)-(b); *see Peterson*, 416 F.3d at 86 ("In the absence of an applicable exception, the foreign sovereign's immunity is 'complete.'" (quoting *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 39 (D.C. Cir. 2000))).  In addition, for personal jurisdiction to exist, the Federation must first be served in accordance with the FSIA.  28 U.S.C. §§ 1330(b), 1608(a).[2]

---

[2] Even if the FSIA's requirements for personal jurisdiction were met (which is not the case), a "statute cannot grant personal jurisdiction where the Constitution forbids it."  *Gilson v. Republic of Ireland*, 682 F.2d 1022, 1028 (D.C. Cir. 1982).  A court must still determine whether the exercise of jurisdiction comports with the constitutional requirements of due process.  The D.C. Circuit has held that a foreign state itself does not qualify as a "person" under the Due Process Clause.  *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 96 (D.C. Cir. 2002). However, the Federation maintains that *Price* was wrongly decided.  The Second Circuit recently acknowledged that its decision to adopt *Price* has been heavily criticized and may have been misguided.  *See Gater Assets Ltd. v. Moldovagaz*, 2 F.4th 42, 66 n.24 (2d Cir. 2021).  And just this term, the Supreme Court granted *certiorari* in a pair of cases that raise the issue of whether foreign states are entitled to constitutional due process.  *See* Petition for Writ of Certiorari at i, *CC/Devas (Mauritius) Limited, et al., v. Antrix Corp. Ltd., et al*. (2024) (No. 23-1201); Petition for Writ of Certiorari at i, *Devas Multimedia Private Limited v. Antrix Corp. Ltd., et al*. (2024) (No. 24-17); Order Granting Certiorari, *CC/Devas (Mauritius) Limited, et al. v. Antrix Corp. Ltd., et al.*, Nos. 23-1201, 24-17 (Oct. 4, 2024), 2024 U.S. LEXIS 3063, at *1.  Therefore, the Federation reserves the right to assert any argument made available by a change in the law based on the Supreme Court's decision in the *Devas* case.

None of these requirements has been met here.  As explained more fully below, not only has Watch Tower failed to properly serve the Federation as required under the FSIA (**I**), but it also has failed to allege sufficient facts to show that an exception to sovereign immunity applies to any of its claims, which are all based entirely upon the Federation's alleged expropriation of real property in Russia belonging to a Russian national without any relevant connection to the United States (**II**).  Furthermore, the complaint fails to state a claim because the act of state doctrine bars this Court from inquiring into the validity of Russia's official acts within its own territory (**III**).

## I.    The Federation Was Not Properly Served under the FSIA

"Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied."  *Omni Capital Int'l v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987).  Section 1608(a) of the FSIA provides the exclusive methods for serving a foreign state.  *Harrison*, 587 U.S. at 4-5; *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 154 (D.C. Cir. 1994).  Section 1608(a) provides that service "shall be made upon a foreign state or political subdivision of a foreign state" by one of the following methods:

> (1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision; or
>
> (2) if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents; or
>
> (3) if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned, or

> (4) if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

28 U.S.C. § 1608(a).  These methods are listed in hierarchical order, meaning that a plaintiff may employ a method of service only after having attempted service or demonstrated that service was unavailable under a preceding method of service.  *Harrison*, 587 U.S. at 4–5; *see also Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 52 (D.D.C. 2008).

Watch Tower correctly concedes that section 1608(a)(1) does not apply because no "special arrangement" for service of process exists in this case.  ECF Nos. 26, 27.  It also acknowledges that service in accordance with an applicable international convention pursuant to section 1608(a)(2) is not available in Russia.  *Id*.  Watch Tower thus purports to have served the Federation by courier and Russian post pursuant to section 1608(a)(3).  But service by any form of mail is not permitted on any defendant in Russia as a matter of law.  The Russian government objected to service by postal channels under Article 10 of the Hague Convention,[3] and the Supreme Court has held that service cannot be made by mail in countries that have so objected. *Water Splash, Inc. v. Menon*, 581 U.S. 271, 284 (2017).  Following *Water Splash*, courts in this district have confirmed that service by mail is "categorically unavailable" under the FSIA where a foreign state has objected under Article 10 of the Hague Convention.  *See*, *e.g.*, *Azadeh v.*

---

[3] Hague Conference on Private International Law, *Declaration/reservation/notification by the Russian Federation*, https://www.hcch.net/en/instruments/conventions/status-table/notifications/?csid=418&disp=resdn (last visited Feb. 7, 2025) ("Service of documents by methods listed in Article 10 of the Convention is not permitted in the Russian Federation.").

*Gov't of the Islamic Republic of Iran*, 318 F. Supp. 3d 90, 99 (D.D.C. 2018); *Tidewater Inv. SRL v. Bolivarian Republic of Venezuela*, No. 17-1457 (TJK), 2018 U.S. Dist. LEXIS 211469, at *13 (D.D.C. Dec. 17, 2018). Indeed, the D.C. District Court's *Attorney Manual for Service of Process on a Foreign Defendant* specifically provides: "If a foreign state which is a party to the Hague Convention formally objected to service by mail when it acceded to the Convention, service under section 1608(a)(3) should not be attempted." U.S. District Court for the District of Columbia, *Attorney Manual for Service of Process on a Foreign Defendant* 6 (2021) ("*Attorney Manual*") (listing the Russian Federation as one of the countries that has objected to "service by mail via postal channels under the Hague Convention").[4] In brief, service by any form of mail is not a legally permissible method for serving the Federation under the FSIA.

Furthermore, service on a foreign state requires strict adherence to the requirements of section 1608(a); neither substantial compliance nor actual notice will suffice. *Harrison*, 587 U.S. at 19 (explaining that "adherence to strict requirements" is necessary for "cases with sensitive diplomatic implications," as is the case with suits against foreign sovereigns under the FSIA); *Barot v. Embassy of the Republic of Zambia*, 785 F.3d 26, 27 (D.C. Cir. 2015); *Transaero*, 30 F.3d at 155. Service by mail under section 1608(a)(3) expressly requires that the service package "be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned[.]" 28 U.S.C. § 1608(a)(3). As held by the D.C. Circuit in *Barot*, the failure to address and dispatch the service package directly from the clerk of court to the head of the Ministry of Foreign Affairs falls short of strict compliance and renders service ineffective. 785 F.3d at 30; *see Harrison*, 587 U.S. at 4 (holding that that the

---

[4] In that case, the *Attorney Manual* directs that the "plaintiff should proceed to service under Section 1608(a)(4)," which provides for service by diplomatic channels. *Attorney Manual* at 6.

"addressed and dispatched" language under section 1608(a)(3) "requires that a mailing be sent directly to the foreign minister's office in the minister's home country").

As is evident from the Certificate of Clerk, the service package in this case was not addressed and dispatched by the clerk of the court directly to the Minister of Foreign Affairs of the Federation in Russia, but rather to a courier service, Care Courier Group, in Turkey. ECF No. 18–1, ECF No. 20-1. In fact, Watch Tower itself acknowledged that it could not address and dispatch the service package as required under section 1608(a)(3), because U.S. mail carriers had suspended mail delivery to Russia. ECF No. 8–1 at 1-2, ECF No. 9-1 at 1-2.

Section 1608(a)(3) also requires that the service package be sent by a form of mail "requiring a signed receipt." 28 U.S.C. § 1608(a)(3). Watch Tower's affidavit of service further confirms that it did not comply with this requirement either. After repeatedly failing to deliver the service package personally, ECF No. 26 at 3; ECF No. 27 at 3, the courier mailed it "via Russian Post using a service that required both a tracking number and a signature upon delivery." *Id.* But that is not what happened. The affidavit of service states only that "the package was delivered 'to addressee by QR code,'" *id.*, without requiring a signed receipt. *Id.*

"Section 1608(c) further buttresses" the importance of strict adherence to these statutory requirements. *Harrison*, 587 U.S. at 13. Under section 1608(c), service is deemed to have occurred on the date indicated on "the certification, signed and returned postal receipt, or other proof of service applicable to the method of service employed." 28 U.S.C. § 1608(c). The only proof of service applicable under section 1608(a)(3) is a "signed receipt." 28 U.S.C. § 1608(a)(3). A QR code is not a signed receipt. Requiring a signature is not a meaningless formality. "[W]here service is deemed to have occurred on the date shown on a document signed by the person who received it from the carrier, Congress presumably thought that the

individuals *who signed for the service packet* could be trusted to ensure that the service packet is handled properly and expeditiously." *Harrison*, 587 U.S. at 14 (emphasis added). Watch Tower has not produced acceptable proof of service, let alone actually served in strict adherence to the FSIA's requirements.

Watch Tower's failure to effect service on the Federation on its own warrants dismissal of the complaint against the Federation.

## II.    No Exception to Sovereign Immunity Applies under the FSIA

Apart from ineffective service, this case should also be dismissed for lack of personal and subject matter jurisdiction because Watch Tower has failed to satisfy the requirements of any exception to sovereign immunity under the FSIA. A defendant may first bring a facial challenge to subject matter jurisdiction, meaning that the complaint, as pleaded, does not state sufficient facts to satisfy the substantive requirements of an exception to sovereign immunity.[5] *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170, 187 (2017) ("*H&P II*"); *Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela*, 743 F. App'x 442, 446 (D.C. Cir. 2018) ("*H&P III*"). Factual allegations are accepted as true, but not conclusions of law. *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 91 (D.C. Cir. 2002). Conclusory allegations are not enough; the complaint must allege specific facts that bring the claims within one of the exceptions to immunity. *Phoenix Consulting*, 216 F.3d at 40; *Butler v. Sukhoi Co.*, 579 F.3d 1307, 1313–14 (11th Cir. 2009). Allegations include the contents of any documents attached to the complaint or referenced therein. *Azima v. Rak Inv. Auth.*, 305 F. Supp. 3d 149, 159 (D.D.C. 2018), *rev'd on other grounds*, 926 F.3d 870 (D.C. Cir. 2019).

---

[5] The Federation reserves the right to bring a factual challenge to subject matter jurisdiction. *See de Csepel v. Republic of Hungary*, 27 F.4th 736, 743 (D.C. Cir. 2022); *De Csepel v. Republic of Hungary*, 714 F.3d 591, 597 (D.C. Cir. 2013).

### A.    The FSIA's Expropriation Exception Does Not Apply

Watch Tower invokes the FSIA's expropriation exception, which permits the exercise of

jurisdiction in an action in which:

> rights in property taken in violation of international law are in issue
> and that property or any property exchanged for such property is
> present in the United States in connection with a commercial activity
> carried on in the United States by the foreign state; or that property
> or any property exchanged for such property is owned or operated
> by an agency or instrumentality of the foreign state and that agency
> or instrumentality is engaged in a commercial activity in the United
> States[.]

28 U.S.C. § 1605(a)(3).  To satisfy this exception, Watch Tower must demonstrate that "(1)

rights in property are at issue; (2) those rights were taken in violation of international law; and

(3) a jurisdictional nexus exists between the expropriation and the United States." *Schubarth v.

Federal Republic of Germany*, 891 F.3d 392, 398–99 (D.C. Cir. 2018) (quoting *Nemariam v.

Federal Democratic Republic of Ethiopia*, 491 F.3d 470, 475 (D.C. Cir. 2007)).  Here, Watch

Tower cannot demonstrate that a taking has occurred "in violation of international law" or that

the requisite jurisdictional nexus exists.

### 1.    The Domestic Takings Rule Precludes Any Finding that the Bethel Facility Was Taken in Violation of International Law

Consistent with customary international law, which governs relations among nations, the

United States has long recognized the complete sovereignty of a foreign state with respect to

property owned by its nationals within its territory.  *Philipp*, 592 U.S. at 176–77.  The Supreme

Court recently confirmed that this principle is encapsulated in what is known as the "domestic

takings rule," which provides that a state's taking of its own nationals' property does not

implicate international law.  *Id.* at 176–77, 179–80.  In *Philipp*, the Court considered whether the

expropriation exception supplied jurisdiction over claims that Germany took property belonging

to its Jewish nationals during the Nazi era in violation of international law embodied in treaties

such as the United Nations Universal Declaration of Human Rights and the Convention on the Prevention of Genocide. *Id*. at 175–77. Applying the domestic takings rule, the Supreme Court held that the expropriation exception did not apply. The Court explained that the exception incorporates only the international law of property, which includes the domestic takings rule, and does not extend to alleged violations of international human rights law. *Id*. at 180–81.

The domestic takings rule disposes of all of Watch Tower's claims, which are predicated entirely on the alleged taking of the Bethel Facility in Russia. *See* Compl. ¶¶ 110-11, 113-16, 120-21, 126-27, 130. As is evident from the complaint itself, the owner of this property is the Administrative Centre, a Russian legal entity. Compl. ¶ 25. Although Watch Tower alleges that the Administrative Centre transferred the property to Watch Tower, a Pennsylvania corporation, pursuant to so-called "Gift Contracts," the complaint also acknowledges that the Russian courts nullified those transfers as "fictitious." *Id*. ¶ 54.

If there could be any doubt as to the real owner of the property, in the *Taganrog* case— the very case relied upon by Watch Tower for the proposition that the alleged taking violated the European Convention on Human Rights—the European Court treated the properties as being "owned by the Administrative Centre" and other local Russian entities, noting that the Administrative Centre itself had asserted, as a matter of fact, that "the LROs had remained the owners of the properties up to the date on which the liquidation decision became effective," relying on the Russian court decisions. *Taganrog*, ¶¶ 276, 278. The European Court accepted the validity of the Russian court decisions, noting that "the transfer deeds had been null and void under Russian law and that the Administrative Centre or the LROs had been the legal owners of the property on the date of the liquidation decision . . . ." *Id*. ¶ 279. It therefore ordered the Federation to return the properties to the Administrative Centre or LROs, not Watch Tower. *Id.*

¶¶ 27, 306(12).  Nowhere in the European Court's judgment is there any order directing the return of property, or awarding any compensation, to Watch Tower.  In short, the owner of the Bethel Facility was not Watch Tower, but rather the Administrative Centre, a Russian entity.

Because the Bethel Facility was owned by a Russian entity at the time of the alleged taking, and all of Watch Tower's claims are based upon that alleged taking, the domestic takings rule prevents this Court from exercising jurisdiction over any of Watch Tower's claims under the FSIA's expropriation exception to sovereign immunity.

> 2.    *The Complaint Does Not Plead the Requisite Jurisdictional Nexus with the United States*

This Court also lacks jurisdiction under the expropriation exception because the complaint does not sufficiently allege the requisite jurisdictional nexus with the United States. Section 1605(a)(3) provides two different jurisdictional nexus standards that apply depending on the status of the defendant:

> [1] that property or any property exchanged for such property *is present in the United States* in connection with a *commercial activity carried on in the United States by the foreign state*; or [2] that property or any property exchanged for such property is owned or operated *by an agency or instrumentality of the foreign state* and *that agency or instrumentality* is engaged in a commercial activity in the United States.

28 U.S.C. § 1605(a)(3) (emphases added).  Under binding D.C. Circuit precedent, the first clause of the nexus requirement applies when the defendant is the foreign state itself, and the second clause applies only when the defendant is an agency or instrumentality of a foreign state.  *De Csepel v. Republic of Hungary*, 859 F.3d 1094, 1104–08 (D.C. Cir. 2017).  Thus, in order to subject the Federation to jurisdiction under this exception, the expropriated property or property exchanged for that property must be both (i) present in the United States and (ii) connected to a commercial activity carried on by the Federation in the United States.  *Schubarth*, 891 F.3d at

401; *Simon v. Republic of Hungary*, 812 F.3d 127, 146 (D.C. Cir. 2016), *abrogated in part on other grounds by Philipp*, 592 U.S. 169 (2021).

Here, there is no question that the allegedly expropriated property—*i.e.*, the Bethel Facility—is located in Russia, not the United States. Watch Tower nevertheless attempts to establish jurisdiction by alleging that the Bethel Facility is generating income that has become part of the general revenues of the Federation and that such revenues have been exchanged for property in the United States. Compl. ¶ 98. But those allegations are insufficient because the allegedly expropriated property, *i.e.*, the Bethel Facility, has not been "exchanged" for anything: it remains property of the Federation according to the complaint. *Id*. at ¶ 77. Revenues generated from the allegedly expropriated property are irrelevant to the analysis under section 1605(a)(3).

In addition, apart from the fact that the Bethel Facility has not been exchanged for any property, the complaint does not sufficiently allege a connection between the property at issue and any "commercial activity carried on in the United States" by the Federation. 28 U.S.C. § 1605(a)(3). Watch Tower makes a vague reference to the Federation's consular offices in New York, Texas, and the District of Columbia, which it claims "promote business and commercial interests in the United States," as well as the Federation's "use of United States capital and debt markets to obtain financing[.]" Compl. ¶ 98. However, Watch Tower fails to allege how those supposedly "commercial" activities are "connected" to the revenues generated by the Bethel Facility.

Since the requisite jurisdictional nexus with the United States does not exist, the FSIA's expropriation exception to sovereign immunity does not apply.

**B.     The Commercial Activity Exception Does Not Apply**

Watch Tower also asserts jurisdiction under the third clause of the FSIA's commercial activity exception, which abrogates sovereign immunity when "the action is based upon … an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States."  28 U.S.C. § 1605(a)(2).  Watch Tower makes no allegation specific to the Federation that would bring any of the claims against the Federation within the commercial activity exception.

The Supreme Court has held that the phrase "based upon" in the commercial activity exception refers to the "gravamen" of the plaintiff's lawsuit.  *OBB*, 577 U.S. at 33–36.  To determine the gravamen of the case, courts must "zero[] in on the core of [the plaintiff's] suit: the [ ] sovereign [defendant's] acts that actually injured [the plaintiff]."  *Id.* at 35.  In this case, the act that allegedly injured Watch Tower was the alleged expropriation of the Bethel Facility in Russia.  Compl. ¶¶ 110–11, 113–16, 120–21, 126–27, 130.  Expropriation is a quintessentially sovereign—not commercial—act.  *See, e.g.*, *Yang Rong*, 452 F.3d at 889–90; *Barnet v. Ministry of Culture & Sports of the Hellenic Republic,* 961 F.3d 193, 201 (2d Cir. 2020).  None of the causes of action asserted in the complaint turn on any other actionable conduct that allegedly injured Watch Tower.

Where, as here, the gravamen of the complaint is an expropriation of property, subject matter jurisdiction exists only if the substantive requirements of the FSIA's expropriation exception are satisfied.  *Yang Rong*, 452 F.3d at 890; *Garb v. Republic of Poland*, 440 F.3d 579, 588 (2d Cir. 2006).  Indeed, "courts have repeatedly rejected litigants' attempts to establish subject matter jurisdiction pursuant to other FSIA exceptions when their claims are in essence based on disputed takings of property."  *Id.*  Watch Tower cannot "escape the requirements of section 1605(a)(3) through artful recharacterization of [its] takings claims."  *Id.* (quoting

*Chuidian v. Philippine National Bank*, 912 F.2d 1095, 1106 (9th Cir. 1990)); *accord Beg v. Islamic Republic of Pakistan*, 353 F.3d 1323, 1326 (11th Cir. 2003); *De Sanchez v. Banco Central de Nicaragua*, 770 F.2d 1385, 1398 (5th Cir. 1985).

Moreover, the complaint does not allege any commercial activity by the Federation upon which the action is based. Any post-expropriation use of the property by the Almazov Centre is irrelevant and does not convert a sovereign taking into commercial activity. *See Yang Rong*, 452 F.3d at 890 ("[T]he Province's subsequent acts of forming Huachen and transferring the Brilliance Holdings shares to Huachen did not transform the Province's expropriation into commercial activity."); *see also Garb*, 440 F.3d at 587 ("[S]ubsequent commercial transactions involving expropriated property do not give rise to subject matter jurisdiction over claims arising from the original expropriation.").

While the complaint correctly identifies the Almazov Centre as a legally separate "agency or instrumentality" of the Federation under the FSIA, 28 U.S.C. § 1603(b)(1), Watch Tower also claims that the Almazov Centre is an alter ego of the Federation. The complaint does not make clear to what end Watch Tower advances that claim. To the extent Watch Tower seeks to argue that the Almazov Centre's alleged activities are attributable to the Federation because it is the alter ego of the Federation, that argument fails. In *First Nat'l City Bank v. Banco Para El Comercio Exterior De Cuba*, 462 U.S. 611, 626–28 (1983) ("*Bancec*"), the Supreme Court established that state-owned entities enjoy a "strong" presumption of separateness. *Arch Trading Corp. v. Republic of Ecuador*, 839 F.3d 193, 201 (2d Cir. 2016). Watch Tower has failed to allege sufficient facts to overcome *Bancec*'s strong presumption. The fact that the Almazov Centre is owned by Russia and subject to Russian regulatory and supervisory authority does not distinguish it from other wholly owned state enterprises that the D.C. Circuit has held were

entitled to be respected as legal personalities separate and distinct from their state owners.  *See*, *e.g.*, *GSS Grp. Ltd. v. Nat'l Port Auth. of Liberia & Republic of Liberia*, 822 F.3d 598, 607 (D.C. Cir. 2016) ("*GSS Group II*"); *TransAmerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 850–51 (D.C. Cir. 2000); *UAB Skyroad Leasing v. OJSC Tajik Air*, No. 21-7015, 2022 U.S. App. LEXIS 16977, at *3–6 (D.C. Cir. June 17, 2022).  Nothing in the complaint alleges the sort of day-to-day control that is the touchstone of *Bancec*'s extensive-control inquiry. *TransAmerica Leasing*, 200 F.3d at 852; *Gater Assets*, 2 F.4th at 55 (2d Cir. 2021).  Nor has Watch Tower come close to pleading any fraud or abuse of the corporate form that injured Watch Tower.  *See GSS Group II*, 822 F.3d at 608.

Moreover, even if the activities of the Almazov Centre alleged in the complaint were attributable to the Federation, they are not "commercial" in nature when viewed in context.  *See* Almazov Centre's Op. Br. 16-17.  Nor has Watch Tower sufficiently pleaded a "direct effect" in the United States.  The D.C. Circuit has rejected similar allegations that a foreign state's actions abroad had some general impact on commerce in the United States as insufficient to plead a direct effect under the FSIA's commercial activity exception.  *See Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela*, 784 F.3d 804, 817 (D.C. Cir. 2015) ("*H&P I*"), *rev'd on other grounds*, 581 U.S. 170 (2017).

In brief, none of the exceptions to sovereign immunity applies to the Federation, and Watch Tower has not and could not sufficiently plead otherwise.  Therefore, the complaint should be dismissed for lack of personal and subject matter jurisdiction under the FSIA.

## III.     Watch Tower Cannot State a Claim Because the Act of State Doctrine Applies

Based on the pleadings, the act of state doctrine provides a separate basis for dismissal as a matter of law pursuant to Federal Rule 12(b)(6).  This is because "the act of state doctrine provides foreign states with a substantive defense on the merits."  *Republic of Austria v.*

*Altmann*, 541 U.S. 677, 700–01 (2004); *see also Smith-Haynie v. District of Columbia*, 155 F.3d 575, 578 (D.C. Cir. 1998) ("[A]n affirmative defense may be raised by pre-answer motion under Rule 12(b) when the facts that give rise to the defense are clear from the face of the complaint.").[6]

The act of state doctrine "precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964); *see also Underhill v. Hernandez*, 168 U.S. 250, 252–54 (1897). Put differently, the act of state doctrine requires dismissal of any case where the "relief sought . . . would … require[] a court in the United States to declare invalid the official act of a foreign sovereign performed within its own territory." *W.S. Kirkpatrick & Co. v. Env't Tectonics Corp.*, 493 U.S. 400, 405 (1990). Here, Watch Tower submits claims based on an alleged expropriation of real property belonging to a Russian national in Russia. Such an "expropriation of property is the classic act of state." *World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1166 (D.C. Cir. 2002).

Watch Tower's claims are also barred by the act of state doctrine because the resolution of those claims would require this Court to question the validity of certain decisions of the Russian courts adjudicating rights in real property located in Russia. *See Von Saher v. Norton Simon Museum of Art*, 897 F.3d 1141, 1156 (9th Cir. 2018) (act of state doctrine barred claims that would require U.S. court to question validity of Dutch court decisions); *Nocula v. UGS Corp.*, 520 F.3d 719, 723 (7th Cir. 2008) (similar).

---

[6] The "FSIA in no way affects application of the act of state doctrine." *Altmann*, 541 U.S. at 701. "While the effect of sovereign immunity is to shield the person of the foreign sovereign and, by extension, his agents from jurisdiction, the act of state doctrine shields the foreign sovereign's internal laws from intrusive scrutiny." *Braka v. Bancomer, S.A.*, 589 F. Supp. 1465, 1470 (S.D.N.Y. 1984), *aff'd*, 762 F.2d 222 (2d Cir. 1985).

To be sure, one court in this district recently held that the so-called "Second Hickenlooper Amendment" bars application of the act of state doctrine to expropriation claims even where the allegedly expropriated property is outside the United States.  *See Helmerich v. Petroleos de Venezuela, S.A.*, No. 11-cv-1735 (CRC), 2024 U.S. Dist. LEXIS 169895, at *47–48 (D.D.C. Sep. 20, 2024) ("*H&P IV*").  The Federation submits that this case, which is now on appeal to the D.C. Circuit, was wrongly decided.

The Hickenlooper Amendment states in relevant part:

> … [N]o court in the United States shall decline on the ground of the federal act of state doctrine to make a determination on the merits giving effect to the principles of international law *in a case in which a claim of title or other rights to property is asserted* by any party including a foreign state (or a party claiming through such state) based upon (or traced through) a confiscation or other taking after January 1, 1959, by an act of that state *in violation of the principles of international law* ….

22 U.S.C. § 2370(e)(2) (emphases added).

By its plain terms, the Hickenlooper Amendment applies only where there is a violation of international law.  As held by the Supreme Court in *Philipp*: "[N]othing in the [Hickenlooper] Amendment purported to alter any rule of international law, including the domestic takings rule." 592 U.S. at 170.  Again, Watch Tower cannot allege a violation of international law because the allegedly expropriated property belonged to a Russian national.

Furthermore, the Hickenlooper Amendment applies only "in a case in which a claim *of title* or other rights to property" are asserted.  22 U.S.C. § 2370(e)(2) (emphasis added); *French v. Banco Nacional de Cuba*, 23 N.Y.2d 46, 58 (N.Y. 1968) ("The law is restricted, manifestly, to … a claim of title or other right to specific property.").  A "claim of title" refers to a dispute over ownership of property.  *See Title*, *Black's Law Dictionary* (12th ed. 2024) ("[T]he legal link between a person who owns property and the property itself.").  The term "claim of title" sets the

outer bounds for what is included within the phrase "other rights to property." Otherwise, the specific language of a "claim of title" would become superfluous, as it would be swallowed by an overly broad reading of "other rights to property." *See Fischer v. United States*, 603 U.S. 480, 486–88 (2024) (applying the canons of *noscitur a sociis* and *ejusdem generis* to avoid surplusage in a statute); *Dole Food Co. v. Patrickson*, 538 U.S. 468, 476–77 (2003) (applying the canon against surplusage to a similar provision of the FSIA). Indeed, the amendment was not meant "to assure a remedy in American courts for every kind of monetary loss resulting from actions, even unjust actions, of foreign governments." *French*, 23 N.Y.2d at 57–58. In this case, Watch Tower is not seeking to adjudicate a claim of title or other *similar* ownership rights to property. It is asserting a claim for damages. A claim for monetary damages, even one based on the taking of property, is outside the scope of the Hickenlooper Amendment. *See id.* at 57–58, 61–62.

The language of "claim of title" also indicates that Congress intended for the amendment to apply only to cases in which the allegedly expropriated property is in the United States, because U.S. courts may only adjudicate title or similar ownership rights to property located in the United States. "It is well understood that, unless a contrary intent appears, an act of Congress 'is meant to apply only within the territorial jurisdiction of the United States.'" *Garvey v. Admin. Rev. Bd.*, 56 F.4th 110, 122 (D.C. Cir. 2022) (quoting *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010)). This "presumption" against extraterritoriality may be "rebutted only when the statute's 'text, history, or purposes . . . evince[] a clear indication of extraterritorial reach.'" *Id.* at 122 (quoting *Kiobel v. Royal Dutch Petro. Co.*, 569 U.S. 108, 109 (2013)); *see also RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 335 (2016).

Nothing in the text of the statute suggests that Congress intended U.S. courts to adjudicate claims of title or other similar ownership rights to property located outside the United States. The history and purpose of the amendment further confirms this territorial limitation. The amendment was "intended to reverse in part the … decision of the Supreme Court in *Banco de Nacional de Cuba v. Sabbatino*," which held that the act of state doctrine barred any challenge in U.S. courts to a Cuban government's expropriation of property belonging to a U.S. company. *Banco Nacional de Cuba v. Farr*, 383 F.2d 166, 174 (2d Cir. 1967) (quoting S. Rep. No. 88-1188, pt. I, at 24 (1964)). Specifically, *Sabbatino* involved the issue of whether the Cuban government acquired "good title to" a shipment of sugar that it expropriated from a U.S. company. *Id*. at 170. The proceeds from the sale of the sugar found their way into a bank account in New York. *Id*. That fact made the Supreme Court's decision in *Sabbatino* unbearable to Congress. *Id.* at 174–75. Thus, the amendment's reversal of *Sabbatino* would "mak[e] sure that the United States [did not] become a 'thieves market' for the product of foreign expropriations," and would send the message that "foreign states taking action against U.S. investments in violation of international law cannot market the product of their expropriation in the United States free from the risk of litigation." *Id.* at 175 (quoting 110 Cong. Rec. 19559 (1964)). In other words, the amendment was only intended to apply when the expropriated property, or proceeds from the sale of that property, found their way into the United States, so as to ensure that U.S. courts would exercise their power to adjudicate title or other similar ownership rights to property that was located in the United States.

A long line of authorities establishes that the Hickenlooper Amendment does not apply where the property allegedly taken is outside the United States. *See*, *e.g.*, *Compania de Gas de Nuevo Laredo, S.A. v. Entex, Inc.*, 686 F.2d 322, 327 (5th Cir. 1982) ("[W]e hold that the

Hickenlooper amendment is inapplicable because neither the nationalized property nor its proceeds are located in the United States."); *Empresa Cubana Exportadora de Azucar y Sus Derivados v. Lamborn & Co.*, 652 F.2d 231, 237 (2d Cir. 1981) ("Since in this case the seized assets are still in Cuba, the Hickenlooper Amendment does not apply."); *Yang Rong v. Liaoning Province Gov't*, 362 F. Supp. 2d 83, 99 (D.D.C. 2005) (holding that the Hickenlooper Amendment did not apply because the property at issue, shares in a Hong Kong company allegedly expropriated by China, was "not located in the United States"), *aff'd*, 452 F.3d 883 (D.C. Cir. 2006); *Glen v. Club Mediterranee S.A.*, 365 F. Supp. 2d 1263, 1268 (S.D. Fla. 2005), *aff'd on other grounds*, 450 F.3d 1251 (11th Cir. 2006) (holding that the Hickenlooper Amendment did not apply because the "property is alleged to be real property located outside the territorial jurisdiction of the United States"); *see also* Restatement (Third) of Foreign Relations Law of the United States (1987) § 444 cmt. e ("[F]or the … Amendment to apply, the plaintiff must allege and prove that the property that is the subject of the claim is in the United States.").

The court in *H&P IV* admittedly "br[oke] ranks with these authorities" and relied on dicta in the majority decision in *Ramirez de Arellano v. Weinberger*, 745 F.2d 1500 (D.C. Cir. 1984) (en banc), which was vacated by the Supreme Court on other grounds, 471 U.S. 1113 (1985). But it is far from clear that the D.C. Circuit today would abide by the majority's dicta in *Ramirez*, as a forceful dissent joined by then-Judge Scalia would have held, like all other circuit courts to have ruled on the issue, that the Hickenlooper Amendment applies only to cases in which the specific property is in the United States. *Ramirez*, 745 F.2d at 1573 (Starr, J., dissenting).[7]

_____

[7] The court in *H&P IV* also mistakenly relied on a supposedly implicit holding in *Agudas Chasidei Chabad of U.S. v. Russian Federation*, 528 F.3d 934 (D.C. Cir. 2008), in which the D.C. Circuit stated that, under the Hickenlooper Amendment, the act of state doctrine "pose[d]

In sum, the act of state doctrine bars Watch Tower's claims as a matter of law.

## CONCLUSION

For the reasons stated above, the complaint should be dismissed for ineffective service of process and lack of personal and subject matter jurisdiction under the FSIA, as well as for failure to state a claim by operation of the act of state doctrine.

Dated: Washington, D.C.
        February 7, 2025

Respectfully submitted,

CURTIS, MALLET-PREVOST,
    COLT & MOSLE LLP

By: /s/ Juan O. Perla
    Kevin A. Meehan (D.C. Bar No. 1613059)
    Juan O. Perla (D.C. Bar No. 1660389)
    1717 Pennsylvania Avenue, N.W.
    Washington, D.C. 20006
    Tel.: (202) 452-7373
    Fax: (202) 452-7333
    kmeehan@curtis.com
    jperla@curtis.com

    *Attorneys for Defendants Russian Federation,
    Ministry of Health of the Russian Federation,
    and Federal State Budgetary Institution V.A.
    Almazov National Medical Research Centre*

---

no apparent barrier" to the plaintiff's expropriation claim, without addressing the fact that the property was in Russia. *H&P IV*, 2024 U.S. Dist. LEXIS 169895, at *52. But the D.C. Circuit itself has cautioned against reading too much into *Agudas* because a "passing remark" has "no precedential effect." *Chabad v. Russian Federation*, 110 F.4th 242, 252 (D.C. Cir. 2024) (quoting *De Csepel*, 859 F.3d at 1105–06).