## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WATCH TOWER BIBLE AND TRACT SOCIETY OF PENNSYLVANIA,<br><br>Plaintiff,<br><br>v.<br><br>THE RUSSIAN FEDERATION, *et al.*,<br><br>Defendants. | Case No. 1:24-cv-02523-RC<br><br>**<u>Oral Argument Requested</u>** |

## REPLY MEMORANDUM OF POINTS AND AUTHORITIES
## <u>IN SUPPORT OF THE ALMAZOV CENTRE'S MOTION TO DISMISS</u>

CURTIS, MALLET-PREVOST,
 COLT & MOSLE LLP
 Kevin A. Meehan (D.C. Bar No. 1613059)
 Juan O. Perla (D.C. Bar No 1660389)
 1717 Pennsylvania Avenue, N.W.
 Washington, D.C. 20006
 Tel.: (202) 452-7373
 Fax: (202) 452-7333
 kmeehan@curtis.com
 jperla@curtis.com

*Attorneys for Defendants Russian Federation, Ministry of Health of the Russian Federation, and Federal State Budgetary Institution V.A. Almazov National Medical Research Centre*

Dated: Washington, D.C.
       February 17, 2025

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................................................................ ii

PRELIMINARY STATEMENT ................................................................................................... 1

ARGUMENT ................................................................................................................................. 3

    I.    The Almazov Centre Was Not Properly Served ................................................. 3

    II.    The Court Lacks Subject Matter Jurisdiction Under The FSIA ......................... 5

        A.    The FSIA's Expropriation Exception Does Not Apply .............................. 5

            1.    *Watch Tower Cannot Establish a Violation of International Law* ....................... 5

            2.    *The Complaint Does Not Plead the Requisite Jurisdictional Nexus with the United States* ........................... 8

        B.    The Commercial Activity Exception Does Not Apply ............................. 10

            1.    *Watch Tower's Claim Is Not Based Upon Acts of the Almazov Centre* ............... 11

            2.    *Watch Tower Has Failed to Establish a "Direct Effect" in the United States* ........................... 13

    III.    The Exercise Of Jurisdiction Would Violate Due Process ................................. 16

    IV.    The Act Of State Doctrine Bars Watch Tower's Claims .................................... 21

CONCLUSION ............................................................................................................................ 25

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Af-Cap, Inc. v. Chevron Overseas (Congo), Ltd.*,
    475 F.3d 1080 (9th Cir. 2007) ................................................ 19

*AMTO, LLC v. Bedford Asset Mgmt., LLC*,
    No. 14-CV-9913, 2015 U.S. Dist. LEXIS 70577 (S.D.N.Y. May 29, 2015) ........................... 4

*Arch Trading Corp. v. Republic of Ecuador*,
    839 F.3d 193 (2d Cir. 2016) ................................................ 16

*Azadeh v. Gov't of the Islamic Republic of Iran*,
    318 F. Supp. 3d 90 (D.D.C. 2018) ................................................ 4

*Banco Nacional de Cuba v. Farr*,
    383 F.2d 166 (2d Cir. 1967) ................................................ 23

*Banco Nacional De Cuba v. Sabbatino*,
    376 U.S. 398 (1964) ................................................ 21, 23, 24

*Barnet v. Ministry of Culture & Sports of the Hellenic Republic*,
    961 F.3d 193 (2d Cir. 2020) ................................................ 11

*Base Metal Trading SA v. Russian Aluminum*,
    253 F. Supp. 2d 681 (S.D.N.Y. 2003) ................................................ 7

*Bidonthecity.com LLC v. Halverston Holdings Ltd.*,
    No. 12 Civ. 9258, 2014 U.S. Dist. LEXIS 45891 (S.D.N.Y. Mar. 31, 2014) ........................... 4

*Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*,
    581 U.S. 170 (2017) ................................................ 5

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
    932 F.3d 126 (3d Cir. 2019) ................................................ 19, 21

*De Csepel v. Republic of Hungary*,
    27 F.4th 736 (D.C. Cir. 2022) ................................................ 20

\* *De Csepel v. Republic of Hungary*,
    859 F.3d 1094 (D.C. Cir. 2017) ................................................ 21

*Dewhurst v. Telenor Invest AS*,
    83 F. Supp. 2d 577 (D. Md. 2000) ................................................ 18

*Dole Food Co. v. Patrickson*,
    538 U.S. 468 (2003) ................................................ 22

*EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.,*
   104 F.4th 287 (D.C. Cir. 2024) ................................................................. 14

*Elbasir v. Kingdom of Saudi Arabia,*
   468 F. Supp. 2d 155 (D.D.C. 2007) ......................................................... 10

*EM Ltd. v. Banco Central de la República Argentina,*
   800 F.3d 78 (2d Cir. 2015) ...................................................................... 17

*Exxon Mobil Corp. v. Corporation CIMEX, S.A. (Cuba),*
   111 F.4th 12 (D.C. Cir. 2024) ........................................................... passim

\* *Federal Republic of Germany v. Philipp,*
   592 U.S. 169 (2021) ...................................................................... 6, 22, 25

*First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba,*
   462 U.S. 611 (1983) ................................................................. 2, 17, 19, 20

*Fischer v. United States,*
   603 U.S. 480 (2024) ................................................................................ 22

*Foremost-McKesson, Inc. v. Islamic Republic of Iran,*
   905 F.2d 438 (D.C. Cir. 1990) ...................................................... 15, 17, 21

*French v. Banco Nacional de Cuba,*
   23 N.Y.2d 46 (N.Y. 1968) ................................................................. 24, 25

*Garb v. Republic of Poland,*
   440 F.3d 579 (2d Cir. 2006) .................................................................... 11

*Garvey v. Admin. Rev. Bd.,*
   56 F.4th 110 (D.C. Cir. 2022) ................................................................. 22

*Gater Assets Ltd. v. Moldovagaz,*
   2 F.4th 42 (2d Cir. 2021) ........................................................................ 18

*Gen. Star Nat'l Ins. Co. v. Administratia Asigurarilor de Stat,*
   713 F. Supp. 2d 267 (S.D.N.Y. 2010) ..................................................... 17

*Glen v. Club Mediterranee, S.A.,*
   450 F.3d 1251 (11th Cir. 2006) ............................................................... 12

\* *GSS Grp. Ltd. v. Nat'l Port Auth. of Liberia & Republic of Liberia,*
   822 F.3d 598 (D.C. Cir. 2016) ........................................................... 17, 18

*Hammerstein v. Federal Republic of Germany,*
   No. 09-CV-443, 2011 U.S. Dist. LEXIS 88565
   (E.D.N.Y. July 28, 2011) ........................................................................ 10

*Havana Docks Corp. v. Royal Caribbean Cruises, Ltd.*,
   119 F.4th 1276 (11th Cir. 2024) ................................................................ 12

*Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela*,
   784 F.3d 804 (D.C. Cir. 2015) ............................................................. 13, 16

*Helmerich & Payne Int'l Drilling Co. v. Petroleos de Venezuela, S.A.*,
   No. 11-cv-1735, 2024 U.S. Dist. LEXIS 169895 (D.D.C. Sep. 20, 2024) ........................ 19, 20

*Helmerich Int'l Drilling Co. v. Bolivarian Republic of Venezuela*,
   No. 11-cv-01735, 2023 U.S. Dist. LEXIS 15576 (D.D.C. Jan. 31, 2023) ............................ 19

*Hilton v. Guyot*,
   159 U.S. 113 (1895) ........................................................................... 7

*Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*,
   115 F.3d 1020 (D.C. Cir. 1997) ............................................................... 10

*Kadmon Corp., Ltd. Liab. Co. v. Ltd. Liab. Co. Oncon*,
   No. 22-cv-5271, 2023 U.S. Dist. LEXIS 36070 (S.D.N.Y. Mar. 3, 2023) ............................. 4

*Kiobel v. Royal Dutch Petro. Co.*,
   569 U.S. 108 (2013) .......................................................................... 22

*Letelier v. Republic of Chile*,
   748 F.2d 790 (2d Cir. 1984) .................................................................. 17

*Livnat v. Palestinian Auth.*,
   851 F.3d 45 (D.C. Cir. 2017) ................................................................. 16

\* *LS Energia Inc v. Corp. Electrica Nacional S.A.*,
   No. 21-21642-CIV-WILLIAMS/MCALILEY, 2023 U.S. Dist. LEXIS 2677
   (S.D. Fla. Jan. 6, 2023) ...................................................................... 4

*McKesson HBOC, Inc. v. Islamic Republic of Iran*,
   271 F.3d 1101 (D.C. Cir. 2001) ........................................................... 14, 15

*Morrison v. Nat'l Australia Bank Ltd.*,
   561 U.S. 247 (2010) .......................................................................... 22

\* *Nocula v. UGS Corp.*,
   520 F.3d 719 (7th Cir. 2008) .................................................................. 6

\* *OBB Personenverkehr AG v. Sachs*,
   577 U.S. 27 (2015) ........................................................................... 11

\* *Philippine Nat'l Bank v. United States Dist. Court*,
   397 F.3d 768 (9th Cir. 2005) ......................................................... 7, 13, 25

*Price v. Socialist People's Libyan Arab Jamahiriya*,
    294 F.3d 82 (D.C. Cir. 2002) ................................................................................ 6, 16

*Republic of Argentina v. Weltover, Inc.*,
    504 U.S. 607 (1992) .................................................................................................... 9

*Republic of Austria v. Altmann*,
    541 U.S. 677 (2004) .................................................................................................. 24

*Republic of Sudan v. Harrison*,
    587 U.S. 1 (2019) ........................................................................................................ 5

*Ricaud v. Am. Metal Co.*,
    246 U.S. 304 (1918) .................................................................................................... 6

*RJR Nabisco, Inc. v. European Cmty.*,
    579 U.S. 325 (2016) .................................................................................................. 22

*Rubin v. Islamic Republic of Iran*,
    583 U.S. 202 (2018) .................................................................................................. 17

*Saudi Arabia v. Nelson*,
    507 U.S. 349 (1993) .................................................................................................... 9

*Tidewater Inv. SRL v. Bolivarian Republic of Venezuela*,
    No. 17-1457, 2018 U.S. Dist. LEXIS 211469 (D.D.C. Dec. 17, 2018) ..................... 4

*TMR Energy Ltd. v. State Prop. Fund of Ukraine*,
    411 F.3d 296 (D.C. Cir. 2005) ................................................................................. 20

*Transaero, Inc. v. La Fuerza Aerea Boliviana*,
    30 F.3d 148 (D.C. Cir. 1994) ................................................................................... 20

*TransAmerica Leasing, Inc. v. La Republica de Venezuela*,
    200 F.3d 848 (D.C. Cir. 2000) ........................................................................... 17, 18

\* *Von Saher v. Norton Simon Museum of Art*,
    897 F.3d 1141 (9th Cir. 2018) ............................................................................. 6, 25

*Walker Int'l Holdings Ltd. v. Republic of Congo*,
    395 F.3d 229 (5th Cir. 2004) .................................................................................... 19

\* *Water Splash, Inc. v. Menon*,
    581 U.S. 271 (2017) .................................................................................................... 3

*Whitehead v. CBS/Viacom, Inc.*,
    221 F.R.D. 1 (D.D.C. 2004) ....................................................................................... 5

*Yang Rong v. Liaoning Province Gov't*,
    452 F.3d 883 (D.C. Cir. 2006) ........................................................................ 2, 11

*Zedan v. Kingdom of Saudi Arabia*,
    849 F.2d 1511 (D.C. Cir. 1988) .............................................................................. 15

**Statutes and Rules**

22 U.S.C. § 2370(e)(2) ................................................................................................ 3, 22

22 U.S.C. § 6021 ..................................................................................................... 2, 11, 12

22 U.S.C. §§ 2151 *et seq.* (1961), *amended by* 22 U.S.C. § 2370 (1964) .................................... 24

28 U.S.C. § 1603(b)(1) ............................................................................................... 2, 19

28 U.S.C. § 1603(b)(2) ...................................................................................................... 17

28 U.S.C. § 1605(a)(2) ...................................................................................................... 11

28 U.S.C. § 1605(a)(3) ......................................................................................... 2, 18, 23, 24

28 U.S.C. § 1608(a)(3) ........................................................................................................ 5

28 U.S.C. § 1608(b) ........................................................................................................... 3

28 U.S.C. § 1608(b)(3)(B) ................................................................................................... 5

Fed. R. Civ. P. 12(b)(6) ...................................................................................................... 6

**Treaties**

Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or
    Commercial Matters, Nov. 15, 1965, 20 U.S.T. 361 .................................................... 1, 3, 4

**Other Authorities**

110 Cong. Rec. 19559 (1964) .............................................................................................. 23

*Black's Law Dictionary* (12th ed. 2024) .................................................................................. 22

Restatement (Third) of Foreign Relations Law § 481(1) (1987) ....................................................... 7

S. Rep. No. 88-1188 (1964) ................................................................................................ 23

*Taganrog LRO and Others v. Russia*,
    App. Nos. 32401/10 and 19 others, Eur. Ct. H.R. (2022) .......................................................... 7, 8

The Almazov Centre submits this reply in support of its motion to dismiss (ECF No. 23).

## PRELIMINARY STATEMENT

Watch Tower has failed to establish personal and subject matter jurisdiction over the Almazov Centre under the Foreign Sovereign Immunities Act ("FSIA"). To start, Watch Tower offers no legal basis for serving the Almazov Centre by mail in Russia in light of Russia's objection to service by postal channels under Article 10 of the Hague Convention. Watch Tower's only response on this point is that the cases cited by the Almazov Centre either do not involve service under the FSIA or do not involve service specifically in Russia after Russia suspended cooperation with the United States under the Hague Convention. Watch Tower does not cite a single authority to support either of those arguments, yet research has revealed case after case in which courts have held that service by mail in Russia is not available in any context. Neither substantial compliance nor actual notice suffices to cure that legal defect.

Watch Tower has also failed to establish that either the expropriation or the commercial activity exception to sovereign immunity under the FSIA applies in this case. The expropriation exception does not apply because no property has been taken in violation of international law. The Bethel Facility belonged to Watch Tower's Russian affiliate, the Administrative Centre, not Watch Tower, as the Russian courts conclusively determined. Even though the Administrative Centre asserted to the European Court of Human Rights that the property belonged to the Administrative Centre, and even though the European Court accepted the Russian court decisions as valid and granted relief only to the Administrative Centre for that property, Watch Tower now asks this Court to relitigate the ownership of real property in Russia. This Court should reject that extraordinary request.

As for the FSIA's commercial activity exception, Watch Tower cannot get out from under this Court's decision in *Yang Rong v. Liaoning Province Gov't*, 452 F.3d 883 (D.C. Cir.

2006), and other cases like it, which hold that the commercial activity exception does not apply where, as here, the cause of action rises or falls on establishing an alleged taking in violation of international law.  In that case, only the expropriation exception can apply.  Watch Tower mistakenly relies on this Court's recent decision in *Exxon Mobil Corp. v. Corporation CIMEX, S.A. (Cuba)*, 111 F.4th 12 (D.C. Cir. 2024), which held that a plaintiff may invoke the commercial activity exception to bring a claim for trafficking in confiscated property under Title III of the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996, 22 U.S.C. § 6021 *et seq*, commonly referred to as the Helms-Burton Act.  That statute creates a special cause of action only for trafficking in property that was taken by Cuba, which obviously is not the case here.  *Exxon* is thus inapposite, and *Yang Rong* governs.  This Court should thus dismiss the complaint for lack of personal and subject matter jurisdiction under the FSIA.

The Almazov Centre should also be dismissed for lack of personal jurisdiction under the Due Process Clause.  Watch Tower's theory that the Almazov Centre is an alter ego of the Federation under *First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba* ("*Bancec*"), 462 U.S. 611 (1983), is wrong because Watch Tower alleges nothing more than the ordinary indicia of state ownership.  Moreover, if Watch Tower's alter ego theory were to be accepted, it would be fatal to this Court's subject matter jurisdiction under the expropriation exception.  If the Almazov Centre is an alter ego of the Federation and therefore not a "person" entitled to due process, it cannot be a separate "agency or instrumentality" of the Federation under the FSIA's expropriation exception because the *sine qua non* of an agency or instrumentality under that statute is being a "separate legal person, corporate or otherwise."  28 U.S.C. § 1603(b)(1).  In that case, the Almazov Centre, like the Federation, would have to be dismissed because the allegedly expropriated property is not "present in the United States."  28 U.S.C. § 1605(a)(3).

Lastly, the act of state doctrine bars adjudication of Watch Tower's claims on the merits. The Second Hickenlooper Amendment does not apply where the allegedly expropriated property

is outside the United States.  The statute's plain language supports that reading because it explicitly limits the amendment to cases "in which a claim of title or other rights to property is asserted."  22 U.S.C. § 2370(e)(2).  Since a U.S. court may only adjudicate claims to title or similar ownership rights to property located in the United States, Congress must have intended the amendment to apply only to cases where the property is in the United States.  That interpretation is bolstered by the presumption against extraterritoriality, as nothing in the text, history or purpose of the amendment indicates that Congress intended to reach cases in which the property remains outside the United States and out of the reach of U.S. courts.

## ARGUMENT

### I.    The Almazov Centre Was Not Properly Served

Watch Tower has not served the Almazov Centre in accordance with a permissible method for serving an agency or instrumentality of a foreign state under the FSIA.  28 U.S.C. § 1608(b).  In *Water Splash, Inc. v. Menon*, the Supreme Court unequivocally held that service cannot be effected by mail in countries that have objected to service by postal channels under Article 10 of the Hague Convention.  581 U.S. 271, 284 (2017).  There is no dispute that Russia objected to service by any form of mail, including courier, under Article 10 of the Hague Convention.

Contrary to Watch Tower's contention (at 27), it does not matter that *Water Splash* did not involve service on an agency or instrumentality of a foreign state under the FSIA or service on a defendant in Russia after Russia stopped processing service requests from the United States under the Hague Convention.  Russia's objection to service by postal channels under Article 10 of the Hague Convention is unconditional and does not carve out service on agencies or instrumentalities of Russia.  Indeed, following *Water Splash*, courts in and outside this district have consistently held that service by mail is "categorically unavailable" under the FSIA where a foreign state has so objected.  *See, e.g., Azadeh v. Gov't of the Islamic Republic of Iran*, 318 F.

3

Supp. 3d 90, 99 (D.D.C. 2018); *Tidewater Inv. SRL v. Bolivarian Republic of Venezuela*, No. 17-1457, 2018 U.S. Dist. LEXIS 211469, at *13 (D.D.C. Dec. 17, 2018); *see also LS Energia Inc v. Corp. Electrica Nacional S.A.*, No. 21-21642-CIV-WILLIAMS/MCALILEY, 2023 U.S. Dist. LEXIS 2677, at *9 (S.D. Fla. Jan. 6, 2023).  Watch Tower cites no contrary authority.

Courts have likewise rejected attempts to serve any defendant in Russia by mail after Russia suspended cooperation with the United States under the Hague Convention in 2003.  *See*, *e.g.*, *Kadmon Corp., Ltd. Liab. Co. v. Ltd. Liab. Co. Oncon*, No. 22-cv-5271, 2023 U.S. Dist. LEXIS 36070, at *9 (S.D.N.Y. Mar. 3, 2023) (explaining that service "through DHL courier service" in Russia is not permitted because of "Russia's objection to Article 10"); *AMTO, LLC v. Bedford Asset Mgmt., LLC*, No. 14-CV-9913, 2015 U.S. Dist. LEXIS 70577, at *18–19 (S.D.N.Y. May 29, 2015) (rejecting request to serve defendant by mail in Russia because "Russia objected to Article 10 of the Hague Convention, and Russia's failure to abide by the Convention does not change the fact that Russia does not agree to service by mail" (cleaned up)); *Bidonthecity.com LLC v. Halverston Holdings Ltd.*, No. 12 Civ. 9258, 2014 U.S. Dist. LEXIS 45891, at *25 (S.D.N.Y. Mar. 31, 2014) (holding that even though Russia ceased processing service requests from the United States under the Hague Convention, "service by mail still does not suffice as adequate service" in Russia).  Watch Tower does not cite a single case in which a court rejected Russia's objection under the Hague Convention and authorized service by any form of mail in Russia.

Watch Tower seeks to distract from this clear prohibition by arguing that substantial compliance and actual notice is enough.  Opp. 22.  But actual notice is irrelevant if service is legally defective, as is the case here.  Nor does substantial compliance with an impermissible method of service cure defective service.  *See Whitehead v. CBS/Viacom, Inc.*, 221 F.R.D. 1, 3 (D.D.C. 2004) (holding that service on an unauthorized agent was ineffective, even though defendant had actual notice).  Watch Tower does not argue otherwise.  In any case, Watch

Tower's opposition itself confirms that it is not possible to substantially comply with section 1608(b)(3)(B) in this case, because that method of service is practically unavailable at this time. That provision authorizes service by mail "addressed and dispatched by the clerk of the court to the agency or instrumentality to be served." 28 U.S.C. § 1608(b)(3)(B). In *Republic of Sudan v. Harrison*, the Supreme Court interpreted the same "addressed and dispatched" language under section 1608(a)(3) and concluded that it "requires that a mailing be sent directly" by the clerk of court to the sovereign defendant. 587 U.S. 1, 4 (2019). That did not and could not happen in this case because, as Watch Tower avers, "U.S. mail carriers suspended mail delivery to Russia" and therefore it is not possible for the service package to be addressed and dispatched by the clerk of court *directly* to the Almazov Centre. Opp. 24.

In brief, since Watch Tower failed to serve the Almazov Centre in accordance with the FSIA, the complaint against the Almazov Centre should be dismissed.

## II.    The Court Lacks Subject Matter Jurisdiction Under The FSIA

### A.    The FSIA's Expropriation Exception Does Not Apply

#### 1.    Watch Tower Cannot Establish a Violation of International Law

While the expropriation exception relates to jurisdiction, the Supreme Court has held that a court must decide whether the plaintiff has made a "legally valid claim" that a violation of international law has occurred for the expropriation exception to apply. *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170, 174 (2017) ("*H&P II*"). "If to do so, it must inevitably decide some, or all, of the merits issues, so be it." *Id.* at 178. Here, Watch Tower cannot establish jurisdiction under the expropriation exception to immunity because of the domestic takings rule, which provides that a state's taking of its own national's property does not implicate international law. *Federal Republic of Germany v. Philipp*, 592 U.S.

169, 177 (2021). Because the Administrative Centre, a Russian entity, owned the property at issue in this case at the time of the alleged taking, no international law violation has occurred.[1]

Watch Tower seeks to avoid application of the domestic takings rule by claiming that it was in fact the real owner of the Bethel Facility, and attempts to establish such ownership by pointing to various allegations in the complaint stemming from the Administrative Centre's purported transfer of that property to Watch Tower pursuant to "Gift Contracts." Opp. 8-9. But those allegations share a fatal flaw: they each depend on the validity of the Gift Contracts. Opp. at 9-10. That is a legal issue, and Watch Tower's legal assertion about the validity of those contracts cannot simply be accepted as true under Rule 12(b)(6). *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 91 (D.C. Cir. 2002).

"Under the act of state doctrine, 'title to the property in this case must be determin[e]d by the result of the action taken by'" the Russian government. *Von Saher v. Norton Simon Museum of Art*, 897 F.3d 1141, 1150 (9th Cir. 2018) (quoting *Ricaud v. Am. Metal Co.*, 246 U.S. 304, 309 (1918) (brackets supplied)); *see also Nocula v. UGS Corp.*, 520 F.3d 719, 727 (7th Cir. 2008) (noting that where the complaint was "internally inconsistent on the ownership" of the relevant property, resolution of that issue "implicate[d] the act-of-state doctrine."). There is no dispute that the Russian courts issued decisions nullifying the purported transfers of property under the Gift Contracts as "fictitious" under Russian law. Compl. ¶ 54. The judgments of a foreign

---

[1] Watch Tower's attempt to distinguish *Philipp* is meritless. In *Philipp*, the Supreme Court stated: "The expropriation exception is best read as referencing the international law of expropriation rather than of human rights." *Philipp*, 592 U.S. at 180. All the international treaties that Watch Tower invokes (at 19) are international human rights treaties, including the European Convention on Human Rights, the Universal Declaration of Human Rights, the International Covenant on Civil and Political Rights, and the U.N. General Assembly's Declaration on the Elimination of All Forms of Intolerance and of Discrimination Based on Religion or Belief. None of those treaties can provide a basis for a supposed violation of international law under the FSIA's expropriation exception. *See Philipp*, 592 U.S. at 177–78 (identifying the United Nations Declaration of Human Rights and "decisions of the European Commission on Human Rights" as examples of international human rights law).

state's courts "are treated as acts of state when they 'g[i]ve effect to the public interest' of the

government." *Von Saher*, 897 F.3d at 1152.[2]  "There is no question that the judgment of the

[Russian courts] gave effect to the public interest of the [Russian] government," because the

liquidation and related asset seizure proceedings were "not a mere dispute between private

parties," but rather "action[s] initiated by the [Russian] government pursuant to its" laws.

*Philippine Nat'l Bank v. United States Dist. Court*, 397 F.3d 768, 773 (9th Cir. 2005).  Thus, as

explained more fully in section IV below and in the Almazov Centre's opening brief, the act of

state doctrine precludes this Court from declaring invalid the judgments of the Russian courts

ordering the liquidation of the Administrative Centre and the seizure of its property under

Russian law, including the determination that the Bethel Facility belonged to the Administrative

Centre, not Watch Tower.

      The representations made by the Administrative Centre, Watch Tower's Russian affiliate

(Compl. ¶ 22), to the European Court in *Taganrog LRO and Others v. Russia*, App. Nos.

32401/10 and 19 others, Eur. Ct. H.R. (2022), further confirm that Watch Tower was not the

lawful owner of the Bethel Facility at the time of the alleged expropriation.  Relying on the same

Russian court decisions that Watch Tower now asks this Court to disregard, the Administrative

Centre asserted that "the LROs had remained the owners of the properties up to the date on

which the liquidation decision became effective."  *Taganrog* ¶ 276.  Watch Tower attempts to

deflect from those statements by pointing to statements made by the Federation in those

---

[2] While the act of state doctrine is dispositive on this question, general principles of comity
further weigh in favor of deferring to the Russian court judgments.  *See Hilton v. Guyot*, 159
U.S. 113 (1895); *see also* Restatement (Third) of Foreign Relations Law § 481(1) (1987) ("[A]
final judgment of a court of a foreign state . . . *determining interests in property*[] is conclusive
between the parties, and is entitled to recognition in courts in the United States.").  This Court
should not act as a court of appeals for the Russian judiciary.  *See*, *e.g., Base Metal Trading SA
v. Russian Aluminum*, 253 F. Supp. 2d 681, 708 (S.D.N.Y. 2003), *aff'd*, 98 F. App'x 47 (2d. Cir.
2004) ("This Court is not a court of appeals for the Russian legal system and will not act as such.
To do so would amount to an act of judicial overreaching[.]").

proceedings. The European Court acknowledged both positions and deferred to the Russian courts' decision, noting "that the transfer deeds had been null and void under Russian law and that the Administrative Centre or the LROs had been the legal owners of the property on the date of the" alleged expropriation. *Id.* at ¶ 279.

Even more, Watch Tower does not dispute that the European Court granted compensation for the property, and ordered that it be returned, only to the Administrative Centre, not Watch Tower. The European Court granted that relief precisely because it recognized the Administrative Centre as the owner of the property. Thus, contrary to Watch Tower's contentions, identifying the real owner of the property was not an "ancillary" issue in the European Court proceedings.

2.    *The Complaint Does Not Plead the Requisite Jurisdictional Nexus with the United States*

Watch Tower also cannot establish jurisdiction under the expropriation exception because it has not established the requisite jurisdictional nexus with the United States. Watch Tower's allegations in this regard fail for two distinct reasons: first, the complaint is devoid of any allegation that the Almazov Centre engaged in any activity *in the United States*, and second, Watch Tower provides no context for the various alleged transactions that would permit this Court to determine that the Almazov Centre's activities were "commercial" in nature. While Watch Tower claims that the Almazov Centre "ignores the Complaint's specific allegations that it is involved in commercial activity" in the United States (Opp. 20), its allegations are conclusory at best and appear to be intentionally vague.

Watch Tower claims that the Almazov Centre's supposed "commercial activity" in the United States is established by its charter, which refers to "income-generating activities" related to its operations as a state-owned medical research facility, as well as supposed "collaborations" with U.S. entities. Opp. 21. But none of those allegations actually establishes that the Almazov

Centre is engaged in any activity, much less commercial activity, *in the United States*. For example, Watch Tower alleges that the Almazov Centre entered into a "contract with [IBM] in New York," showing only that IBM is in New York, but not the Almazov Centre. Opp. 21. Watch Tower also alleges that the Almazov Centre has a "contractual relationship with the University of Texas MD Anderson Cancer Center in Texas to perform work in oncological care," which only establishes that the Anderson Cancer Center is in Texas, not that the Almazov Centre has performed any oncological work in Texas. *Id.* Likewise, Watch Tower alleges that the Almazov Centre has an "agreement with Greehey's Children Cancer Research Institute at the University of Texas Health Science Center to carry out the scientific work in the molecular and physiology field," again carefully omitting which party is carrying out what work and where. *Id.* Watch Tower makes similarly loose allegations of "agreements with University of Arkansas, University of Iowa, Yale University in Connecticut, and Broad Institute of MIT in Harvard to engage in medical research," without alleging which entity is performing what activities where. *Id.* Even its allegation that Almazov doctors and researchers "are reportedly paid clinical investigators in clinical trials for pharmaceutical and biotechnology companies in the United States" indicates that the companies are in the United States, but Watch Tower does not allege that any Almazov Centre researchers or doctors are doing anything in the United States. *Id.* Indeed, Watch Tower fails to identify a single allegation in the complaint that places any representatives of the Almazov Centre in the United States.

Moreover, Watch Tower's allegations do not establish that the nature of the Almazov Centre's involvement in these supposed collaborations is "commercial" rather than governmental in nature. *See Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992); *Saudi Arabia v. Nelson*, 507 U.S. 349, 360 (1993). Watch Tower does not dispute that context matters for this inquiry, yet it offers no analysis about the context of these alleged collaborations. Nor does it even attempt to distinguish the cases the Almazov Centre cited, which explain that activities that

9

might seem commercial on the surface may actually be governmental in light of the context in which they occur.  *See*, *e.g.*, *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1030 (D.C. Cir. 1997) (noting that it is insufficient that the alleged "actions may relate in certain respects to commercial activity"); *see also Hammerstein v. Federal Republic of Germany*, No. 09-CV-443, 2011 U.S. Dist. LEXIS 88565, at *11–13 n.4 (E.D.N.Y. July 28, 2011) ("observ[ing] that running a government-operated children's hospital is similar to the sovereign activities of managing a police force or a park, and less like operating a cruise ship or hotel"); *Elbasir v. Kingdom of Saudi Arabia*, 468 F. Supp. 2d 155, 161 (D.D.C. 2007) (finding that the provision of health care benefits is "uniquely sovereign in nature").  While Watch Tower alleges that the Almazov Centre complies with "governmental orders" and collaborates on research and scientific work with various entities, including "governmental organizations" (Opp. 38, 41), it seems to take for granted that the Almazov Centre's role in these alleged collaborations involves the sort of activities in which any private actor can engage, rather than actions more properly attributed to regulators and public health entities, such as the National Health Institute or the Centers for Disease Control and Prevention.  Watch Tower's allegations are thus insufficient to establish that Watch Tower's alleged activities are commercial.

### B.    The Commercial Activity Exception Does Not Apply

Watch Tower also cannot establish jurisdiction under the FSIA's commercial activity exception.  It relies only on the third clause of the commercial activity exception, which applies when (i) "the action is based upon . . . an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere" and (ii) "that act causes a direct effect in the United States."  28 U.S.C. § 1605(a)(2).  Watch Tower has not demonstrated that any of those requirements is met here.

1.    *Watch Tower's Claim Is Not Based Upon Acts of the Almazov Centre*

In order to determine what conduct an action is "based upon," the court must zero in on the "gravamen" of the plaintiff's lawsuit. *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 33–36 (2015). The "gravamen" of the lawsuit is determined by looking to the "acts that actually injured [the plaintiff]." *Id.* at 35. Here, the only act that allegedly injured Watch Tower was the seizure of the Bethel Facility by the Federation in Russia. Compl. ¶¶ 110–11, 113–16, 120–21, 126–27, 130. A taking of property by the state is a quintessentially sovereign—not commercial—act. *See, e.g., Yang Rong*, 452 F.3d at 889–90; *Barnet v. Ministry of Culture & Sports of the Hellenic Republic*, 961 F.3d 193, 201 (2d Cir. 2020). A plaintiff may not repackage its takings claim as a claim "based upon" commercial activity if the "gravamen" of the complaint is the sovereign act of expropriation. *See, e.g., Yang Rong*, 452 F.3d at 890; *Garb v. Republic of Poland*, 440 F.3d 579, 587 (2d Cir. 2006) ("[S]ubsequent commercial transactions involving expropriated property do not give rise to subject matter jurisdiction over claims arising from the original expropriation.").

In response, Watch Tower relies on the D.C. Circuit's recent decision in *Exxon*, citing the court's statement that a sovereign's "antecedent expropriation and the defendants' possession of [plaintiff's] property may have enabled the challenged commercial activity" but "does not diminish the applicability of the commercial-activity exception." 111 F.4th at 31. But *Exxon* was not an expropriation case. Rather, the plaintiffs in *Exxon* brought an action under the Helms-Burton Act, 22 U.S.C. § 6021 *et seq.*, a statute enacted specifically for purposes of creating a cause of action under federal law—*distinct* from the original taking of property—against any person who "traffics" in property wrongfully taken from a U.S. national by the Cuban government. *See Havana Docks Corp. v. Royal Caribbean Cruises, Ltd.*, 119 F.4th 1276, 1291 (11th Cir. 2024) ("Congress enacted the Helms-Burton Act to provide a comprehensive remedial regime for the property that the Cuban Government confiscated in 1959."). The statute

presumes that the original expropriation of property was unlawful. 22 U.S.C. § 6081(6)(B) (stating that "the foreign policy of the United States" is "to protect the claims of United States nationals who had property wrongfully confiscated by the Cuban Government"); *Glen v. Club Mediterranee, S.A.*, 450 F.3d 1251, 1255 (11th Cir. 2006). The court concluded that a claim for "trafficking" in confiscated property under that statute—not for the original taking—may fit within the commercial activity exception under the FSIA. *Exxon*, 111 F.4th at 19, 31 (distinguishing *Rong* and similar cases because "the core of the suit in those cases, unlike here, was an antecedent act of expropriation, not subsequent commercial activity").

Unlike in *Exxon,* Watch Tower's claims are all based upon the alleged expropriation of the Bethel Facility. None of Watch Tower's claims invokes any cause of action distinct from the alleged taking. In quoting *Exxon* for the proposition that "the commercial use of the confiscated Bethel Facility" is sufficient to establish commercial activity, Watch Tower conveniently omits the end of the court's sentence, which makes clear that the core of the suit was "the commercial use of confiscated property, *which Congress has deemed actionable under Title III* [*i.e.*, the Helms-Burton Act]." 111 F. 4th at 33 (emphasis added). That statute does not apply here, and thus *Exxon* is inapposite.

Moreover, the allegations in the complaint are insufficient to establish that the alleged expropriation bears any relation to commercial activity anywhere. Watch Tower claims only that the Almazov Centre's "extensive and ongoing commercial activities" were "enabled by Russia's taking of Watch Tower's vast property complex." (Opp. at 32.) But all of the activities Watch Tower relies upon—collaborations with health care facilities and educational institutions—form part of the Almazov Centre's general operations, and there is no allegation that they bear any connection to the taking of the Bethel Facility itself.

Watch Tower claims that the "manner" in which the Federation expropriated the property supports that the taking was in the nature of a commercial act. According to Watch Tower, the

Federation acted "as a private party" by "bringing an action equivalent to a quiet title lawsuit." Opp. 33.  Watch Tower cites no authority supporting its position, and its argument rests on an oversimplification of the act constituting the alleged "expropriation."  The seizure of the Bethel Facility occurred as a consequence of the Federation's actions seeking to liquidate the Administrative Centre for violating applicable laws and then to seize property belonging to the Administrative Centre.  These proceedings were "not a mere dispute between private parties"; they are the result of the Federation's sovereign acts in pursuing these actions to enforce its own laws.  *Philippine Nat'l Bank*, 397 F.3d at 773.

       2.      *Watch Tower Has Failed to Establish a "Direct Effect" in the United States*

Watch Tower also cannot establish any "direct effect" in the United States within the meaning of the commercial activity exception.  It claims that the taking of the Bethel Facility caused two direct effects: (1) targeting and injuring Watch Tower, an American corporation; and (2) altering the flow of money within, out of, and into the United States.  Opp. at 34.  A direct effect "is one which has no intervening element, but, rather, flows in a straight line without deviation or interruption."  *Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela*, 784 F.3d 804, 817 (D.C. Cir. 2015) ("*H&P I*"), *rev'd on other grounds*, 581 U.S. 170 (2017) ("*H&P II*").  Merely alleging that a foreign state's actions abroad impacted commerce in the United States is insufficient to plead a direct effect under the FSIA's commercial activity exception.  *Id.*.

Contrary to Watch Tower's argument (at 36), none of the authorities it relies upon supports its position that targeting a U.S. entity by itself establishes the requisite direct effect in the United States.  Watch Tower incorrectly relies on *EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.*, 104 F.4th 287 (D.C. Cir. 2024).  *EIG Energy* actually works against Watch Tower because the court made clear that "targeting [wa]s not the touchstone of [its] inquiry," explaining that it "drew that term not from the FSIA's text or . . . precedent but from [the

plaintiff]'s allegations." 104 F.4th at 294. Rather, the court found that there was a direct effect because the foreign instrumentality "facilitated and promoted" —essentially induced—the U.S. plaintiff to invest in Brazil, "directly leading to both the investment and [the plaintiff]'s ultimate injury when the investment was lost." *Id.* at 295. The "specific targeting" at issue in *EIG* was a foreign instrumentality's fraudulent misrepresentations made to a U.S. investor, its intentional concealment of ongoing fraud, and the use of the U.S. investor's money to pay bribes and kickbacks, all of which resulted in significant financial loss to those investors. *Id.* at 292. Here, there is no contention that Russia intentionally targeted and induced Watch Tower, as an American corporation, to invest in Russia, and then used that investment to commit illegal acts that financially harmed Watch Tower in the United States. According to the complaint, Russia liquidated the Administrative Centre, a Russian entity, in accordance with applicable laws, and the Russian courts determined that the Bethel Facility belonged to the Administrative Centre, not Watch Tower, under Russian law.

Watch Tower also relies on *McKesson HBOC, Inc. v. Islamic Republic of Iran*, 271 F.3d 1101 (D.C. Cir. 2001) ("*McKesson II*"), claiming that the "cutting-off" of an American corporation's "rights to its assets" creates a "direct effect" in the United States. Opp. 35. But *McKesson* does not stand for the proposition that an expropriation of an American corporation's property automatically creates a "direct effect" simply because the American corporation is prevented from accessing the property abroad and thus suffers financial losses in the United States. To the contrary, it has long been established that "the suffering of financial hardship in the United States from events that take place abroad is not, alone, sufficient to establish 'direct effects.'" *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 450 (D.C. Cir. 1990) ("*McKesson I*") (citing *Zedan v. Kingdom of Saudi Arabia*, 849 F.2d 1511, 1514–15 (D.C. Cir. 1988)).

In *McKesson I*, the court found a "direct effect" because the plaintiff, an American corporation, had a contractual relationship with the Iranian government as joint shareholders of an Iranian dairy company. *Id.* at 451. In *McKesson II*, the court reiterated that, after the plaintiff was frozen out of the dairy company by Iran, it "no longer received its standard yearly dividends," "lost control of the [foreign company's] board," and stopped receiving "shareholder communications or compensation for its investment" in the United States, "even though it still own[ed] a thirty-one percent interest in the [company]." *McKesson II*, 271 F.3d at 1104. The court upheld its prior determination, at the motion to dismiss stage, that these effects were sufficiently "direct" because they were not merely "fortuitous," but rather expressly set forth in the parties' agreement. *See id.* at 1105; *McKesson I,* 905 F.2d at 451. That is not the case here. Watch Tower does not allege to have entered into any shareholder or other agreement with the Federation, much less one that contemplated that Watch Tower would exercise any rights in the United States.

Next, Watch Tower relies on *Exxon* for the proposition that "a change in the flow of money in the United States constitutes a direct effect." 111 F.4th at 33. *Exxon* does not help Watch Tower, because all the court did there was suggest that, under certain circumstances, changes in cash flows in and out of the United States *might* satisfy the "direct effects" requirement. However, it expressly remanded to the district court to determine whether those effects were sufficiently "direct" in that case. *Id.* at 35–37. As the Almazov Centre explained in its opening brief, interrupting the flow of money in and out of the United States without more is far too remote to constitute a *direct* effect in the United States under the FSIA's commercial activity exception. *See H&P I*, 784 F.3d at 817. Rather, a direct effect exists where there is a "guarantee of future business" in the United States, and money that was "supposed to have been paid in the United States" is not in fact paid. *Id.* at 818–19 (cleaned up).

In brief, the commercial activity exception does not apply where the act upon which the claims are based is an alleged expropriation, and, in any event, Watch Tower has failed to show that the alleged expropriation caused a direct effect in the United States.

### III.    The Exercise Of Jurisdiction Would Violate Due Process

Watch Tower has not established, nor does it even attempt to establish, that the exercise of personal jurisdiction over the Almazov Centre would comport with constitutional due process. Rather, it claims that agencies or instrumentalities "that are alter egos or agents of the foreign state" under *Bancec* are not entitled to due process. Opp. 38. The basis for that argument is that, unlike a corporate instrumentality, a foreign state is not a "person" under the Due Process Clause. *Price*, 294 F.3d at 96; *Livnat v. Palestinian Auth.*, 851 F.3d 45, 49 (D.C. Cir. 2017).

Watch Tower's allegations regarding the purported alter ego relationship between the Federation and the Almazov Centre are insufficient to overcome the "strong" presumption of separateness established in *Bancec*. *Arch Trading Corp. v. Republic of Ecuador*, 839 F.3d 193, 201 (2d Cir. 2016); *see Bancec*, 462 U.S. at 626 (cautioning against too "[f]reely ignoring the separate status of government instrumentalities"). *Bancec* identified circumstances under which a corporate instrumentality's separateness may be disregarded: (1) "where a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created"; or (2) where recognizing the corporate entity as a separate juridical entity "would work fraud or injustice." 462 U.S. at 629. *Bancec* did not announce a "mechanical formula," *id.* at 633, and the D.C. Circuit has never recognized a pre-determined set of factors that should guide the analysis in every case.[3]

---

[3] In *Rubin v. Islamic Republic of Iran*, 583 U.S. 202 (2018), the Supreme Court did not purport to announce a set of factors that guide the analysis under *Bancec*. The Court was only noting that Congress' inclusion of the factors indicated an intent to abrogate *Bancec* specifically with respect to the enforcement of terrorism judgments under section 1610(g) of the FSIA. *Rubin*, 583 U.S. at 211 (observing that "at a minimum, §1610(g) serves to abrogate *Bancec* with respect to the liability of agencies and instrumentalities of a foreign state where a [terrorism exception]

Watch Tower's allegations purporting to establish the Federation's "complete dominion and control" over the Almazov Centre are nothing more than the ordinary indicia of a legally separate instrumentality that is majority-owned by the state. 28 U.S.C. § 1603(b)(2). For instance, Watch Tower relies on allegations of supervisory or governance-type control that stems from that ownership interest, such as the appointment of directors and the assignment of tasks or duties to the Almazov Centre under its charter and applicable laws. *See* Opp. 40-41. But ordinary governance or supervisory control, without some abuse of the corporate form, does not establish an alter ego or agent relationship under *Bancec*. *See TransAmerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 849 (D.C. Cir. 2000); *McKesson I*, 905 F.2d at 448; *EM Ltd. v. Banco Central de la República Argentina*, 800 F.3d 78, 92–93 (2d Cir. 2015); *Letelier v. Republic of Chile*, 748 F.2d 790, 794 (2d Cir. 1984). That is true even where the foreign state appoints government officials to serve as officers and directors of state-owned companies. *See GSS Grp. Ltd. v. Nat'l Port Auth. of Liberia & Republic of Liberia*, 822 F.3d 598, 607 (D.C. Cir. 2016) ("*GSS Group II*"); *see also Gen. Star Nat'l Ins. Co. v. Administratia Asigurarilor de Stat*, 713 F. Supp. 2d 267, 282 (S.D.N.Y. 2010); *Dewhurst v. Telenor Invest AS*, 83 F. Supp. 2d 577, 588 (D. Md. 2000). Otherwise, all state-owned enterprises would automatically be alter egos of their parent governments.

Watch Tower also points to the Federation's exercise of regulatory control over the Almazov Centre, such as the "issuance of policies," as well as the Almazov Centre's general "compliance with government orders." Opp. 40-41. However, a foreign state's actions as a regulator do not overcome the *Bancec* presumption of separateness. *See TransAmerica Leasing*, 200 F.3d at 851; *see also GSS Group II*, 822 F.3d at 606–07. And compliance with the law is not

---

judgment holder seeks to satisfy a judgment held against the foreign state"). To the contrary, *Rubin* expressly observed that *Bancec* left "lower courts with the task of assessing the availability of exceptions on a case-by-case basis." *Id.* at 210.

evidence that corporate formalities have been ignored.  What is notably absent from Watch Tower's complaint is any allegation that the Federation interferes with and manages the Almazov Centre's day-to-day operations.  *See TransAmerica Leasing*, 200 F.3d at 852.  That omission is dispositive because the touchstone of *Bancec*'s control inquiry is whether the foreign state "exercises significant and repeated domination and control" over the instrumentality's day-to-day operations.  *Gater Assets Ltd. v. Moldovagaz*, 2 F.4th 42, 55 (2d Cir. 2021); *see TransAmerica Leasing*, 200 F.3d at 847–48, 852.

Nor has Watch Tower pointed to any fraud or other similar injustice that would warrant disregarding the Almazov Centre's juridical separateness.  Contrary to Watch Tower's suggestion, transferring property to be operated by the Almazov Centre, while the Federation retains ownership of the property, does not erase legal distinctions.  The expropriation exception itself contemplates that the state may transfer expropriated property to be "owned or operated" by an agency or instrumentality, without the transferee losing its separate legal status as an agency or instrumentality under the FSIA.  28 U.S.C. § 1605(a)(3).  Watch Tower's reliance on *Bancec* for this point is misplaced.  The transfer of property that concerned the *Bancec* Court involved a situation in which Cuba brought an action against a U.S. bank in U.S. court, and then attempted to evade a counterclaim by the bank by transferring the allegedly expropriated property to a separate entity, Bancec.  *Bancec*, 462 U.S. at 632–33.  That is not the case here.

In any event, concluding that the Almazov Centre is legally indistinguishable from the Federation would have the effect of depriving this Court of subject matter jurisdiction under the FSIA's expropriation exception.  If Almazov is not a separate "person" entitled to due process, then by definition it cannot be an "agency or instrumentality" under the FSIA, because under that statute the defining feature of being an "agency or instrumentality" is being a "separate legal person, corporate or otherwise."  28 U.S.C. § 1603(b)(1).  In that case, the more stringent jurisdictional nexus standard that applies to the Federation under the FSIA's expropriation

exception would also have to apply to the Almazov Centre. Therefore, because the property at issue is located in Russia, not the United States, the Almazov Centre, like the Federation, would have to be dismissed for lack of subject matter jurisdiction under the expropriation exception. *Helmerich Int'l Drilling Co. v. Bolivarian Republic of Venezuela*, No. 11-cv-01735, 2023 U.S. Dist. LEXIS 15576, at *3–4 (D.D.C. Jan. 31, 2023) ("*H&P III*").[4]

  While the district court in the *H&P* case recently held that an instrumentality of a state could be legally indistinguishable from the foreign state under *Bancec* for purposes of due process and still be a legally separate "agency or instrumentality" for purposes of subject matter jurisdiction under the FSIA, this Court should not follow that approach. *See Helmerich & Payne Int'l Drilling Co. v. Petroleos de Venezuela, S.A.*, No. 11-cv-1735, 2024 U.S. Dist. LEXIS 169895, at *42-44 (D.D.C. Sep. 20, 2024) ("*H&P IV*"). The *H&P* decision was wrongly decided, and is currently on appeal to the D.C. Circuit. The *H&P* court reasoned that the foreign entity's status as a "person" under the Due Process Clause was governed by *Bancec*, while its status as an "agency or instrumentality" under the FSIA was determined by the so-called "core functions" test. *H&P IV*, 2024 U.S. Dist. LEXIS 169895, at *43 (citing *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148 (D.C. Cir. 1994)). In the court's view, "[b]ecause these tests answer different questions, they need not come to the same answer." *Id*.

  The district court failed to appreciate that, while the *Bancec* test and the core functions test may be different, they turn on the same fulcrum: legal personhood. The core functions test is a judicial gloss on section 1603(b)(1)'s requirement that an agency or instrumentality be a "separate legal person." *See Transaero*, 30 F.3d at 151. The D.C. Circuit devised this test as a

---

[4] Courts have uniformly held that a plaintiff must satisfy the more stringent standards applicable to the foreign state itself under the FSIA where the plaintiff is proceeding on the theory that the defendant is the alter ego of the state under *Bancec*. *See, e.g.*, *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126, 149–50 n.14 (3d Cir. 2019); *Walker Int'l Holdings Ltd. v. Republic of Congo*, 395 F.3d 229, 237 (5th Cir. 2004); *Af-Cap, Inc. v. Chevron Overseas (Congo) Ltd.*, 475 F.3d 1080, 1095 (9th Cir. 2007).

means of easily determining whether an entity should be treated as part of the foreign state itself

or as a legally separate "agency or instrumentality" under the FSIA's service of process

provisions. *Id.* at 152; *see also TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296,

301 (D.C. Cir. 2005). While the D.C. Circuit has extended the core functions test to other

provisions of the FSIA, including the expropriation exception, *De Csepel v. Republic of*

*Hungary*, 27 F.4th 736, 743 (D.C. Cir. 2022), it has never ruled that an agency or instrumentality

can be treated as a separate legal person under the core functions test and at the same time be

treated as an alter ego of the state under *Bancec* for any purpose.

Like the core functions test, *Bancec* is concerned with determining the "[s]eparate legal

personality" of a foreign state's instrumentality. 462 U.S. at 625.[5] The D.C. Circuit has

recognized that *Bancec*'s presumption of separateness stems, at least in part, from the FSIA's

separate treatment of agencies and instrumentalities. *De Csepel v. Republic of Hungary*, 859

F.3d 1094, 1107 (D.C. Cir. 2017) (noting "the Act's 'presumption' that agencies and

instrumentalities have 'independent status' from the foreign state"); *accord Crystallex Int'l Corp.*

*v. Bolivarian Republic of Venezuela*, 932 F.3d 126, 139 (3d Cir. 2019) ("[T]he *Bancec* doctrine

. . . is a federal common-law outgrowth of [the FSIA].").  Accordingly, unless the *Bancec*

presumption is overcome, "the court lacks subject matter jurisdiction over the foreign state for

the acts of its instrumentality." *De Csepel*, 859 F.3d at 1107 (quoting *McKesson I*, 905 F.2d at

446–47). The inverse is also true: courts have exercised subject matter jurisdiction over an

instrumentality as if it were the foreign state itself under the FSIA where the *Bancec* presumption

has been overcome. *See*, *e.g.*, *Crystallex*, 932 F.3d at 139. In short, a determination that the

---

[5] In *Bancec*, the Supreme Court announced a presumption that "government instrumentalities
established as juridical entities distinct and independent from their sovereign should normally be
treated as such." 462 U.S. at 625–27. *Bancec* recognized that this presumption stems, in part,
from Congress' treatment of agencies or instrumentalities as legally separate from their parent
governments in the FSIA. *Id.* at 627–28 (looking to the text and legislative history of the FSIA).

Almazov Centre and the Federation are one and the same under *Bancec* would mean that they are also one and the same under the FSIA.

Because there is no dispute that due process is not satisfied here, the complaint against the Almazov Centre should be dismissed for lack of personal jurisdiction, but in the event that this Court were to accept Watch Tower's alter ego argument, the Almazov Centre, like the Federation, would have to be dismissed for lack of subject matter jurisdiction.

## IV.     The Act Of State Doctrine Bars Watch Tower's Claims

Watch Tower does not contest that the act of state doctrine, if applicable, would bar its claims under *Banco Nacional De Cuba v. Sabbatino*, 376 U.S. 398 (1964), and its progeny, which applied the act of state doctrine to expropriations. Rather, Watch Tower argues that the act of state doctrine does not apply because *Sabbatino* was superseded by the Second Hickenlooper Amendment for a "claim of taking of property in violation of international law, which occurred after January 1, 1959." (Opp. at 12.) True, the Second Hickenlooper Amendment superseded *Sabbatino*, but only with respect to the "adjudication of claims *Sabbatino* had avoided deciding." *Philipp*, 592 U.S. at 170. The text of the amendment is the best indication of what exactly those claims are.

The Second Hickenlooper Amendment applies only "in a case in which a claim of title or other rights to property is asserted." 22 U.S.C. § 2370(e)(2). A "claim of title" refers to a dispute over ownership of property. *See Title*, *Black's Law Dictionary* (12th ed. 2024) ("[T]he legal link between a person who owns property and the property itself."). As the Almazov Centre explained in its opening brief, the term "claim of title" sets the outer bounds for what is included within the phrase "other rights to property." Otherwise, the specific language of a "claim of title" would become superfluous, as it would be swallowed by an overly broad reading of "other rights to property." *See Fischer v. United States*, 603 U.S. 480, 486–88 (2024) (applying the canons of *noscitur a sociis* and *ejusdem generis* to avoid surplusage in a statute);

*Dole Food Co. v. Patrickson*, 538 U.S. 468, 476 (2003) (applying the canon against surplusage to a similar provision of the FSIA).

Congress' use of the term "claim of title" thus indicates that it intended for the amendment to apply only to cases in which the allegedly expropriated property is in the United States, because U.S. courts may only adjudicate title to property in the United States. Moreover, "[i]t is well understood that, unless a contrary intent appears, an act of Congress 'is meant to apply only within the territorial jurisdiction of the United States.'" *Garvey v. Admin. Rev. Bd.*, 56 F.4th 110, 122 (D.C. Cir. 2022) (quoting *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010)). This "presumption" against extraterritoriality may be "rebutted only when the statute's 'text, history, or purposes . . . evince[] a clear indication of extraterritorial reach.'" *Id.* at 122 (quoting *Kiobel v. Royal Dutch Petro. Co.*, 569 U.S. 108, 109 (2013)); *see also RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 335 (2016).

Nothing in the text of the statute suggests that Congress intended U.S. courts to adjudicate claims of title or other similar ownership rights to property located outside the United States. The history and purpose of the amendment further confirm this territorial limitation. As Watch Tower acknowledges, the amendment was "intended to reverse in part the" *Sabbatino* decision, which held that the act of state doctrine barred any challenge in U.S. courts to a government's expropriation of property belonging to a U.S. company. *Banco Nacional de Cuba v. Farr*, 383 F.2d 166, 174 (2d Cir. 1967) (quoting S. Rep. No. 88-1188, pt. I, at 24 (1964)). Specifically, *Sabbatino* involved the issue of whether the Cuban government acquired "good title to" a shipment of sugar that it expropriated from a U.S. company. *Id.* at 170. The bill of ladings and the proceeds from the sale of the sugar found their way to New York, and yet the Court declined to adjudicate ownership of that property. *Id.* That fact made the Supreme Court's decision in *Sabbatino* unbearable to Congress. *Id.* at 174–75. Thus, the amendment's reversal of *Sabbatino* would "mak[e] sure that the United States [did not] become a 'thieves market' for the

22

product of foreign expropriations," and would send the message that "foreign states taking action against U.S. investments in violation of international law cannot market the product of their expropriation in the United States free from the risk of litigation." *Id.* at 175 (quoting 110 Cong. Rec. 19559 (1964)). In other words, the amendment was only intended to apply when the expropriated property, or proceeds from the sale of that property, found their way into the United States, so as to ensure that U.S. courts would exercise their power to adjudicate title or other similar ownership rights to property that was located in the United States.

Watch Tower has no response to the Almazov Centre's textual analysis of the Second Hickenlooper Amendment. Instead, Watch Tower improperly relies on the textual distinction between the first and second clauses of the jurisdictional nexus requirement of the FSIA's expropriation exception, section 1605(a)(3). Opp. 14. It argues that, unlike the first clause (or "clause 2A"), which requires that the property "be present in the United States," the second clause (or "clause 2B") does not. According to Watch Tower, reading the Second Hickenlooper Amendment to mean that the act of state doctrine applies unless the property is in the United States would render "clause 2B" of the expropriation exception a "nullity." Opp. 14. But application of the act of state doctrine is entirely distinct from the FSIA's jurisdictional provisions. The Supreme Court has made clear that "the FSIA in no way affects application of the act of state doctrine." *Republic of Austria v. Altmann*, 541 U.S. 677, 701 (2004). "Unlike a claim of sovereign immunity, which merely raises a jurisdictional defense, the act of state doctrine provides foreign states with a substantive defense on the merits." *Id*. at 700. Under the act of state doctrine, U.S. courts "will not question the validity of public acts (acts *jure imperii*) performed by other sovereigns within their own borders, even when such courts have jurisdiction over a controversy in which one of the litigants has standing to challenge those acts." *Id*. Moreover, applying the act of state doctrine as the rule of decision is an exercise of the court's

jurisdiction. *Sabbatino*, 376 U.S. at 418 ("To accept a ruling authority and to decide accordingly is not a surrender or abandonment of jurisdiction but is an exercise of it.").[6]

Watch Tower's argument that "claim of title or other rights to property" covers money damages is also unavailing. Watch Tower does not dispute the holding in *French v. Banco Nacional de Cuba*, 23 N.Y.2d 46, 58 (N.Y. 1968), but instead argues only that this case is "inapplicable" because it cites *Sabbatino*. But that is the point. *Sabbatino* was dealing with a claim of title to property, not monetary damages. *See French*, 23 N.Y.2d at 57–58 (holding that the amendment was not meant "to assure a remedy in American courts for every kind of monetary loss"). Therefore, as the *French* court explained, the Hickenlooper Amendment "is restricted, manifestly, to the kind of problem exemplified by the *Sabbatino* case itself, a claim of title or other right to specific property which had been expropriated abroad." *Id.* at 58. That is not the case here.

Lastly, the Second Hickenlooper Amendment does not apply in this case because, as explained in section II above, no violation of international law has occurred. Watch Tower relies on *Philipp*, but in that case, the Supreme Court actually clarified that "nothing in the [Second Hickenlooper] Amendment purported to alter any rule of international law, including the domestic takings rule." 592 U.S. at 170. Since no taking of violation of international law has occurred, the process or means of the alleged taking is irrelevant. Moreover, the act of state doctrine indeed requires U.S. courts to defer to the acts of foreign states within their territory, including judgments obtained by the state in its courts. *Von Saher,* 897 F.3d at 1152. The

---

[6] The Second Hickenlooper Amendment was enacted in 1964 before the FSIA, which was enacted in 1976. 22 U.S.C. §§ 2151 *et seq.* (1961), *amended by* 22 U.S.C. § 2370 (1964). To the extent the later-enacted expropriation exception is relevant to interpreting the text of the Second Hickenlooper Amendment, it supports the Almazov Centre's argument that Congress' use of the term "claim of title" intended to restrict the scope of the amendment, as that language is missing from the expropriation exception, which refers only to "rights in property." 28 U.S.C. § 1605(a)(3).

Russian courts adjudicated ownership rights to real property located in Russia and did so pursuant to actions commenced by the Russian government.  Those are quintessential acts of state.  *See Philippine Nat'l Bank ,* 397 F.3d at 773 (holding that a forfeiture action initiated by a government pursuant to its own laws "qualifies for treatment as an act of state").

## CONCLUSION

For these reasons, this Court should grant the Almazov Centre's motion and dismiss the complaint against the Almazov Centre.


Dated: Washington, D.C.
       February 17, 2025

                              Respectfully submitted,

                              CURTIS, MALLET-PREVOST,
                                COLT & MOSLE LLP


                              By:  */s/  Juan O. Perla*
                                   Kevin A. Meehan (D.C. Bar No. 1613059)
                                   Juan O. Perla (D.C. Bar No. 1660389)
                                   1717 Pennsylvania Avenue, N.W.
                                   Washington, D.C. 20006
                                   Tel.: (202) 452-7373
                                   Fax: (202) 452-7333
                                   kmeehan@curtis.com
                                   jperla@curtis.com

                                   *Attorneys for Defendants Russian Federation,*
                                   *Ministry of Health of the Russian Federation,*
                                   *and Federal State Budgetary Institution V.A.*
                                   *Almazov National Medical Research Centre*