**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| WATCH TOWER BIBLE AND TRACT SOCIETY OF PENNSYLVANIA, | : : : | | |
| Plaintiff, | : : | Civil Action No.: | 24-2523 (RC) |
| v. | : : | Re Document Nos.: | 23, 31 |
| RUSSIAN FEDERATION, *et al.*, | : : | | |
| Defendants. | : : | | |

**MEMORANDUM OPINION**

**GRANTING DEFENDANTS RUSSIAN FEDERATION AND MINISTRY OF HEALTH OF THE RUSSIAN FEDERATION'S MOTION TO DISMISS; GRANTING DEFENDANT V.A. ALMAZOV NATIONAL MEDICAL RESEARCH CENTRE'S MOTION TO DISMISS**

**I.  INTRODUCTION**

In 2017, the Russian Federation ("Russia") seized the Jehovah's Witnesses' Russian headquarters in St. Petersburg, then known as the Bethel Facility.  According to the complaint, Watch Tower Bible and Tract Society of Pennsylvania ("Watch Tower"), a U.S. nonprofit, owned the multi-million-dollar Bethel Facility at the time.  Russia later converted the property into a state-owned medical research facility known as the V.A. Almazov National Medical Research Centre, or Almazov.

Watch Tower initiated this action under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1602–11, against Russia, the Ministry of Health of the Russian Federation ("Ministry of Health"), and Almazov (collectively, "Defendants").  It claims that Defendants' expropriation of the Bethel Facility violated international law.  Russia and the Ministry of Health jointly filed a motion to dismiss; Almazov filed a separate motion to dismiss.  For the reasons discussed below, the Court grants both motions.

## II. BACKGROUND

Because this case is at the motion to dismiss stage, the Court recounts the facts as alleged in the complaint. *See N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1249 (D.C. Cir. 2020). Though Jehovah's Witnesses have been present in Russia since 1891, they faced nearly a century of persecution until the Soviet Union enacted legislation in 1990 that allowed them to worship openly. Compl. ¶¶ 2–4, 20, ECF No. 1. Soviet authorities registered the Administrative Centre of Jehovah's Witnesses in Russia ("Administrative Centre") as the national religious entity for Russian Jehovah's Witnesses. *Id.* ¶ 21–22. In the early 1990s, the Administrative Centre bought and renovated a complex of buildings in St. Petersburg that it named the Bethel Facility. *Id.* ¶ 25. The Bethel Facility ultimately served as the national headquarters for over 175,000 Jehovah's Witnesses in Russia. *Id.* ¶ 26.

Eventually the Administrative Centre transferred the Bethel Center to Watch Tower, a U.S.-based nonprofit that "support[s] the worship of Jehovah's Witnesses worldwide." *Id.* ¶ 27. It did so by executing gift contracts in 2000 and 2010, both of which it registered with Russian authorities. *Id.* ¶¶ 29–30, 36; *see also* Ex. C to Compl., ECF No. 1-4 (2000 gift contract); Ex. G to Compl., ECF No. 1-8 (2010 gift contract). The contracts allowed the Administrative Centre to continue using and operating the Bethel Facility for free in exchange for maintaining the property. Compl. ¶¶ 31, 32, 36; *see also* Ex. E to Compl., ECF No. 1-6; Ex. F to Compl., ECF No. 1-7; Ex. H to Compl., ECF No. 1-9. After Watch Tower took ownership of the Bethel Center, it paid 172 million rubles, or approximately $3 million USD, in land and property taxes. Compl. ¶¶ 28, 38; *see also* Ex. B to Compl., ECF No. 1-3.

But then Russia began what Watch Tower describes as "a targeted campaign of persecution against the entire community of Jehovah's Witnesses." Compl. ¶¶ 40–41. In March

2017, after Russia's Office of the Prosecutor General submitted a claim to the Russian Supreme Court asking it to declare the Administrative Centre an extremist organization under Russia's Suppression of Extremism Act ("the Extremism Act"), Russia liquidated the Administrative Centre; banned its activity; and confiscated its assets. *Id.* ¶¶ 48, 51(a); *see also* Ex. I to Compl., ECF No. 1-10. Watch Tower was prohibited from participating in that proceeding. Compl. ¶ 51(b).

In April 2017, the Supreme Court of Russia ordered the liquidation of the Administrative Centre. *Id.* ¶¶ 49(c), 51(c). That "Liquidation Decision" effectively banned the activities of Jehovah's Witnesses in Russia.[1] *Id.* ¶ 49(c). Watch Tower tried to appeal the Liquidation Decision but was unsuccessful. *Id.* ¶ 51(d), (e).

Russia then began to seize Jehovah's Witnesses' property. *Id.* ¶¶ 52–53. Because the Bethel Facility was still in Watch Tower's name, Russia initiated legal proceedings to void the 2000 and 2010 gift contracts. *Id.* ¶ 52; *see also* Ex. J to Compl., ECF No. 1-11. In December 2017, a Russian district court annulled the gift contracts as fictitious. Compl. ¶ 54; *see also* Ex. K to Compl., ECF No. 1-12. The court explained that under Russian law, a "fictitious transaction" is a "transaction concluded only for appearances, without the intention to create corresponding legal consequences." Ex. K at 5. Because the Administrative Centre had continued to possess and use the Bethel Facility on the same terms at no cost and continued to be responsible for its maintenance, the Russia court concluded that it had "essentially continu[ed] to

---

[1] Since the Liquidation Decision, hundreds of Jehovah's Witnesses in Russia have been criminally prosecuted and imprisoned. Compl. ¶ 49(e). Russia has also banned the Jehovah's Witnesses' website and bible. *Id.* ¶ 49(b), (d). These acts, Watch Tower claims, show that Russia is engaged in a "clear, systematic plan to suppress the peaceful worship of Jehovah's Witnesses." *Id.* ¶ 50.

3

exercise authority as an owner." *Id.* at 6.  Watch Tower's appeals were unsuccessful.  Compl. ¶¶ 56–57, 59; *see also* Ex. M to Compl., ECF No. 1-14.

On February 19, 2019, Russia permanently transferred the former Bethel Facility to Almazov.  Compl. ¶¶ 61–62; *see also* Ex. N to Compl., ECF No. 1-15.  According to Watch Tower, Defendants now use the facility for biomedical research, scientific endeavors, and medical education and training.  Compl. ¶ 63; *see also* Ex. O to Compl., ECF No. 1-16; Ex. P to Compl., ECF No. 1-17.  They continue to deny Watch Tower access to the property, which is valued at over $30 million USD.  Compl. ¶¶ 64–65; *see also* Ex. Q to Compl., ECF No. 1-18 (valuing the property at $30,972,000); Ex. R to Compl., ECF No. 1-19 (valuing the property at $32,011,027).

Having failed to obtain relief in Russia, Watch Tower and the Administrative Centre each filed applications against Russia in the European Court of Human Rights ("ECHR").  Compl. ¶ 66; *see also Admin. Centre of Jehovah's Witnesses v. Russia*, App. No. 10188/17 (Dec. 1, 2017); *Watch Tower v. Russia*, App. No. 31683/19 (Mar. 27, 2023).  Watch Tower's application was held in abeyance while the ECHR resolved the Administrative Centre's.  Compl. ¶ 67.  On June 7, 2022, the ECHR rendered a judgment in favor of the Administrative Centre in *Taganrog LRO and Others v. Russia*.  *Id.* ¶ 68; *see also Taganrog LRO and Others v. Russia*, App. Nos. 32401/10 and 19 others, Eur. Ct. H.R. (June 7, 2022) ("*Taganrog*").  The ECHR held that the Liquidation Decision was a violation of international law.  Compl. ¶ 68; *Taganrog* ¶¶ 254–255.  Relying on the Russian court's holding that the gift contracts were null and void, the ECHR treated the Bethel Center as the property of the Administrative Centre.  *Taganrog* ¶¶ 276, 278, 279.  It ordered Russia to either return the Bethel Center to the Administrative Centre or pay €38,243,874, or around $42 million USD.  Compl. ¶ 69.

4

On the same day the ECHR issued its decision in *Taganrog*, Russia passed legislation to remove itself from that court's jurisdiction. *Id.* ¶ 70; *see also Russian MPs vote to quit European Court of Human Rights*, Al Jazeera (June 7, 2022), https://perma.cc/WCV6-RMAY. Russia has refused to implement the ECHR's judgment. Compl. ¶ 70. Neither Watch Tower nor the Administrative Centre has been compensated for Russia's seizure of the Bethel Facility. Compl. ¶ 94.

Watch Tower initiated this action in September 2024. Its five-count complaint alleges that (1) Defendants expropriated the Bethel Facility in violation of international law; (2) Defendants' actions in confiscating and using the Bethel Facility constitute trespass; (3) Defendants unjustly enriched themselves by taking real property from Watch Tower without compensation; (4) Defendants are involved in a civil conspiracy; and (5) in the alternative, to the extent Defendants are deemed separate legal entities, they aided and abetted one another in the aforementioned expropriation, trespass, unjust enrichment, and conspiracy. *Id.* ¶¶ 105–133. For relief, Watch Tower requests that the Court award damages pursuant to 28 U.S.C. § 1606. *Id.* at 41.

Almazov moved to dismiss the complaint for lack of subject matter and personal jurisdiction; for insufficient process and service of process; and for failure to state a claim. Mot. Dismiss Compl., ECF No. 23; Memo. P. & A. Supp. Almazov Centre's Mot. Dismiss ("Almazov Mot. Dismiss"), ECF No. 23-1; *see also* Fed. R. Civ. P. 12(b)(1), (2), (4), (5), (6). Watch Tower filed an opposition, and Almazov filed a reply. Pl.'s Memo. P. & A. Opp'n Def. Almazov's Mot. Dismiss ("Pl.'s Almazov Opp'n"), ECF No. 28; Reply Memo P. & A. Supp. Almazov Centre's Mot. Dismiss ("Almazov's Reply"), ECF No. 33. Russia and the Ministry of Health jointly filed a motion to dismiss generally making the same arguments. Mot. Dismiss Compl.,

5

ECF No. 31; Memo. P. & A. Supp. Russian Federation's Mot. Dismiss ("Russia Mot. Dismiss"), ECF No. 31-1; *see also* Fed. R. Civ. P. 12(b)(1), (2), (4), (5), (6).  Watch Tower filed an opposition, and Russia filed a reply.  Pl.'s Memo. P. & A. Opp'n Def. Russian Federation's Mot. Dismiss ("Pl.'s Russia Opp'n"), ECF No. 34; Reply Memo. P. & A. Supp. Russia Federation's Mot. Dismiss ("Russia Reply"), ECF No. 35.  Watch Tower also filed a notice of supplemental authority, to which defendants jointly responded.  Pl.'s Notice Suppl. Authority Concerning Opp'n Defs.' Mots. Dismiss, ECF No. 36; Defs.' Resp. Pl.'s Notice Suppl. Authority, ECF No. 37.  Both motions to dismiss are now ripe for decision.

### III.  LEGAL STANDARDS

#### A.  Lack of Personal Jurisdiction

To withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction, the plaintiff must make a *prima facie* showing of specific and pertinent jurisdictional facts.  *See Reuber v. United States*, 750 F.2d 1039, 1052 (D.C. Cir. 1984); *Naegele v. Albers*, 355 F. Supp. 2d 129, 136 (D.D.C. 2005).  Under the FSIA, "[p]ersonal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have [subject-matter] jurisdiction . . . where service has been made under section 1608 of this title."  28 U.S.C. § 1330(b).  An FSIA plaintiff must properly serve the foreign defendant in accordance with 28 U.S.C. § 1608 for the court to have personal jurisdiction.  *See I.T. Consultants, Inc. v. Republic of Pakistan*, 351 F.3d 1184, 1191 (D.C. Cir. 2003) ("[P]ersonal jurisdiction over a foreign state shall exist as to every claim for relief over which subject matter jurisdiction exists under the FSIA, so long as the defendant was properly served." (internal quotation marks and citation omitted)).

### B. Insufficient Process & Insufficient Service of Process

Under Federal Rule of Civil Procedure 12(b)(4) and 12(b)(5), a complaint may be dismissed for "insufficient process" or "insufficient service of process," respectively.  Rule 12(b)(4) allows a party to "'challenge noncompliance with the provisions of Rule 4(b) . . . that deal[] specifically with the content of the summons.'"  *Smith v. Overseas Korean Cultural Heritage Found.*, 279 F. Supp. 3d 293, 295–96 (D.D.C. 2018) (quoting 5B Wright & Miller's Federal Practice & Procedure § 1353 (3d ed. 2004)).  A motion under Rule 12(b)(5) is the "proper vehicle for challenging the mode of delivery or the lack of delivery of the summons and complaint."  *Id.* (quoting Wright & Miller § 1353).  The plaintiff has the burden of establishing proper service of process.  *See Light v. Wolf*, 816 F.2d 746, 751 (D.C. Cir. 1987).  In FSIA actions, service of process is governed by 28 U.S.C. § 1608.

### IV.  ANALYSIS

Foreign states are generally immune from suit in United States courts.  *E.g.*, *CC/Devas (Mauritius) Ltd. v. Antrix Corp.*, 605 U.S. ___, 145 S. Ct. 1572, 1576 (2025); *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 486 (1983); 28 U.S.C. § 1604.  But the FSIA creates exceptions to that default immunity.  *Schubarth v. Fed. Republic of Germany*, 891 F.3d 392, 398 (D.C. Cir. 2018); *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989); *see also Mauritius*, 145 S. Ct. at 1577–79.  The FSIA provides that a federal court has personal jurisdiction over a foreign state, including its agencies or instrumentalities, if there is subject matter jurisdiction[2] and if service is made pursuant to the statute's service of process provision, 28 U.S.C. § 1608.[3]  28 U.S.C. § 1330(b); *Practical Concepts, Inc. v. Republic of*

---

[2] See 28 U.S.C. §§ 1605–07 for the FSIA's substantive immunity exceptions.

[3] For some instrumentalities, the plaintiff will also need to show minimum contacts with the United States.  *See Redes Andinas de Comunicaciones S.R.L. v. Republic of Peru*, No. 22-cv-

7

*Bolivia*, 811 F.2d 1543, 1548 n.11 (D.C. Cir. 1987). Section 1608 divides the methods for serving foreign entities into two sections: § 1608(a) establishes how a plaintiff can serve foreign states, like Russia, and their political subdivisions, like the Ministry of Health; and § 1608(b) provides how a plaintiff can serve a foreign agency or instrumentality, like Almazov.[4] Defendants argue that they were not served in accordance with § 1608, and that therefore the Court lacks personal jurisdiction over them. Almazov Mot. Dismiss at 9–11; Almazov Reply at 3–5; Russia Mot. Dismiss at 9–13; Russia Reply at 3–6. The Court agrees.

### A. Russia & Ministry of Health

The Court starts with Russia's motion to dismiss.[5] As discussed, § 1608(a) governs service of process on "a foreign state or political subdivision of a foreign state." 28 U.S.C. § 1608(a); Fed. R. Civ. P. 4(j)(1). It sets out, in descending order of preference, four methods by which service "shall be made." 28 U.S.C. § 1608(a); *Republic of Sudan v. Harrison*, 587 U.S. 1, 4 (2019). The first is delivery of the summons and complaint "in accordance with any special arrangement for service between the foreign state or political subdivision." 28 U.S.C.

---

3631, 2025 WL 2049219, at *5–6 (D.D.C. July 22, 2025) (describing under what conditions the Due Process Clause applies to a foreign agency or instrumentality).

[4] The FSIA defines "agency or instrumentality of a foreign state" as any entity that is (1) "a separate legal person, corporate or otherwise"; (2) "an organ of a foreign state or political subdivision thereof"; and (3) not a "citizen of a State of the United States" or "created under the laws of any third country." 28 U.S.C. § 1603(b). Almazov and Watch Tower agree that Almazov is a Russian agency or instrumentality. Almazov Mot. Dismiss at 8 ("The Almazov Centre is an 'agency or instrumentality of a foreign state' under the FSIA."); Pl.'s Almazov Opp'n at 23 ("[I]t is undisputed that Defendant Almazov is an agency or instrumentality of a foreign state under the FSIA.").

[5] For purposes of this discussion, the Court refers to Russia and the Ministry of Health collectively as "Russia." *See* Pl.'s Russia Opp'n at 1 (doing the same); Russia Mot. Dismiss at 1 (referring to the two Defendants as "the Federation"); *see also TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 300 (D.C. Cir. 2005) (holding that in FSIA actions, "an entity that is an integral part of a foreign state's political structure is to be treated as the foreign state itself") (internal quotation omitted).

8

§ 1608(a)(1).  "[I]f no special arrangement exists," service may be made by delivery of the summons and complaint "in accordance with an applicable international convention on service of judicial documents."  *Id.* § 1608(a)(2).  If service is not possible under the first or second method, the plaintiff may invoke the third method, which calls for:

> sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of court to the head of the ministry of foreign affairs of the foreign state concerned.

*Id.* § 1608(a)(3).  Finally, if service cannot be made within 30 days under § 1608(a)(3), service may be effected by the clerk of the court dispatching the service packet to the Secretary of State in Washington, D.C. for transmittal "through diplomatic channels to the foreign state."  *Id.* § 1608(a)(4).

Because service under § 1608(a)(1) and (a)(2) was unavailable here, *see* Russia Mot. Dismiss at 10; Pl.'s Russia Opp'n at 31, Watch Tower requested that the clerk of court dispatch the required materials to Russia's Minister of Foreign Affairs pursuant to § 1608(a)(3).  Aff. Requesting Foreign Mailing, ECF No. 8 (requesting service on Russia); Aff. Requesting Foreign Mailing, ECF No. 9 (requesting service on Ministry of Health).  But there were complications.  After Russia invaded Ukraine in 2022, the major U.S. mail carriers largely suspended deliveries to Russia.  Pl.'s Russia Opp'n at 31–32.  Watch Tower had originally directed the clerk of court to dispatch copies of the service packages to DHL, but DHL refused to ship to Russia.  *Id.* at 32 (citing Ex. A to Aff. Requesting Foreign Mailing, ECF No. 15-2; Ex. A to Aff. Requesting Foreign Mailing, ECF No. 16-2).

So Watch Tower tried again.  It arranged for the Clerk of Court to dispatch the service documents via DHL to Turkey, where a German courier service would arrange for delivery into Russia.  Pl.'s Russia Opp'n at 32–33, 40.  After the courier took possession of the packages, it

9

made "several attempts to personally deliver the parcel and obtain a signed receipt." *Id.* at 34. But the recipient representing Russia's foreign minister refused personal delivery. *Id.* The courier then sent the documents through Russian Post, the national postal operator in Russia. *Id.* Ultimately Russian Post was able to deliver the documents, although it did not obtain a signature upon delivery. *Id.* at 40–41. Instead delivery was apparently confirmed through a QR code. *Id.* at 34. According to Watch Tower, the combined dispatch to DHL, the foreign courier, and Russian Post "resulted in the successful service of process on Russia on December 9, 2024." *Id.*

Russia argues that its service was invalid for two reasons: one, because service by mail is categorically unavailable in Russia, Russia Mot. Dismiss at 10–11, and two, because § 1608(a) requires strict compliance, which Watch Tower did not satisfy. *Id.* at 11–13. The Court agrees with both points.

The United States and Russia are both parties to the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters ("the Convention"), Nov. 15, 1965, art. 3, 20 U.S.T. 361, 658 U.N.T.S. 163; *Status Table, 14: Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters*, Hague Conf. on Private Int'l L. (Mar. 21, 2024), https://perma.cc/KFC2-5AT3. The Convention, which was ratified by the United States in 1965, "regularized and liberalized service of process in international civil suits." *Brockmeyer v. May*, 383 F.3d 798, 801 (9th Cir. 2004). "[C]ompliance with the Convention is mandatory in all cases to which it applies," *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 705 (1988), which is "in all cases, in civil or commercial matters, where there is occasion to transmit a judicial or extrajudicial document for service abroad." 20 U.S.T., at 362. Watch Tower acknowledges that this action requires service abroad. *See generally* Affs. Requesting Foreign

Mailing; *Harrison*, 587 U.S. at 4 (holding that to serve a foreign sovereign through the mail, the plaintiff must send the service packet "directly to the foreign minister's office in the minister's home country"). The Hague Convention therefore applies.

Article 10(a) of the Convention establishes that "[p]rovided the State of destination does not object," the Convention does not "interfere with the freedom to send judicial documents, by postal channels, directly to persons abroad." 20 U.S.T., at 363. In *Water Splash, Inc. v. Menon*, the Supreme Court interpreted Article 10(a) to encompass service of court documents. 581 U.S. 271, 284 (2017). After analyzing the Convention's text, structure, and drafting history, the Court concluded that in "cases governed by the Hague Service Convention, service by mail is permissible if two conditions are met: first, the receiving state has not objected to service by mail; and second, service by mail is authorized under otherwise-applicable law." *Id.*; *see also id.* at 281 (citing then-Secretary of State Dean Rusk's contemporaneous report to the Senate stating that "Article 10 permits direct service by mail . . . unless [the receiving] state objects to such service.").

When Russia acceded to the Convention, it formally objected to Article 10. *See Declaration/Reservation/Notification*, Hague Conf. on Private Int'l L (July 19, 2016), https://perma.cc/PW3H-TZXX ("Service of documents by methods listed in Article 10 of the Convention is not permitted in the Russian Federation."). So under *Water Splash*, service by mail is categorically impermissible in Russia. *See, e.g.*, *Azadeh v. Gov't of the Islamic Republic of Iran*, 318 F. Supp. 3d 90, 99 (D.D.C. 2018) (describing that "the method of service proscribed in section 1608(a)(3) is categorically unavailable when attempting to serve those countries" that "specifically objected to service by mail when they acceded to the Hague Convention"); *Tidewater Inv. SRL v. Bolivian Republic of Venezuela*, No. 17-cv-1457, 2018 WL 6605633, at *5

(D.D.C. Dec. 17, 2018) (stating that service under § 1608(a)(3) was unavailable because the defendant state had "expressly objected to service by mail when it acceded to the Hague Convention); *United States ex rel. Walterspiel v. Bayer AG*, 639 F. App'x 164, 167 (4th Cir. 2016) (holding that service by mail of defendant in Germany was improper because Germany had "objected to Article 10(a)"). That includes service effected through international courier services. *E.g.*, *AMTO, LLC v. Bedford Asset Mgmt., LLC*, No. 14-cv-9913, 2015 WL 3457452, at *10 (S.D.N.Y. May 29, 2015) ("Courts have held . . . that service of documents by international courier constitutes service through 'postal channels,' and accordingly this method of service in insufficient in light of Russia's objection to Article 10."); *Advanced Aerofoil Techs., AG v. Todaro*, No. 11-cv-9505, 2012 WL 299959, at *2 (S.D.N.Y. Jan. 31, 2012) (characterizing service by international courier as tantamount to service through postal channels, and therefore unavailable in countries that have expressly objected to Article 10).

Watch Tower argues that *Water Splash* is "inapplicable to this case" because it did not involve the FSIA or Russia. Pl.'s Russia Opp'n at 38. That argument is unavailing. In *Water Splash* the Supreme Court held—without qualification—that in "cases governed by the Hague Service Convention," service by mail is only permissible if the receiving member state has not objected to Article 10. *Water Splash*, 581 U.S. at 284. Granted, in 2003 Russia unilaterally suspended the application of the Hague Convention to the United States. *E.g.*, Russia Reply at 4; *Agudas Chasidei Chabad of U.S. v. Russian Federation*, 798 F. Supp. 2d 260, 268 ("*Agudas Chasidei I*") (D.D.C. 2011) (describing how Russia "unilaterally suspended all judicial cooperation with the United States in civil and commercial matters" in 2003). *Cf.* Pl.'s Russia Opp'n at 38, 40 (attempting to distinguish *Water Splash* because Russia "is no longer applying the Convention to the United States"). But "Russia's failure to abide by the Convention . . . does

12

not change the fact that Russia does not agree to service by mail." *Kuklachev v. Gelfman*, No. 08-cv-2214, 2008 WL 5068860, at *2 n.2 (E.D.N.Y. Nov. 24, 2008); *see also Advanced Aerofoil Techs.*, 2012 WL 299959, at *2 ("[D]istrict courts cannot circumvent the Hague Convention at whim and authorize alternative service when the foreign state has affirmatively objected to the type of service requested."). Since 2003, district courts have uniformly continued to apply the Hague Convention to defendants in Russia. *E.g.*, *Kadmon Corp. v. Ltd. Liab. Co. Oncon*, No. 22-cv-5271, 2023 WL 2346340, at *4 (S.D.N.Y. Mar. 3, 2023) (holding that "[b]ecause of Russia's objection to Article 10," service "through DHL courier service" is not permitted within Russia); *AMTO, LLC*, 2015 WL 3457452, at *7, *10 (rejecting request to serve defendant in Russia by mail or international courier because "Russia objected to Article 10 of the Hague Convention, and Russia's failure to abide by the Convention does not change the fact that Russia does not agree to service by mail" (cleaned up)); *Bidonthecity.com LLC v. Halverston Holdings Ltd.*, No. 12-cv-9258, 2014 WL 1331046, at *9 (S.D.N.Y. Mar. 31, 2014) (holding that, despite Russia's noncompliance with the Hague Convention, "service by mail still does not suffice as adequate service" in Russia).

Notably, Watch Tower does not identify a single case where a federal court permitted service on a defendant in Russia—or Russia itself—by mail. *See generally* Pl.'s Russia Opp'n. Instead Watch Tower points to this District's "Clerk's Office Procedures for Service of Process on a Foreign Defendant" as proof that "this district has already approved" service on Russia under § 1608(a)(3).[6] Pl.'s Russia Opp'n at 32–33 (citing U.S. District Court for the District of

---

[6] Watch Tower claims to rely on the "current *Attorney Manual* (dated July 2024)," but it instead cites to Attachment B-2 of the Clerk's Office Procedures for Service of Process on a Foreign Defendant (Pursuant to FRCP 4 and the Foreign Sovereign Immunities Act). Pl.'s Russia Opp'n at 32–33, 39–40; Pl.'s Almazov Opp'n at 24.

13

Columbia, *Clerk's Office Procedures for Service of Process on a Foreign Defendant* Attachment B-2 (July 2024), https://perma.cc/W89D-ZG9W). Attachment B-2 to the Procedures constitutes a letter from the plaintiff in *Yukos Capital Ltd. v. Russian Federation* requesting that the clerk of court dispatch service to Russia via international courier. No. 22-cv-798, 2025 WL 1650386 (D.D.C. June 11, 2025). But in *Yukos*, the parties eventually stipulated that the plaintiff would serve Russia "pursuant to 28 U.S.C. § 1608(a)(4) (that is, through 'diplomatic channels')." *Id.* at *3. The *Yukos* letter therefore does not show that any court in this District has actually approved a plaintiff serving Russia under § 1608(a)(3).

To be clear, the Court's holding does not render Russia categorically immune from FSIA actions. That is because Watch Tower still has access to the FSIA's fourth method for service of a foreign state: service through diplomatic channels. *See* 28 U.S.C. § 1608(a)(4). Plaintiffs in this District have recently used the method described in § 1608(a)(4) to successfully serve Russia. *E.g.*, *Yukos*, 2025 WL 1650386, at *7 (finding Russia had been properly served where the parties had stipulated to service pursuant to § 1608(a)(4)); *JSC DTEK Krymenergo v. Russian Federation*, No. 23-cv-3330, 2025 WL 1148347, at *2, *6 (D.D.C. Apr. 17, 2025) (holding that plaintiff had "effected proper service" of Russia under § 1608(a)(4)); *Stabil LLC v. Russian Federation*, No. 22-cv-983, 2024 WL 5093202, at *2, *2 n.1 (D.D.C. Dec. 12, 2024) (finding proper service where Russia "[did] not contest service" under § 1608(a)(4)); *Agudas Chasidei I*, 798 F. Supp. 2d at 269 (finding Russia had been "properly served" under § 1608(a)(4)). And Russia has conceded that a "proper method for serving [it] in this case" would be "via diplomatic channels." Russia Mot. Dismiss at 11 n.4; Russia Reply at 5.

One last point. Russia argues in the alternative that Watch Tower failed to satisfy the requirements of § 1608(a)(3), *see* Russia Mot. Dismiss at 11–13, which requires "strict"

14

compliance.  *See Harrison*, 587 U.S. at 19; *Barot v. Embassy of the Republic of Zambia*, 785 F.3d 26, 27 (D.C. Cir. 2015) (holding that neither substantial compliance nor actual notice constitutes effective service under section 1608(a)(3)).  By its terms, § 1608(a)(3) obligates the clerk of court to "address[] and dispatch[]" the service packet "to the head of the ministry of foreign affairs of the foreign state concerned."  28 U.S.C. § 1608(a)(3); *see also Harrison*, 587 U.S. at 11 (holding that to satisfy § 1608(a)(3), the "service packet must bear the foreign minister's name and customary address").  It also requires the plaintiff to use a "form of mail requiring a signed receipt."  28 U.S.C. § 1608(a)(3).  Watch Tower admits that it was unable to address the service packet to the Russian Minister of Foreign Affairs because of shipping restrictions, Pl.'s Russia Opp'n at 31–32; the packets were actually addressed to "Rustem Ulker, Attn: Care Courier Group GmbH" in Turkey.  *See* Certificate of Clerk, ECF No. 18-1; Certificate of Clerk, ECF No. 20-1.  Watch Tower also acknowledges that the Russian Post did not obtain a signed receipt upon delivery.  Pl.'s Russia Opp'n at 34.  Those formal deficiencies render Russia's service invalid under § 1608(a)(3).  Russia Reply at 5–6; *Harrison*, 587 U.S. at 4 ("[Section] 1608(a)(3) requires that a mailing be sent directly to the foreign minister's office in the minister's home country."); *see also Harrison*, 587 U.S. at 11 (requiring the service packet to "bear the foreign minister's name and customary address"); *Agudas Chasidei I*, 798 F. Supp. 2d at 269 (holding that plaintiff's failure to submit signed receipts of service was "fatal" to effecting valid service under § 1608(a)(3)).  It does not matter that Russia has actual notice of this lawsuit, because "even 'actual notice' is insufficient to bypass the requirement[s]" of § 1608(a)(3).  *Agudas Chasidei Chabad of U. S. v. Russian Federation*, 659 F. Supp. 3d 1, 12 (D.D.C. 2023) (quoting *Barot*, 785 F.3d at 27).

15

Absent effective service under § 1608, the Court lacks personal jurisdiction over Russia and the Ministry.  *See* 28 U.S.C. § 1330(b).  The Court therefore dismisses the claims against Russia and the Ministry under Rule 12(b)(2) without prejudice.  *See Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 154 (D.C. Cir. 1994) (ordering district court to dismiss FSIA action where defendant had not been properly served under § 1608).

### B.  Almazov

The Court now turns to Almazov.  Section 1608(b) provides that service "shall be made upon an agency or instrumentality of a foreign state" using one of three methods, in descending order of preference.  28 U.S.C. § 1608(b); Fed. R. Civ. P. 4(j)(1); *Amaplat Mauritius Ltd. v. Zimbabwe Mining Dev. Corp.*, 717 F. Supp. 3d 1, 14 (D.D.C. 2024), *reversed in part on other grounds*, 143 F.4th 496 (D.C. Cir. 2025).  The first method is "by delivery . . . in accordance with any special arrangement for service between the plaintiff and the agency or instrumentality."  28 U.S.C. § 1608(b)(1).  If "no special arrangement exists," the plaintiff can effect service by delivering the service packet "either to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process in the United States; or in accordance with an applicable international convention on service of judicial documents."  *Id.* § 1608(b)(2).  Finally, if neither of those methods is available, service "reasonably calculated to give actual notice" may be made

    (A) as directed by an authority of the foreign state or political subdivision in response to a letter rogatory or request or

    (B) by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the agency or instrumentality to be served, or

    (C) as directed by order of the court consistent with the law of the place where service is to be made.

*Id.* § 1608(b)(3).  Unlike § 1608(a), "section 1608(b) may be satisfied by technically faulty service that gives adequate notice."  *Transaero, Inc.*, 30 F.3d at 153.

Watch Tower concluded that service under § 1608(b)(1) and (2) was unavailable, so it attempted to serve Almazov pursuant to § 1608(b)(3)(B).  *See* Pl.'s Almazov Opp'n at 23; Request for Service of Process on Def. Almazov, ECF No. 5-1.  But as with Russia, Watch Tower was unable to directly send the service packet to Almazov because U.S. mail carriers have suspended deliveries to Russia.  Pl.'s Almazov Opp'n at 24.  So Watch Tower requested that the clerk of court dispatch the service documents to DHL for delivery to an Austrian courier service.  *Id.*; Return of Service for Def. Almazov, ECF No. 14.  The courier was able to hand deliver the service documents to the Director General of Almazov, though it did not obtain a signed receipt.  Pl.'s Almazov Opp'n at 25; Ex. A to Return of Service for Def. Almazov, ECF No. 14-1.

Like Russia, Almazov argues that service by mail was categorically unavailable because of Russia's objection to Article 10 of the Hague Convention.  Almazov Mot. Dismiss at 10.  It also argues that service by mail was practically unavailable because of the U.S. carriers' shipping restrictions.  *Id.* at 10–11.  As discussed above, the Court agrees that plaintiffs cannot serve defendants in Russia through the mail.  *See supra* pp. 11–16.

This result is compelled by *Water Splash*.  *Water Splash* dealt with a U.S. corporation's attempted service on an individual residing in Canada.  581 U.S. at 274.  There the Supreme Court held that "in cases governed by the Hague Service Convention, service by mail is permissible if," among other things, "the receiving state has not objected to service by mail."  *Id.* at 284.  Because this action is governed by the Convention and Russia has objected to service by mail, Almazov's service by courier was legally deficient.  *See, e.g.*, *Kadmon Corp.*, 2023 WL 2346340, at *4 (refusing to allow plaintiff to serve Russian company through courier service);

17

*AMTO, LLC*, 2015 WL 3457452, at *7 (refusing to allow plaintiff to serve Russian individual through the mail). As a general principle, "district courts cannot circumvent the Hague Convention at whim." *Advanced Aerofoil Techs.*, 2012 WL 299959, at *2. Watch Tower has not given the Court a reason to do so here.[7]

That said, Watch Tower may invoke the other methods outlined in § 1608(b)(3) to serve Almazov. *E.g.*, *Stansell v. Revolutionary Armed Forces of Colombia*, No. 16-mc-00405, 2023 WL 6173524, at *8 (S.D.N.Y. Sep. 22, 2023) (approving service of process by personal delivery pursuant to § 1608(b)(3)(C) where alternative methods of service were unavailable, and where such service was "consistent" with the defendant state's laws). The Court will therefore dismiss the complaint against Almazov without prejudice.

\* \* \*

The Court grants both Russia and Almazov's motions to dismiss for lack of personal jurisdiction under Rule 12(b)(2). The Court does not reach Defendants' alternative arguments for dismissal.

## V. CONCLUSION

For the foregoing reasons, both motions to dismiss are **GRANTED** without prejudice. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: September 22, 2025                                         RUDOLPH CONTRERAS
                                                                  United States District Judge

---

[7] Nor could it. Whether the United States should retaliate against Russia's unilateral suspension of the Hague Treaty is a quintessentially political question. *See Baker v. Carr*, 369 U.S. 186, 211–213 (1962).